# EXHIBIT E

# United States District Court
## Northern District of Illinois
### Eastern Division

⌒

I, Michael W. Dobbins, Clerk of the United States District Court for the Northern District

of Illinois, do hereby attest and certify that the annexed document(s) is(are) a full, true,

and correct copy of the original(s) on file in my office and in my legal custody.

IN TESTIMONY WHEREOF:   I have hereunto

subscribed my name and affixed the seal of the

foresaid court at Chicago, Illinois, on    **MAY 2 7 2005**

MICHAEL W. DOBBINS, CLERK

By: _Roberto A. Perez_

Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PETER ROGAN, | ) | Case No. 02C 3310 |
| | ) | |
| Defendant. | ) | Judge John W. Darrah |
| | ) | |
| | ) | |

**FILED**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

FEB 10 2005

**DEFENDANT'S MOTION IN LIMINE
TO EXCLUDE PLAINTIFF'S EXHIBIT 13 AND
TESTIMONY OF KATHLEEN CREIGHTON
(MOTION 3 OF 6)**

Defendant Peter Rogan ("Rogan") respectfully submits this Motion in Limine to

exclude Plaintiff United States' Exhibit 13, a spreadsheet created by Kathleen Creighton, a

government auditor, that purports to summarize $18 million worth of Medicare and Medicaid

payments to Edgewater Medical Center ("Edgewater") from 1995 to 2000 for services provided

by various attending physicians.  Plaintiff's Exhibit 13 is based exclusively on inadmissible

hearsay evidence.  The United States has failed to produce the underlying documents on which

this summary is based in violation of Rule 1006 and its discovery obligations.  This violation is

particularly egregious given that the United States intends to rely on Plaintiff's Exhibit 13 to

prove over $18 million in alleged damages, before trebling, without affording Rogan an

opportunity to review the underlying data, which defeats the underlying purpose embodied in

Rule 1006. The United States also has failed to satisfy the requirements under Rule 1006 of the

Federal Rules of Evidence necessary to admit Plaintiff's Exhibit 13, a summary exhibit, into

evidence. Rogan also moves to preclude the testimony of Ms. Creighton because her knowledge is limited to her preparation of Plaintiff's Exhibit 13, which is inadmissible as described herein.

## FACTUAL BACKGROUND

1.      This case concerns the United States' sweeping allegations that Rogan violated the Civil False Claims Act and committed common law torts by submitting, or causing others to submit, claims for reimbursement to The Centers for Medicare and Medicaid Services ("CMS") that purportedly were engendered by unlawful referrals by Drs. Sheshiquiri Rao Vavilikolanu ("Rao"), Andrew Cubria, Ravi Barnabas, and/or Kumar Kaliana. The United States contends that more than $18 million in claims was falsely submitted over a five-year period.

2.      In order to identify the claims that the United States broadly alleged were falsely submitted, Rogan issued discovery. Specifically, on April 28, 2003, Rogan served his First Set of Document Requests. Request Number 2 sought "all documents that refer or relate to false claims that were submitted to insurers, Medicare and Medicaid." (*See* Rogan's First Set of Document Requests, attached hereto as Exhibit A, at number 2). On April 28, 2003, Rogan served his First Set of Interrogatories. Interrogatory Number 5 asked, "[I]dentify: all false claims that were submitted to insurers, Medicare and Medicaid; all persons who created or caused to create the false claims submitted to insurers, Medicare and Medicaid; the dates these claims were submitted to insurers, Medicare and Medicaid; and the documentary evidence supporting the answers given in this interrogatory. Responses must identify the date, time, place, subject matter and parties to any communication." (*See* Rogan's First Set of Interrogatories, attached hereto as Exhibit B, at number 5).

3.      On July 21, 2003, Rogan served a Rule 30(b)(6) Deposition Notice on the United States, seeking a designated representative to testify about several matters, including "the

computation of the damages alleged in the Complaint filed by the United States of America against Peter Rogan on or about May 8, 2002 in the above-captioned case." (*See* Notice of Rule 30(b)(6) Deposition of The United States of America, attached hereto as Exhibit C, at number 9). On February 11, 2004, the United States produced F.B.I. Agent Sherry Coon to testify as its designated representative in response to the Rule 30(b)(6) Notice. Agent Coon, however, was unable to testify about damages, and the parties agreed to defer the topic of damages and explore the possibility of a stipulation. (*See* Deposition of Sherry Coon, attached hereto as Exhibit D, at 203-04, 215-16).

4.     On October 21, 2004, after the parties were not successful in negotiating a stipulation on the issue of damages, Rogan advised the United States that he needed to resume the Rule 30(b)(6) deposition as to damages. (*See* Correspondence dated October 21, 2004, attached hereto as Exhibit E). On November 9, 2004, the United States produced Kathy Creighton for a deposition.

5.     Three days before Ms. Creighton's deposition, on November 6, 2004, the United States provided a copy of Ms. Creighton's C.V., a copy of a spreadsheet she created ("spreadsheet"), which is Plaintiff's Exhibit 13, and a document the United States obtained from Edgewater entitled "EMC – Payments by Attending Physician" ("EMC document"). (The spreadsheet is attached hereto as Exhibit F and the EMC document is attached hereto as Exhibit G.). Because it designated Ms. Creighton as its Rule 30(b)(6) representative as to damages, the United States intends to prove damages at trial using the spreadsheet along with the testimony of Ms. Creighton, a financial auditor employed by the U.S. Attorney's Office.

6.     Ms. Creighton testified at her deposition that she has been involved in several health care investigations. (*See* Deposition of Kathleen Creighton, attached hereto as

excluded at trial. Fed. R. Evid. 803(c); *Cent. States, SE and SW Areas Pension Fund v. Bomar Nat'l, Inc.*, 253 F.3d 1011, 1018 (7th Cir. 2001). Here, Plaintiff's Exhibit 13 summarizes another hearsay document, the EMC document, that allegedly sets forth the monies paid to Edgewater for claims submitted to Medicare, Medicaid, and private insurance companies for services provided by various attending physicians. The EMC document, which is the lone, underlying basis for Plaintiff's Exhibit 13, is a classic hearsay document for which no exceptions apply. Yet, the United States plainly intends to introduce Plaintiff's Exhibit 13 to prove the truth of the matters asserted in the EMC document, namely, the monies allegedly paid for services provided by certain physicians who allegedly referred patients to Edgewater in violation of applicable law.[1] Thus, Plaintiff's Exhibit 13, a hearsay document, is based exclusively on another hearsay document.

9.      Further, the United States has failed to satisfy the requirements under Rule 1006 of the Federal Rules of Civil Procedure necessary for the admission of Plaintiff's Exhibit 13, which is plainly a summary of payments allegedly received by Edgewater. Under Rule 1006, "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." Fed. R. Evid. 1006. However, a summary may not be admitted unless its proponent has laid a proper foundation showing that the underlying material is admissible and accurate. *United States v. Driver*, 798 F.2d 248, 252-53 (7th Cir. 1986); *Needham v. White Laboratories, Inc.*, 639 F.2d 394, 403 (7th Cir. 1981).

10.     Here, the United States has failed to satisfy this foundation requirement. As stated above, the underlying document, the EMC document, is inadmissible hearsay. The

---

[1]      It is worth noting that both Plaintiff's Exhibit 13 and the EMC document purport to list payments made or services provided by *attending* physicians, not *referring* or *admitting* physicians, despite the fact that this is a case over allegedly unlawful referrals.

United States has failed to establish the accuracy of the underlying document. Indeed, Ms. Creighton, the auditor who created Plaintiff's Exhibit 13, admitted in her deposition that she conducted no investigation to determine the accuracy of the document. (*See* Exhibit H at 42-43). Thus, the United States has not laid a foundation showing that the underlying material is admissible and accurate, and the summary exhibit should be excluded.

11.    Additionally, the EMC document that Ms. Creighton used to create the summary exhibit is itself a summary and suffers from the same deficiencies. According to the United States, the EMC document on which the summary exhibit is based is a compilation of Edgewater records regarding money paid to Edgewater for claims submitted to Medicare, Medicaid, and private insurance companies. (*See* Exhibit H at 33). The United States clearly intends to use the summary exhibit to argue the truth of the matters asserted in the Edgewater records, therefore the documents underlying the schedule are also inadmissible hearsay evidence. *See* Fed. R. Evid. 803(c) (defining hearsay); *Cent. States, SE and SW Areas Pension Fund*, 253 F.3d at 1018 (defining hearsay). Moreover, the United States has not established the accuracy of these records (because, as described below, it never produced them), and thus it has failed to lay the necessary foundation as required by Rule 1006. *See Driver*, 798 F.2d at 252-53 (holding that a summary exhibit will be excluded unless its proponent lays a foundation establishing the accuracy and admissibility of the underlying documents).

12.    Finally, Plaintiff's Exhibit 13 should be excluded under Rule 1006 because, notwithstanding Rogan's discovery requests and the United States' discovery obligations, the United States has failed to make available the records used to compile the EMC document that formed the basis of the summary exhibit. Under Rule 1006, the documents underlying a summary exhibit "shall be made available for examination or copying, or both, by

6

other parties at reasonable time and place." Fed. R. Evid. 1006. The purpose of Rule 1006's disclosure requirements is to allow the opposing party a reasonable opportunity to assess the accuracy and admissibility of the summary exhibit. *Eastern Trading Co. v. Refco, Inc.*, No. 97 C 6815, 1997 U.S. Dist. LEXIS 962, at *9 (N.D. Ill. Feb. 2, 1999). Where a party is not granted reasonable time to examine the underlying documents, that party lacks a reasonable opportunity to assess the accuracy and admissibility of the summary exhibit. *Id.* What constitutes "reasonable time" depends on the complexity and volume of the summary exhibit and underlying documents at issue. *Id.* Where the exhibit and underlying documents are uncommonly complicated and voluminous, however, their proponent must make them available well in advance of trial. *Id.; see also Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1516 (9th Cir. 1985) (excluding summary exhibits where the defendant failed to make the underlying documents available "until just before trial"); *Air Safety, Inc. v. Roman Catholic Archbishop of Boston*, 94 F.3d 1, 9 (1st Cir. 1996) (excluding summary exhibits where the plaintiff neglected to produce the underlying documents before trial despite the fact that the plaintiff would have made the documents available upon request).

13.   In *Eastern Trading Co. v. Refco*, 1997 U.S. Dist. LEXIS at *9, the Northern District court held that disclosure "even a few weeks before trial" would not satisfy the requirements of Rule 1006. In *Eastern Trading*, the defendant intended to admit thirty-four summary exhibits relating to 14,000 pages of underlying material, but failed to disclose more than one of the summary exhibits before trial. *Id.* at *8-9. The court held that disclosure of the exhibits "even a few weeks before trial" would fail to provide the plaintiff reasonable opportunity to analyze their accuracy and admissibility. *Id.* at *9. Accordingly, the court excluded the exhibits the defendant had failed to disclose. *Id.*

14. Here, the United States has failed to disclose the records presumably used to create the EMC document, the schedule of payments that formed the sole basis for its summary exhibit (Plaintiff's Exhibit 13), making its nondisclosure even more egregious than the one at issue in *Eastern Trading*. The United States has not even disclosed to Rogan which documents were used to compile the EMC document, let alone provided him an opportunity to review these documents. Without an opportunity to review the records from which the schedule was formed, Rogan cannot assess whether the schedule accurately summarizes the payments or whether the records themselves are admissible at trial. Therefore, for this additional reason, Plaintiff's Exhibit 13 should be excluded under Rule 1006.

15. Finally, this Court should also exclude Ms. Creighton's testimony. Since Plaintiff's Exhibit 13 is not admissible, her testimony is irrelevant. "Whether testimony is relevant depends on whether it makes the existence of any fact that is of consequence to the determination of the action more or less probable." Fed. R. Evid. 401. Irrelevant evidence is inadmissible. Fed. R. Evid. 402. Here, Ms. Creighton's testimony regarding damages would pertain solely to her preparation of the spreadsheet summarizing the EMC document. Because this Court should exclude the spreadsheet, Ms. Creighton will have nothing to add to the proceeding. Aside from her limited knowledge of the hearsay documents, Ms. Creighton has no information regarding the existence of any fact that is of consequence to the determination of this action. Thus, her testimony is irrelevant and inadmissible.

## CONCLUSION

Plaintiff's Exhibit 13 is based on hearsay evidence for which the United States has offered no exception. Thus, the United States cannot establish that its summary exhibit is based on admissible evidence as required under Rule 1006. Moreover, Ms. Creighton conducted no

investigation into the accuracy of the underlying documents, and thus the United States cannot lay a proper foundation for its summary exhibit under Rule 1006. Finally, the United States also failed to make available the records that form the basis of the underlying document, which it was required to do under Rule 1006. Ms. Creighton's testimony should be excluded because her only role in this case was to prepare Plaintiff's Exhibit 13 and she otherwise has no relevant, admissible testimony.

WHEREFORE, for the reasons set forth above, Defendant Peter Rogan respectfully requests that the Court exclude Plaintiff's Exhibit 13 and the testimony of Kathleen Creighton.

Dated: February 10, 2005

Respectfully submitted,

**PETER ROGAN**

By: _Monike M. Blache_
      One of his attorneys

Neil E. Holmen
Joseph A. Spiegler
Monika M. Blacha
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

10

## CERTIFICATE OF SERVICE

I certify that the foregoing Defendant's Motion to Exclude Plaintiff's Exhibit 13 and Testimony of Kathleen Creighton has been served upon the following counsel this 10th day of February, 2005 as indicated below:

Laurie Oberembt (by federal express)
Trial Attorney
Ben Franklin Station
P.O. Box 261
Washington, D.C.  20044

Linda Wawzenski (by messenger)
Assistant United States Attorney
Dirksen Federal Building
219 South Dearborn Street
Chicago, IL  60604

_Monike M. Bfale_
Attorney for Peter Rogan

G

# EMC - Payments by Attending Physician By Year of Admission

| ATTENDING PHYSICIAN | ATT# | PAYER | Total PAYMENTS | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|
| ABELLO/CURRIA CHA | 48007 | BLUE CROSS INDEMITY | $4,562 | $2,445 | $2,117 | | | | |
| | | COMMERCIAL INS | $6,836 | $3,374 | $2,962 | $590 | | | |
| | | MANAGED CARE/HMO | $32,250 | $10,999 | $17,661 | $3,590 | | | |
| | | MEDICAID | $249,483 | $150,931 | $90,345 | $8,207 | | | |
| | | MEDICARE | $917,372 | $460,838 | $444,505 | $12,029 | | | |
| | | Sum | $1,210,502 | $628,586 | $557,591 | $24,336 | | | |
| BARNABAS, R. (WESTSIDE) | 32414 | BLUE CROSS INDEMITY | $764 | | | | $764 | | |
| | | MCAID/MDCR PART B | $420 | | | | $420 | | |
| | | MEDICAID | $165,528 | | | $35,347 | $130,182 | | |
| | | MEDICARE | $285,501 | | | $65,111 | $228,390 | | |
| | | Sum | $452,213 | | | $100,458 | $351,755 | | |
| BARNABAS, RAVI | 32401 | BLUE CROSS INDEMITY | $327,156 | $112,550 | $32,071 | $130,759 | $51,008 | $768 | |
| | | BLUE CRSS OUT-STATE | $11,982 | $2,646 | $9,336 | | | | |
| | | COMMERCIAL INS | $1,537,394 | $695,725 | $248,393 | $139,426 | $453,849 | | |
| | | MANAGED CARE/HMO | $186,675 | $102,234 | $17,037 | $9,552 | $57,352 | $440 | |
| | | MANG'S PENDING | $3,807 | $716 | $3,091 | | | | |
| | | MCAID/MDCR PART B | $1,290 | | | | $1,290 | | |
| | | MEDICAID | $243,733 | $121,318 | $34,186 | $13,953 | $74,189 | $87 | |
| | | MEDICARE | $1,055,464 | $513,118 | $245,585 | $70,803 | $218,249 | $7,708 | |
| | | Sum | $3,367,500 | $1,548,367 | $589,698 | $364,494 | $855,938 | $9,003 | |
| BARNABAS, RAVI | 32411 | BLUE CROSS INDEMITY | $244,555 | | | $121,472 | $123,083 | | |
| | | CHAMPUS | $4,135 | | | $4,135 | | | |
| | | COMMERCIAL INS | $269,356 | | | $99,329 | $170,026 | | |
| | | MANAGED CARE/HMO | $45,393 | | | $29,718 | $15,636 | $39 | |
| | | MEDICAID | $35,660 | | | $16,094 | $19,567 | | |
| | | MEDICARE | $198,519 | | | $91,208 | $107,312 | | |

Defendant's Exhibit _____
FOR ID # 11-9-04

| ATTENDING PHYSICIAN | ATT# | PAYER | Total PAYMENTS | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|
| BARNABAS/CUBRIA SP | 32409 | Sum | $797,618 | | | $361,956 | $435,624 | 539 | |
| | | BLUE CROSS INDEMITY | $416,961 | $716 | $134,467 | $169,252 | $112,516 | | |
| | | BLUE CRSS OUT-STATE | $736 | | $735 | | | | |
| | | COMMERCIAL INS | $275,507 | $4,971 | $143,383 | $106,411 | $20,742 | | |
| | | MANAGED CARE/HMO | $112,130 | | $107,987 | $4,143 | | | |
| | | MCAID/MDCR PART B | $6,483 | | $6,483 | | | | |
| | | MEDICAID | $101,656 | $7,429 | $32,599 | $42,710 | $18,919 | | |
| | | MEDICARE | $761,946 | $4,630 | $292,209 | $381,878 | $83,230 | | |
| | | SLF PY AFTER COMM PY | $11,957 | | $11,957 | | | | |
| | | Sum | $1,687,377 | $17,746 | $729,820 | $704,354 | $235,416 | | |
| CUBRIA, ANDREW (CHA) | 47402 | BLUE CROSS INDEMITY | $31,238 | $27,366 | | $3,187 | $764 | | |
| | | CHAMPUS | $3,187 | $3,187 | | | | | |
| | | COMMERCIAL INS | $67,020 | $66,557 | | $463 | | | |
| | | MANAGED CARE/HMO | $40,729 | $24,963 | | | $15,766 | | |
| | | MCAID/MDCR PART B | ($580) | ($580) | | | | | |
| | | MEDICAID | $924,262 | $881,441 | | $32,342 | $10,480 | | |
| | | MEDICARE | $403,479 | $89,399 | | $231,564 | $82,516 | | |
| | | Sum | $1,469,835 | $1,092,833 | | $267,476 | $109,536 | | |
| CUBRIA, ANDREW H | 47401 | BLUE CROSS INDEMITY | $103,686 | $14,143 | $2,526 | $11,987 | $35,280 | $2,006 | $21,970 |
| | | COMMERCIAL INS | $274,784 | $108,433 | $44,636 | $66,174 | $21,935 | $26,991 | $6,615 |
| | | MANAGED CARE/HMO | $35,339 | $15,092 | $132 | $2,159 | $7,325 | $811 | $9,810 |
| | | MCAID/MDCR PART B | $1,450 | | | | | $720 | $730 |
| | | MEDICAID | $312,759 | $57,976 | $27,469 | $54,025 | $12,837 | $68,060 | $78,391 |
| | | MEDICARE | $1,288,295 | $146,652 | $140,063 | $125,483 | $135,914 | $225,697 | $502,823 |
| | | WORKMAN COMPENSATION | $13,375 | $733 | $12,642 | | | | |
| | | Sum | $2,029,677 | $343,029 | $227,488 | $269,827 | $193,290 | $374,285 | $619,539 |
| CUBRIA, ANDREW H (SP) | 47404 | BLUE CROSS ENDEMITY | $522,219 | $7,856 | $12,738 | $61,945 | $173,780 | $123,452 | $133,923 |
| | | COMMERCIAL INS | $880,819 | $67,684 | $147,190 | $25,108 | $159,984 | $101,835 | $376,208 |
| | | MANAGED CARE/HMO | $53,684 | | | $32,188 | $5,738 | $4,053 | $11,706 |
| | | MCAID/MDCR PART B | $13,285 | | | $5,211 | $1,153 | $2,345 | $4,575 |

| ATTENDING PHYSICIAN | ATT# | PAYER | Total PAYMENTS | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|
| CUBRIA, ANDREW H (SP) | 47404 | MEDICAID | $742,363 | $6,030 | $29,854 | $64,253 | $235,303 | $134,224 | $272,686 |
| | | MEDICARE | $2,420,328 | $27,375 | $101,476 | $305,574 | $559,277 | $581,701 | $802,193 |
| | | WORKMAN COMPENSATION | $7,696 | | | | | $7,696 | |
| | | Sum | $4,640,394 | $108,945 | $291,258 | $494,279 | $1,134,335 | $955,306 | $1,601,290 |
| FOX, MICHAEL J | 65501 | BLUE CROSS INDEMITY | $222,426 | $96,692 | $40,817 | $26,146 | $14,930 | $5,315 | $20,819 |
| | | COMMERCIAL INS | $203,548 | $91,563 | $54,186 | $23,647 | $25,092 | $1,398 | $3,853 |
| | | CROSS OVER | $4 | | $4 | | | | |
| | | MANAGED CARE/ HMO | $41,538 | $8,575 | $6,860 | $12,005 | $3,179 | $10,126 | $1,295 |
| | | MANG'S PENDING | $6 | | | | $6 | | |
| | | MCAIDMDCR PART B | $18 | | | | | | |
| | | MEDICAID | $134,191 | $15,631 | $7,786 | $13,791 | $11,141 | $27,984 | $44,995 |
| | | MEDICARE | $55,020 | $551 | $585 | $243 | $9,071 | $5,723 | $30,496 |
| | | SLF PY AFTER COMM PY | $411 | | $411 | | | | |
| | | WORKMAN COMPENSATION | $17,737 | $1,252 | $3,152 | $11,683 | $713 | $534 | |
| | | Sum | $674,899 | $213,664 | $113,801 | $87,715 | $62,132 | $51,080 | $101,458 |
| GOOMARCUBRIA CHA | 31003 | BLUE CROSS INDEMITY | $560 | | | $560 | | | |
| | | MANAGED CARE/ HMO | $4,554 | | | $4,554 | | | |
| | | MEDICAID | $11,253 | | | $11,253 | | | |
| | | MEDICARE | $54,572 | | | $54,572 | | | |
| | | Sum | $70,939 | | | $70,939 | | | |
| INACT:BARNABAS, R (SS) | 32413 | BLUE CROSS INDEMITY | $43,532 | | | $43,532 | | | |
| | | COMMERCIAL INS | $19,497 | | | $19,497 | | | |
| | | MEDICAID | $7,553 | | | $7,553 | | | |
| | | MEDICARE | $18,181 | | | $18,181 | | | |
| | | Sum | $88,762 | | | $88,762 | | | |
| INACT:BARNABAS, RAVI RKO | 32412 | BLUE CROSS INDEMITY | $168,167 | | | $168,167 | | | |
| | | COMMERCIAL INS | $272,814 | | | $272,814 | | | |
| | | MANAGED CARE/ HMO | $6,696 | | | $6,696 | | | |
| | | MEDICAID | $33,994 | | | $33,994 | | | |
| | | MEDICARE | $312,324 | | | $312,324 | | | |

Page 3 of 7

| ATTENDING PHYSICIAN | ATT# | PAYER | Total PAYMENTS | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|
| INACT:BARNABAS/CUBRI CBA | 33415 | Sum | $793,814 | | | $793,814 | | | |
| | | COMMERCIAL INS | $514 | | | $514 | | | |
| | | MEDICAID | $629 | | | $629 | | | |
| | | MEDICARE | $5,681 | | | $5,681 | | | |
| | | Sum | $6,825 | | | $6,825 | | | |
| INACT:BARNABAS/CUBRI(S) | 32406 | BLUE CROSS INDEMITY | $259,183 | $30,768 | $3,696 | $224,718 | | | |
| | | COMMERCIAL INS | $320,126 | $58,747 | | $261,379 | | | |
| | | MANAGED CARE/HMO | $14,252 | $14,252 | | | | | |
| | | MEDICAID | $31,392 | $14,792 | | $16,601 | | | |
| | | MEDICARE | $177,347 | $45,134 | | $132,213 | | | |
| | | Sum | $802,299 | $163,693 | $3,696 | $634,919 | | | |
| MATTAR, MICHAEL J | 43404 | BLUE CROSS INDEMITY | $236,461 | $5,032 | $34,445 | $39,199 | $27,413 | $101,950 | $24,200 |
| | | BLUE CRSS OUT-STATE | $7,512 | | | $760 | $4,371 | | $2,381 |
| | | CHAMPUS | $1,685 | | | | $1,685 | | |
| | | COMMERCIAL INS | $375,459 | $8,485 | $27,466 | $126,825 | $84,087 | $47,524 | $77,659 |
| | | MANAGED CARE/HMO | $145,983 | $2,429 | | $88,595 | $32,309 | $6,257 | $16,484 |
| | | MCAID/MDCR PART B | $16,554 | | | $9,833 | $1,304 | $3,699 | $1,399 |
| | | MEDICAID | $1,309,817 | | $47,663 | $562,842 | $181,485 | $290,292 | $164,811 |
| | | MEDICARE | $2,483,692 | $6,652 | $216,665 | $1,398,077 | $364,137 | $278,415 | $171,638 |
| | | OUT OF STATE P.A. | $1,425 | | | | $1,425 | | |
| | | SLF PY AFTER COMM PY | $2,519 | | $2,519 | | | | |
| | | Sum | $4,581,217 | $21,997 | $328,758 | $2,226,036 | $698,216 | $728,137 | $458,573 |
| MATTAR/BARNABAS | 43405 | MEDICAID | $83,969 | | $62,607 | $21,362 | | | |
| | | MEDICARE | $167,309 | | $133,721 | $27,977 | $5,611 | | |
| | | Sum | $251,278 | | $196,328 | $49,339 | $5,611 | | |
| OJEA, FERNANDO A | 39101 | BLUE CROSS INDEMITY | $266,450 | | $25,023 | $6,549 | $38,633 | $127,890 | $22,699 |
| | | COMMERCIAL INS | $264,631 | $26,781 | $99,297 | $46,758 | $24,659 | $63,268 | $35,647 |
| | | MANAGED CARE/HMO | $241,450 | $66,551 | $11,119 | $41,666 | $40,789 | $71,027 | $3,941 |
| | | MANG'S PENDING | $3,078 | | $696 | | $2,382 | | |

| ATTENDING PHYSICIAN | ATT# | PAYER | Total PAYMENTS | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|
| OJEA, FERNANDO A | 39101 | MCAID/MDCR PART B | $23,589 | | | | | $4,253 | $9,336 |
| | | MEDICAID | $3,623,268 | $468,097 | $347,697 | $269,549 | $570,633 | $771,272 | $933,914 |
| | | MEDICARE | $6,491,114 | $826,919 | $1,487,673 | $1,010,886 | $1,367,424 | $1,856,294 | $1,397,726 |
| | | WORKMAN COMPENSATION | $5,722 | | | | | $210 | $5,512 |
| | | Sum | $13,619,301 | $1,388,219 | $1,921,506 | $1,375,488 | $2,048,973 | $2,894,123 | $2,409,276 |
| OJEA/CUBRIA  SP | 39102 | BLUE CROSS INDEMITY | $110,869 | $716 | $736 | $3,990 | $20,586 | $83,445 | $1,397 |
| | | COMMERCIAL INS | $79,510 | | $5,656 | $29,306 | $4,798 | $30,790 | $8,961 |
| | | MANAGED CARE/HMO | $5,575 | | | $2,470 | | $3,105 | |
| | | MCAID/MDCR PART B | $5,957 | | | | $383 | $4,462 | $1,112 |
| | | MEDICAID | $971,718 | $18,660 | $251,439 | $156,519 | $181,265 | $221,850 | $129,621 |
| | | MEDICARE | $2,146,383 | $112,081 | $518,135 | $454,784 | $527,304 | $301,419 | $220,102 |
| | | Sum | $3,320,013 | $131,457 | $775,966 | $647,069 | $734,336 | $645,071 | $361,193 |
| SRIRAM, KRISHNASWAMI | 45901 | BLUE CROSS INDEMITY | $150,176 | | $1,837 | $27,260 | $13,799 | $94,250 | $12,686 |
| | | BLUE CRSS OUT-STATE | $6,839 | | | | | $6,063 | $776 |
| | | COMMERCIAL INS | $180,083 | $22,139 | $5,687 | $34,911 | $14,410 | $87,468 | $25,473 |
| | | HOSPICE CARE | $7,220 | | | | | | $7,220 |
| | | MANAGED CARE/HMO | $80,536 | | $18,700 | $1,700 | $13,006 | $9,916 | $37,213 |
| | | MCAID/MDCR PART B | $24,541 | | | | $6,389 | $5,723 | $12,509 |
| | | MEDICAID | $905,480 | | $26,829 | $95,544 | $158,703 | $208,074 | $416,650 |
| | | MEDICARE | $5,109,235 | | $393,042 | $610,453 | $821,995 | $1,819,586 | $1,446,752 |
| | | OUT OF STATE P.A. | $17,045 | $17,497 | | $4,971 | $12,074 | | |
| | | Sum | $6,481,479 | $39,546 | $446,896 | $764,839 | $1,040,294 | $2,231,081 | $1,959,278 |
| SRIRAM/BARNABAS | 45902 | MEDICARE | $28,160 | | | $28,160 | | | |
| | | Sum | $28,160 | | | $20,160 | | | |
| TANDETER, ELY R | 48803 | BLUE CROSS INDEMITY | $213,281 | | | $107,183 | $48,216 | $22,314 | $25,997 |
| | | BLUE CROSS OUT-STATE | $7,509 | | | $6,705 | | $1,104 | |
| | | COMMERCIAL INS | $351,509 | | | $267,801 | $15,653 | $56,466 | $7,735 |
| | | MANAGED CARE/HMO | $69,778 | | $217 | $46,764 | $3,972 | $679 | $18,145 |
| | | MCAID/MDCR PART B | $6,789 | | | $16 | $1,985 | $1,496 | $3,292 |
| | | MEDICAID | $945,348 | | | $355,566 | $139,408 | $95,632 | $336,029 |

Page 5 of 7

| ATTENDING PHYSICIAN | ATT# | PAYER | Total PAYMENTS | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|
| TANDETER, ELY R | 48403 | MEDICARE | $3,074,303 | | $3,751 | $1,250,012 | $611,028 | $673,970 | $422,261 |
| | | WORKMAN COMPENSATION | $30,127 | | | $30,127 | | | |
| | | Sum | $4,698,943 | | $3,968 | $2,063,975 | $820,261 | $851,661 | $813,458 |
| TANDETER, ELY R (CHA) | 30403 | BLUE CROSS INDEMITY | $43,724 | $7,606 | $2,488 | $8,731 | $23,469 | $1,430 | |
| | | CHAMPUS | $107 | | $107 | | | | |
| | | COMMERCIAL INS | $25,834 | $12,058 | $10,211 | $1,167 | $1,620 | $779 | |
| | | CROSS OVER | $24 | | $24 | | | | |
| | | MANAGED CARE/HMO | $42,695 | $11,576 | $9,547 | $4,522 | $9,942 | $67 | $6,242 |
| | | MANG'S PENDING | $406 | | | $406 | | | |
| | | MCAID/MDCR PART B | $4,216 | | | | $3,231 | $985 | |
| | | MEDICAID | $689,844 | $269,809 | $83,275 | $96,970 | $194,776 | $44,048 | $154 |
| | | MEDICARE | $3,032,511 | $978,187 | $467,304 | $553,710 | $702,934 | $328,370 | $5,007 |
| | | WORKMAN COMPENSATION | $15,322 | $15,322 | | | | | |
| | | Sum | $3,853,882 | $1,234,958 | $572,956 | $662,904 | $935,971 | $375,679 | $11,402 |
| TANDETER/CUBRIA   SP | 48814 | BLUE CROSS INDEMITY | $80,046 | | | | $19,475 | $39,863 | $20,707 |
| | | COMMERCIAL INS | $210,437 | | | $5,802 | $37,703 | $149,606 | $17,327 |
| | | MCAID/MDCR PART B | $3,974 | | | | $1,331 | $2,565 | $78 |
| | | MEDICAID | $165,804 | | | $124,006 | $45,320 | $91,229 | $29,255 |
| | | MEDICARE | $990,859 | | | $129,808 | $190,126 | $397,587 | $79,100 |
| | | Sum | $1,451,080 | | | | $293,955 | $880,851 | $146,467 |
| TANDETER/CUBRIA CHA | 48808 | BLUE CROSS INDEMITY | $8,528 | $573 | $1,657 | $5,121 | $1,177 | | |
| | | COMMERCIAL INS | $50,868 | $26,056 | $736 | $6,213 | $15,929 | $427 | $1,507 |
| | | MANAGED CARE/HMO | $42,049 | | $20,980 | $1,040 | $7,748 | $12,282 | |
| | | MANG'S PENDING | $170 | $170 | | | | | |
| | | MCAID/MDCR PART B | $6,035 | | | | $4,781 | $1,254 | |
| | | MEDICAID | $403,910 | $63,255 | $39,898 | $69,470 | $172,383 | $53,836 | $3,158 |
| | | MEDICARE | $2,483,650 | $351,352 | $227,902 | $601,892 | $844,921 | $364,539 | $96,844 |
| | | Sum | $3,000,211 | $441,406 | $291,083 | $685,735 | $1,046,939 | $432,338 | $102,709 |
| TANDETER/MAITAR | 48815 | COMMERCIAL INS | $7,012 | | | $7,012 | | | |
| | | MEDICARE | $35,620 | | | $35,620 | | | |

| ATTENDING PHYSICIAN | ATT# | PAYER | | Total PAYMENTS | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Sum | $42,632 | | | $42,632 | | | |
| TANDETER/SRIRAM | 4801.3 | MEDICAID | | $2,427 | | | | $2,427 | | |
| | | MEDICARE | | $3,923 | | $3,923 | | | | |
| | | | Sum | $6,350 | | $3,923 | | $2,427 | | |
| Grand Total | | | | $59,419,200 | $7,434,447 | $7,053,935 | $12,938,082 | $11,004,998 | $10,378,654 | $8,584,643 |

# EXHIBIT F

## COMPARISON OF PARAGRAPHS 66 AND 67 OF BANNON'S THIRD AMENDED COMPLAINT AND PUBLICLY-DISCLOSED PLEA AGREEMENT OF ANDREW CUBRIA

| "Fraudulent Acts" Enumerated In Paragraphs 66 and 67 of Bannon's Third Amended Complaint | Fraudulent Acts Enumerated In Andrew Cubria Plea Agreement |
|---|---|
| A. Rogan and Ehmen "gave and/or received money and other benefits in exchange for patient admissions" | Cubria, in concert with Rogan and Ehmen, "received loans, advertising, a contract, and other benefits in exchange for patient admissions." (Third Am. Cmpl., Ex. C at 3) |
| B. Rogan and Ehmen "caused numerous patients to be admitted who did not need to be admitted in order to increase admissions" | Rogan, Ehmen and others "admitted numerous patients to Edgewater who did not need to be admitted, in order increase the admissions" (*Id.*) |
| C. Rogan and Ehmen "caused or knew that false entries were made to certain medical records which included exaggerating the patient's symptoms" | Rogan, Ehmen and others "made false entries in certain medical records which included exaggerating the patients' symptoms" (*Id.*) |
| D. Rogan and Ehmen "caused medically unnecessary tests to be performed such as x-rays and blood tests" | Rogan, Ehmen and others "caused others to perform medically unnecessary procedures and testing on certain patients, including . . . blood tests, and x-rays" (*Id.* at 5) |

# EXHIBIT G

IN THE UNITED STATES OF AMERICA
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANNE BANNON, Individually, and ex rel. UNITED STATES OF AMERICA and THE STATE OF ILLINOIS, | ) ) ) ) | |
| Relator, | ) ) ) | |
| v. | ) ) | NO. 00 C 7036 |
| EDGEWATER MEDICAL CENTER; DR. ANDREW CUBRIA; DR. RAVI BARNABAS; UNIVERSAL GERIATRIC SERVICES, INC.; ANTHONY TODD; THE WELLNESS INSTITUTE, INC.; DR. KRISHNASWAMI SRIRAM; TWO HUNDRED PHARMACY, INC.; JEFF W. VEAL; DOCTORS HOSPITAL OF HYDE PARK, INC., | ) ) ) ) ) ) ) ) ) ) ) | JUDGE GEORGE LINDBERG  MAGISTRATE JUDGE ARLANDER KEYS  JURY TRIAL DEMANDED |
| Defendants. | ) | |

## THIRD AMENDED COMPLAINT

### Jurisdiction and Venue

1.    *    *    *

2.    *    *    *

### Parties

3.    *    *    *

4.    Defendant Edgewater Medical Center, Inc. ("Edgewater Hospital") was an Illinois corporation which operated as a hospital providing medical care and treatment for its patients. Edgewater Hospital was located at 5700 North Ashland Avenue, Chicago in Cook County, Illinois.

5.    *    *    *

6.     Dr. Andrew Cubria was, upon information and belief, a doctor licensed to practice medicine in the State of Illinois. Dr. Cubria's specialty is cardiology. At all relevant times, Dr. Cubria maintained an office at Edgewater Hospital.

7.     Dr. Ravi Barnabas ("Barnabas") was, upon information and belief, a doctor licensed to practice medicine in the State of Illinois. At all relevant times, Dr. R. Barnabas maintained privileges to practice medicine at both Edgewater Hospital and Doctors.

8.     *     *     *

9.     *     *     *

10.    *     *     *

11.    *     *     *

12.    *     *     *

13.    *     *     *

**Factual Background**

14.    *     *     *

15.    *     *     *

16.    *     *     *

17.    *     *     *

18.    *     *     *

19.    *     *     *

20.    *     *     *

21.     At all relevant times, Universal had an agreement with Edgewater Hospital whereby Universal would provide free health screening on behalf of the elderly and indigent for the purpose of referring patients to Edgewater Hospital.

22.    *     *     *

23.    *     *     *

24.    *     *     *

# SCHEME TO DEFRAUD

## A. Filling Hospital Beds With, and Performing Unnecessary Medical Procedures On, Healthy Medicare Beneficiaries

25. On or about October 13, 1998, Universal sponsored a free clinic at Altgeld Gardens which is a HUD (Housing Urban Development) building housing the poor and the elderly. Altgeld Gardens is located on the far south side of Chicago at or around 130th Street.

25. [SIC] At said time and place, free medical testing was performed on behalf of elderly residents of Altgeld Gardens including, but not limited to, Dorothy C. ("Dorothy") who was 75 years old. After the aforesaid testing was performed on Dorothy and other senior citizens, "testers" recommended that they see a physician.

26. On or about October 14, 1998, the day after the free clinic, a van arrived at Altgeld Gardens to take Dorothy to see a doctor. In addition to Dorothy, the van picked up five or six other people who were also first examined at the clinic held the previous day.

27. On or about October 14, 1998, Dorothy was taken to see Dr. Cubria at his office located within Defendant Edgewater Hospital at 5700 North Ashland, Chicago, Illinois. Prior to arriving at Dr. Cubria's office, Dorothy did not know she was being taken to see a cardiologist. Prior to arriving at Dr. Cubria's office, Dorothy did not know that the doctor she was to be seeing had offices on the north side of Chicago, approximately 25 miles from her residence.

28. On or about October 14, 1998, Dorothy was examined by Dr. Cubria. Despite the fact that Dorothy had no clinical signs or symptoms of cardiac abnormalities which would indicate a possible problem with her heart, Dr. Cubria had her admitted as an in-patient to Edgewater Hospital on an "urgent" basis.

29. On or about October 14, 1998 and while Dorothy was hospitalized, Dr. Cubria performed invasive procedures including an angiogram and insertion of a heart catheter. There was no indicated medical necessity for Dorothy's hospitalization or surgical procedures.

30. On or about October 16, 1998, Dorothy was discharged from Edgewater Hospital. Defendant Edgewater Hospital arranged for Dorothy to be transported back to Altgeld Gardens. As part of her discharge instructions, Dorothy was instructed to contact a home health care agency located in a far northwest suburb of Chicago and to make an appointment to see Dr. Cubria.

31. On or about October, 1998, other senior citizens were hospitalized and treated with unnecessary procedures and treatment.

32. On or about October, 1998, and for a number of years prior to that, the Administrative staff at Edgewater Hospital knew or should have known that Dr. Cubria was performing unnecessary procedures on healthy patients. [Defective Allegation Removed – Based Upon Publicly Disclosed Information]

33.     On or about October 14, 1998, and at all relevant times, there was no legitimate medical reason for Universal to refer Dorothy to Edgewater Hospital, let alone to a doctor specializing in cardiology.  There was no legitimate medical reason for Dr. Cubria to have Dorothy admitted into Edgewater Hospital, let alone on an "urgent" basis.  Dorothy did not exhibit any clinical signs or symptoms which would have warranted the invasive heart procedures performed upon Dorothy by Dr. Cubria at Edgewater Hospital.

34.     On or about October 14, 1998, the only true "urgency" in having Dorothy immediately admitted into Edgewater Hospital was so that Defendants Cubria and Edgewater Hospital would have an opportunity to provide unnecessary medical services (for which they would bill Medicare) before Dorothy changed her mind.

35.     Shortly following Dorothy's discharge from Edgewater Hospital on October 16, 1998, Edgewater Hospital submitted a claim for reimbursement for the costs of her hospitalization.  The claim was caused to be submitted by Peter Rogan, Roger Ehmen, and Dr. Cubria.  Said claim was false and fraudulent in that Edgewater Hospital did not provide any services on behalf of Dorothy (a healthy "patient") which would properly be reimbursable by Medicare.



36.     *     *     *

37.     *     *     *

38.     *     *     *

39.     *     *     *

40.     *     *     *

41.     *     *     *

42.     *     *     *

43.     *     *     *

44.     *     *     *

45.     *     *     *

46.     *     *     *

47.     *     *     *

48.     The fraudulent scheme as outlined herein, was, upon information and belief, first initiated in 1994 and has continued until at least through the time of the filing of the original complaint herein.

**B.     Identity of the persons at Edgewater Hospital who made the misrepresentations to the United States Government**

4

49. On and after 1994, Roger Ehman was the Senior Vice President of Marketing for Edgewater Hospital. He was one of the key administrators of the hospital with responsibility for *inter alia* signing documents on behalf of the hospital and handling complaints from doctors and staff.

50. During the time period 1994 to 2000, Roger Ehman was also responsible for maintaining and increasing the number of patients admitted to Edgewater Hospital.

51. On and after January 1, 1990, Peter Rogan was the President and Chief Executive Officer of Edgewater Hospital. During the time period in which Peter Rogan was the President of Edgewater Hospital, Peter Rogan's job responsibilities included the administration and supervision of Medicare cost reports made to the United States government for Medicare and Medicaid reimbursements.

52. On and after February 26, 1999 until November of 2000, Joanne Skvarek was the Chief Executive Officer of Edgewater Hospital. Her job encompassed the financial management of Edgewater Hospital including claims for payment made to United States Government.

53. During the time period 1994 to 2000, Henry Zeisel was the Chief Financial Officer for Edgewater Hospital. Henry Zeisel was responsible for *inter alia* all financial matters pertaining to Edgewater Hospital including claims made to the United States Government.

54. During the time period 1994 through 2000, Peter Rogan, Roger Ehman, Joanne Skavarek and/or Henry Zeisel in their capacities as administrators of Edgewater Hospital, each participated and was ultimately responsible for the submission of claims to the United States Government through the Medicare and Medicaid programs.

55. During the time period 1994 through 2000, Peter Rogan, Roger Ehman, Joanne Skavarek and/or Henry Zeisel were acting in their official capacities when they submitted claims to the United States Government.

56. During the time period 1994 through 2000, Peter Rogan, Roger Ehman, Joanne Skavarek and Henry Zeisel were acting in the course and scope of their employment relationship when they submitted claims to the United States Government on behalf of Edgewater Hospital.

57. During the time period 1994 through 2000, Dr. Andrew Cubria, Dr. Ravi Barnabas and Dr. Krishnaswami Sriram were only permitted to submit claims for payment to the United States Government through the Medicare and Medicaid programs for medically necessary treatment and procedures.

58. During the time period 1994 through 2000, Dr. Andrew Cubria, Dr. Ravi Barnabas and Dr. Krishnaswami Sriram submitted fraudulent claims to the United States Government on each and every instance that they allowed and directed the Edgewater Hospital administrators to submit claims for medically unnecessary hospitalizations.

59. For the time period 1994 through 2000, Dr. Andrew Cubria, Dr. Ravi Barnabas and Dr. Krishnaswami Sriram were ultimately responsible for submitting claims to Medicare and Medicaid for each treatment and/or procedure they performed on their patients.

C.  **Time and Place of the Fraudulent Claims to the United States Government**

59.  [SIC]The fraudulent claims submitted to the United States Government through the Medicare and Medicaid programs occurred over a number of years including 1994 through 2000.

60.  [Defective Allegation Removed – Based Upon Publicly Disclosed Information]

61.  [Defective Allegation Removed – Based Upon Publicly Disclosed Information]

62.  At all times alleged in the complaint, Edgewater Hospital was located at 5700 North Ashland Avenue in Chicago, Illinois.

63.  [Defective Allegation Removed – Pled "Upon Information and Belief"]

64.  [Defective Allegation Removed – Pled "Upon Information and Belief"]

65.  [Defective Allegation Removed – Pled "Upon Information and Belief"]

D.  **Specific set of Fraudulent Claims with Particular Agents of Edgewater**

66.  [Defective Allegation Removed – Based Upon Publicly Disclosed Information]

67.  [Defective Allegation Removed – Based Upon Publicly Disclosed Information]

68.  During the time period 1999 to 2000, Joanne Skavarek in her official capacity as CEO of Edgewater Hospital engaged in numerous acts of fraud committed on behalf of Edgewater Hospital in order to submit fraudulent claims to the United States Government.  The fraudulent conduct by Joanne Skavarek included:

A.  intentionally preventing any audit or internal study to be performed of the cardiac cauterizations procedures at Edgewater Hospital
B.  failed to properly follow-up and perform investigations on numerous allegations of unnecessary procedures being performed

E.  **Billing Medicare for Medically Unnecessary Nutrition Supplements and for Home Health Care Visits Where Skilled Nursing Is Not Provided.**

69.  *    *    *

70.  *    *    *

71.  *    *    *

72.  *    *    *

73.  *    *    *

74.   *     *     *

75.   *     *     *

76.   *     *     *

## Count I

### Violations of Federal False Claims Act (31 USC §3729(a)(1))

77.   *     *     *

78.   *     *     *

79.      Under the guise of providing help on behalf of the elderly poor, Defendant Universal in fact preyed upon said individuals by recruiting them for admission into Defendants Edgewater Hospital and Doctors to be treated by Defendants Barnabas or Cubria.

80.      Despite the fact that Barnabas maintained privileges at both Doctors and Edgewater Hospital, patients recruited from free clinics provided at buildings on the north side of Chicago, would be transported for admission into Doctors on the south side of Chicago. Patients recruited from free clinics at buildings located on the south side of Chicago would be transported to Edgewater Hospital located on the north side of Chicago. Defendants' purpose in transporting patients to a hospital many miles from where they live, was to isolate them from their families, friends, and personal physicians.

81.      On or about October 14, 1998, and at all relevant times, Defendant Edgewater Hospital (through its Board of Directors) acted with deliberate ignorance in failing to properly manage and supervise the day to day operations of Edgewater Hospital.

82.      On or about October 14, 1998, and at all relevant times, Defendant Edgewater Hospital acted with deliberate ignorance in failing to properly manage and supervise its billing practices.

83.      The following administrators of Edgewater Hospital acting in their official capacity fraudulently caused to be certified through cost reports that the aforesaid medically unnecessary procedures were medically necessary: Peter Rogan (President) Roger Ehman (Senior Vice President) Joanne Skavarek (Chief Executive Officer) Henry Zeisel (Chief Financial Officer).

84.      During the time period 1994 through 2000, the Edgewater Hospital Board of Directors included: Stina Hans, Dr. Bertram Rosenthal, George Chappas, William Fruland and Macon Brewer (hereinafter "The Board").

85.      During the time period 1994 through 2000, The Board acted with reckless disregard and deliberate ignorance of the aforementioned fraud.

86.      [Defective Allegation Removed – Based Upon Publicly Disclosed Information]

87.    [Defective Allegation Removed – Based Upon Publicly Disclosed Information]

88.    On or about October 14, 1998, and at all relevant times, The Board acted with deliberate ignorance of the systematic submission of bills to Medicare for unnecessary medical treatment.

89.    The claims submitted by Defendants Cubria, and Barnabas, for services provided on behalf of patients under the circumstances set forth herein, are false and fraudulent in that all such services were, and known by Defendants to be, medically unnecessary.  It is only through the "referral" of patients by Defendant Universal to Defendants Wellness and Edgewater Hospital that the unnecessary medical services came to be performed by the remaining Defendants.

90.    *    *    *

91.    *    *    *

92.    On or about February, 2000, through the fraudulent scheme as outlined herein, the Defendants either filed or caused to be filed many thousands of fraudulent claims with Medicare for services which were either never provided or, when provided, were not medically necessary.

93.    *    *    *

94.    *    *    *

## Count II
### Violations of State of Illinois Whistleblower Reward and Protection Act (740 ILCS 175/3)

95.    *    *    *

96.    *    *    *

97.    *    *    *

98.    *    *    *