# EXHIBIT H

Westlaw.

Not Reported in F.Supp.2d

2004 WL 2434260 (N.D.Ill.)

**(Cite as: 2004 WL 2434260 (N.D.Ill.))**

Page 1

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
NATIVE AMERICAN ARTS, INC., Plaintiff,
v.
Emma AQUINO and Mohammad Rahman d/b/a
Emma's Sterling Silver Jewelry,
Defendants.
**No. 04 C 2540.**

Oct. 29, 2004.
Michael Patrick Mullen, Scott M. Kolosso, Mullen
& Foster, Chicago, IL, for Plaintiff.

John William Billhorn, Billhorn Law Firm,
Chicago, IL, for Defendants.

*MEMORANDUM OPINION*

GRADY, J.

*1 Before the court is defendants' motion to
dismiss for failure to plead fraud with particularity
pursuant to Rule 9(b). For the reasons stated below,
the motion is granted.

*BACKGROUND*
Plaintiff Native American Arts, Inc. has brought
this action against defendants Emma Aquino and
Mohammad Rahman, d/b/a Emma's Sterling Silver
Jewelry, alleging that they falsely represented that
goods they sold were Indian-made in violation of
the Indian Arts and Crafts Act of 1990, 25 U.S.C. §
305e. ("the IACA" or "the Act"). [FN1]

> FN1. Consistent with the language used in
> the Act, we use the term "Indian" rather

than "Native American." *See* 25 U.S.C. §
305e.

The following facts, drawn from the complaint and
attached exhibits, are taken as true for purposes of
this motion. [FN2] Plaintiff is an Indian arts and
crafts organization within the meaning of the IACA.
*See* 25 U.S.C. § 305e(d)(4) (an "Indian arts and
crafts organization" is "any legally established arts
and crafts marketing organization composed of
members of Indian tribes."). It is wholly-owned by
members of the Ho-Chunk Nation, a tribe
recognized by the Bureau of Indian Affairs, and
sells authentic Indian arts and crafts. Defendants
own and operate a retail business with various
locations in Illinois through which they sell artwork,
crafts and jewelry, "including but not limited to
products in a traditional Indian style motif and
design." (*Compl.,* ¶ 4.)

> FN2. Attachments to the complaint
> become a part of the complaint, and
> therefore may be considered in deciding a
> motion to dismiss without converting the
> motion into one for summary judgment.
> *Tierney v. Vahle,* 304 F.3d 734, 738 (7th
> Cir.2002).

On December 21, 2002, plaintiff's agent purchased
an "Indian Necklace" from defendants' Northbrook,
Illinois store. (A photograph of the necklace is
attached to the Complaint as Exhibit A .) At the
time of purchase, a sales clerk stated that the
necklace, as well as other "Indian-style artwork"
displayed for sale, were authentic Indian-produced
products. Three days later, plaintiff's agent
purchased from the same store an "Indian Kokopelli
Pendant," an "Indian Inlay Pendant" and an "Indian
Bracelet." (Photographs are attached to the
complaint as Exhibits B, C and D, respectively.)
Again, at the time of purchase, a sales clerk stated
that these items and other Indian-style artwork were
authentic Indian-made products. Finally, on January

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 2434260 (N.D.Ill.)

**(Cite as: 2004 WL 2434260 (N.D.Ill.))**

Page 2

3, 2003, plaintiff's agent purchased a second "Indian Necklace" and "Indian Earrings" from defendants' store in Vernon Hills, Illinois, and once more a sales clerk stated that these pieces, along with other items displayed for sale, were authentic Indian-produced products. (Photographs are attached to the complaint as Exhibits E and F, respectively.)

Notwithstanding the sales clerks' representations, "on information and belief," none of the items displayed and offered for sale in defendants' stores, including those purchased by plaintiff, were authentic Indian-made products. Defendants have been displaying for sale and selling artwork, crafts and jewelry in a manner that falsely suggests the goods were Indian-made "for substantial periods of time, and possibly since November 9, 2000 and continuously thereafter to the present date." ( *Compl.,* ¶¶ 8-12, 20, 21.)

On these facts, plaintiff has brought a single-count complaint under the IACA, which allows an Indian arts and crafts organization to bring a civil suit "against a person who, directly or indirectly, offers or displays for sale or sells a good, with or without a Government trademark, in a manner that falsely suggests it is Indian produced, an Indian product, or the product of a particular Indian or Indian tribe or Indian arts and crafts organization...." 25 U.S.C. § 305e(a). [FN3] Plaintiff seeks compensatory damages, an injunction and attorneys' fees. Defendants now move to dismiss the complaint, or in the alternative, for a more definite statement, on the grounds that plaintiff has failed to plead its IACA claim with particularity under Rule 9(b).

> FN3. Under the original enactment of the IACA, only the United States Attorney General or an Indian tribe had standing to enforce its terms. Then, in 2000, Congress passed the Indian Arts and Crafts Enforcement Act which amended the IACA by, *inter alia,* allowing an action to be brought by an Indian arts and crafts organization. *See* 25 U.S.C. § 305e(c)(1)(C); S.Rep. No. 106-452, at 4 (2000) ("To date, there has not been a

successful prosecution under the IACA. One of [the] obstacles in enforcing the IACA has been the lack of suits initiated by either the Attorney General and [sic] individual Indian tribes. Often these entities are not aggressive in bringing suits on behalf of individual artisans and/or artisan organizations because the Attorney General or an Indian tribe suffer no direct injury. Individual Indian artisans and artisan organizations suffer both financial and cultural injury from inauthentic Indian arts and crafts entering the market. By broadening standing under the statute, the Committee's intent is to encourage greater enforcement of the Act.")

## DISCUSSION

**\*2** Fraud is the sine qua non of an action brought under the IACA, so Rule 9(b) applies to the complaint. The Rule requires that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). In our Circuit, this generally means pleading: "the identity of the person making the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *General Electric Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1078 (7th Cir.1997) (citation omitted). Put simply, Rule 9(b) particularity "means the who, what, when, where and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). The Rule is intended to "protect defendants' reputations, prevent fishing expeditions, and to provide adequate notice to defendants of the claims against them." *Fugman v. Aprogenex, Inc.,* 961 F.Supp. 1190, 1194 (N.D.Ill.1997).

Defendants first contend that the complaint is deficient under Rule 9(b) because it does not state the names of the sales clerks who allegedly made the fraudulent statements. Generally, compliance with Rule 9(b) requires a plaintiff to specifically identify the individual who allegedly made the misrepresentation. The Rule's requirements may be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 3

2004 WL 2434260 (N.D.Ill.)

**(Cite as: 2004 WL 2434260 (N.D.Ill.))**

relaxed, however, when such particulars are inaccessible prior to discovery. *See Emery v. American General Finance,* 134 F.3d 1321, 1323 (7th Cir.1998); *Katz v. Household Int'l Inc.,* 91 F.3d 1036, 1040 (7th Cir.1996). And here, plaintiff cannot be expected, at this stage of the litigation, to know the names of defendants' sales clerks; that information is exclusively within defendants' possession. Plaintiff's allegations concerning "who" made the alleged misrepresentations therefore fall within the exception to Rule 9(b) that allows further particulars to be obtained by discovery. [FN4]

> FN4. Practically speaking, defendants should have little trouble identifying who among its sales clerks are alleged to have made the misrepresentations. Although the complaint refers to defendants' "stores," defendants' motion papers describe their retail operations as "keas," which are "portable display booths in the walkways of five Chicagoland malls." (*Defs.' Mot.,* pp. 1-2.) Unlike many "stores" located in urban malls, these "keas," in all likelihood, are not staffed with scores of sales clerks at any given time.

Next, defendants maintain that plaintiff has not adequately pled the "how", or the method of communicating, the alleged misrepresentations, arguing that the complaint "does not allege why or how those pieces [sold to plaintiff] or other certain pieces of jewelry could be mistaken for Indian produced jewelry." (*Defs.' Mot.,* p. 2.) This argument is puzzling. Plaintiff's allegations in this regard could not be more clear--the items "could be mistaken for Indian produced jewelry" because, according to plaintiff, defendants' sales clerks *told* plaintiff's agents that the items *were* Indian-produced. Defendants' last argument is equally perplexing. They claim that the complaint insufficiently alleges the "what" of the misrepresentations because it "fails to even allege that the pieces depicted in the photographs and allegedly sold in violation of the IACA *are not Indian produced.* ..." (*Defs.' Mot.,* p. 2.) We direct defendants' attention to paragraph 21 of the complaint, which reads: "The Indian-style goods ...

offered for sale and sold by defendants ... *are not and were not Indian produced.* ..." (emphasis added.) Defendants' arguments are without merit.

**\*3** But there is a problem with the complaint that has been overlooked. The allegation that defendants' goods in fact are not Indian-made is made on "information and belief." And while fraud allegations proffered on "information and belief" are not improper *per se,* they will comport will Rule 9(b) only if they are accompanied by an explanation as to why the facts are unavailable to plaintiff *and* a statement of the grounds for believing the existence of those facts. *See Bankers Trust Co. v. Old Republic Insurance Co.,* 959 F.2d 677, 683-84 (7th Cir.1992) ("Even before Rule 11 was amended to require [reasonable precomplaint inquiry], and *a fortiori* since, it was understood that the duty to plead the circumstances constituting fraud with particularity could not be fulfilled by pleading those circumstances on "information and belief" unless they were facts inaccessible to the plaintiff, in which event he had to plead the grounds for his suspicions.") (citations omitted). Plaintiff's contention that defendants' goods are not Indian-made is not an ancillary detail of the alleged fraud. It is the fraud. Allowing this complaint to go forward, then, without any articulated basis for plaintiff's suspicions or any explanation regarding the unavailability of information necessary to verify those suspicions, would be entirely at odds with the goals of Rule 9(b).

A final matter remains. In addition to the allegations of fraud on the three specific dates noted above, the complaint contains several paragraphs stating that defendants have sold goods in a manner that falsely suggested they are Indian-made "for substantial periods of time, and possibly since November 9, 2000 and continuously thereafter to the present date." (*Compl.,* ¶¶ 8, 9, 20, 21.) Assuming these paragraphs are intended to be allegations on which relief is sought, and not mere background information, they are wholly inadequate under Rule 9(b). Devoid of any detail, these allegations appear to be nothing more than a "fishing expedition," that is, general averments of fraud cast in the hopes that subsequent discovery

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 2434260 (N.D.Ill.)

**(Cite as: 2004 WL 2434260 (N.D.Ill.))**

will uncover enough evidence to substantiate them.

Accordingly, because plaintiff's fraud allegations made on "information and belief" are improper, and other allegations lack any particulars whatsoever, the complaint is dismissed pursuant to Rule 9(b).

*CONCLUSION*

For the foregoing reasons, defendants' motion to dismiss for failure to plead fraud with particularity is granted. Defendants' alternative motion for a more definite statement is denied. Plaintiff may have until November 17, 2004 to file an amended complaint consistent with this order and with counsel's obligations under Fed.R.Civ.P. 11. Defendants may have until December 7, 2004 to file an answer or otherwise plead to any amended complaint.

2004 WL 2434260 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

- 1:04CV02540  (Docket)

(Apr. 09, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I

Westlaw.

Not Reported in F.Supp.2d

Page 1

2003 WL 262515 (N.D.Ill.)

**(Cite as: 2003 WL 262515 (N.D.Ill.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois.
PETERSON
v.
COMMUNITY GENERAL HOSP.
**No. 01 C 50356.**

Feb. 7, 2003.

MEMORANDUM OPINION AND ORDER

REINHARD, J.

*1 Plaintiff, Dr. David Peterson, who is actually suing as a relator on behalf of the United States, has filed this *qui tam* action under the False Claims Act, 31 U.S.C. § 3730(b)(1) ("FCA"), against defendants, CGH Medical Center (improperly named as "Community General Hospital"), Sterling Rock Falls Clinic, and Katherine Shaw Bethea Hospital. Jurisdiction and venue are proper based on 31 U.S.C. § 3732(a). Before the court is defendants' joint motion to dismiss, filed pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6).

The so-called Stark law, 42 U.S.C. § 1395nn, generally prohibits, with various exceptions, a physician from referring Medicare patients to an entity for designated health care services when the physician has a "financial relationship" with that entity (a practice known more commonly as "self-referral"). *See id.* § 1395nn(a)(1)(A). An entity that provides health care services pursuant to a self-referral may not seek payment for those services. *See id.* § 1395nn(a)(1)(B). In his complaint, relator accuses defendants of violating

the Stark law by "providing numerous Dixon/Sterling-Rock Falls area physicians with financial remunerations and other benefits in exchange for referrals to Defendants' health care facilities." (Am.Compl.¶ V, p. 4) He further alleges defendants submitted, over a four-year period, somewhere between $100 to $250 million worth of claims to Medicare for reimbursement of services they rendered to Medicare patients and, in doing so, falsely certified that such claims complied with federal law - falsely because they violated the Stark law. It is these "false or fraudulent" claims that form the basis of relator's FCA action.

Because defendants do not contest the issue, the court assumes for present purposes the FCA can be used as a vehicle to enforce the Stark law, even when the claims are not false in the sense that the services were actually performed, medically necessary, and billed at an appropriate rate. *See, e.g., United States ex rel. Sharp v. Consolidated Med. Transp., Inc.,* No. 96 C 6502, 2001 WL 1035720, at *3-11 (N.D.Ill. Sept. 4, 2001); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 20 F.Supp.2d 1017, 1047 (S.D.Tex.1998); *United States ex rel. Pogue v. American Healthcorp, Inc.,* 914 F.Supp. 1507, 1509-13 (M.D.Tenn.1996). Instead, defendants argue relator's allegations of fraud do not meet the heightened pleading standard of Rule 9(b). Relator concedes Rule 9(b) applies to claims brought under the FCA. *See United States ex rel. Clausen v. Laboratory Corp. of Am., Inc.,* 290 F.3d 1301, 1308-09 & n. 16 (11th Cir.2002) (collecting cases), *cert. denied,* - U.S. -, 2003 WL 95369 (Jan. 13, 2003).

The essence of the fraud relator alleges is this: (1) defendants provided financial remunerations and other benefits to various physicians; (2) in exchange, those physicians referred Medicare patients to defendants; (3) defendants billed Medicare for the services they provided to those

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 2

2003 WL 262515 (N.D.Ill.)

**(Cite as: 2003 WL 262515 (N.D.Ill.))**

patients; and (4) defendants falsely certified their claims complied with federal law. Although he has provided ample detail about (1), relator has made only the sketchiest allegations concerning (2), (3), and (4). Specifically, throughout his complaint relator does not identify a single Medicare patient referred to defendants pursuant to any of the allegedly unlawful self-referral arrangements. Nor does he identify or attach a single Medicare claim submitted by defendants for services rendered pursuant to a forbidden referral, let alone one for which defendants certified their compliance with federal law.

**\*2** Here is an example of what relator does allege: "On or about June 15, 1999, Defendant CGH guaranteed to pay a salary in excess of then current market demands for Dr. Robert Whitaker who became employed by co-defendant Sterling Rock Falls Clinic in exchange for Dr. Whitaker's exclusive referral of Medicare patients to defendant CGH. Defendant CGH, from on or about June 15, 1999 through August 30, 2001, submitted claims to Medicare for reimbursement of services rendered to Medicare patients in an approximate amount of $40 million dollars. That from June 15, 1999 through August 30, 2001, Defendant CGH certified in writing and/or implicitly to Medicare that each submitted claim for reimbursement complied with federal, state, and local laws." (Am.Compl.¶¶ V(F)(i)(a)-(b)) All of relator's allegations follow this same general pattern, only changing the name of the doctor and defendant, the type of financial remuneration, and the dates. In the court's opinion, such allegations do not satisfy Rule 9(b)'s particularity requirement.

As explained above, the whole point of relator's case is that defendants submitted Medicare claims for services they provided to patients who allegedly had been referred to them in violation of the Stark law. But which patients? And which claims? And which claims or other documents show defendants falsely certified their compliance with federal law? These questions are absolutely essential to relator's claim of fraud. Their answers, however, cannot be found anywhere in the sort of all-inclusive allegations quoted above. They must be pleaded

with particularity. To be clear, the court does not expect relator to list every single patient, claim, or document involved, but he must provide at least some representative examples. *See Clausen,* 290 F.3d at 1312-13 (affirming dismissal of FCA claim alleging overbilling and submission of other false claims to Medicare because relator failed to plead specific instance of fraud with particularity under Rule 9(b)).

In response, relator argues he cannot provide such information because it is within defendants' exclusive possession. As other courts have noted, however, this is simply not true as the claims at issue were submitted to the government. *See id.* at 1314 n. 25; *United States ex rel. Russell v. Epic Healthcare Mgmt. Group,* 193 F.3d 304, 308 (5th Cir.1999). And even if it were true, relator at the very least must plead the particular circumstances of defendants' fraud on information and belief, in which case he also must plead the factual basis for his suspicions. *See Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 684 (7th Cir.1992) ; *see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir.1997).

Finally, defendants have objected to paragraphs V(B), V(C), and V(H) of the amended complaint on the ground that they do not amount to violations of the Stark law. As for paragraphs V(C) and V(H), relator does not respond at all to defendants' objections, implicitly conceding their validity. With respect to V(B), it seems the substance of this paragraph, which is contained in subparagraph V(B)(ii)(a), is nearly identical to the first two subparagraphs in paragraph V(F)(ii)(a), except the latter provides far more detail, so that the former is simply redundant and unnecessary. As the court is requiring relator to replead his complaint to comply with Rule 9(b) anyway, he can at the same time either amend these paragraphs or drop them altogether.

**\*3** For the reasons stated above, defendants' motion to dismiss is granted. Relator is given twenty-one days from the date of this order to file an amended complaint consistent with this opinion. Any such

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 3

2003 WL 262515 (N.D.Ill.)

**(Cite as: 2003 WL 262515 (N.D.Ill.))**

amended complaint also shall be recaptioned to identify the plaintiff as "United States ex rel. Dr. David Peterson." If relator does not file an amended complaint within the allotted time, this case will be dismissed with prejudice without further notice and a final judgment entered against relator.

2003 WL 262515 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 3:01CV50356  (Docket)
                    (Oct. 01, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT J

Westlaw.

Not Reported in F.Supp.2d

2000 WL 17838 (E.D.La.)

**(Cite as: 2000 WL 17838 (E.D.La.))**

Page 1

---

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
UNITED STATES of America, ex rel. William St.
John Lacorte, M.D.
v.
SMITHKLINE BEECHAM CLINICAL
LABORATORIES, INC.
**No. CIV. A. 96-1380.**

Jan. 10, 2000.

ORDER AND REASONS

VANCE, District J.

*1 Before the Court is the motion of defendant, SmithKline Beecham Clinical Laboratories, Inc., to dismiss plaintiff's urinalysis claims for failure to plead fraud with the requisite specificity as required by Rule 9(b) of the Federal Rules of Civil Procedure . For the following reasons, the Court grants the motion.

I. BACKGROUND

This consolidated proceeding involves *qui tam* actions brought by plaintiff against SmithKline Beecham Clinical Laboratories, Inc. pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.* Plaintiff, William St. John LaCorte, M.D., [FN1] is a physician who treats patients at hospitals, nursing homes and home healthcare agencies throughout New Orleans. He alleges that SBCL performed unauthorized and medically unnecessary laboratory tests, including urinalysis tests, on patients in hospitals, nursing homes, and home healthcare agencies throughout Louisiana and the United

States. SBCL then allegedly billed and received reimbursement for these fraudulent claims from Medicare and other government healthcare programs.

> FN1. The United States has declined to intervene in this action. In its Order and Reasons of August 19, 1999, this Court rejected defendants' motion to dismiss on the grounds that the *qui tam* provisions of the FCA are unconstitutional. At oral argument on January 5, 2000, the Court advised the parties that it will monitor the effect of *Riley v. St. Luke's Episcopal Hospital* on this case. 196 F.3d 514 (5th Cir.1999). In *Riley,* a three judge panel held that *qui tam* actions brought by uninjured relators in which the government does not intervene violate the Take Care Clause of Article II of the Constitution and the constitutional separation of powers doctrine. *See id.* at 531. The Fifth Circuit has granted rehearing *en banc* of *Riley,* and oral argument is scheduled for later this month.

Most of the claims in *LaCorte I,* plaintiff's first FCA complaint filed in this Court on April 22, 1996, were released as a result of a settlement between SBCL, the United States, and three original relators signed on September 26, 1996. Under the settlement, SBCL agreed to pay the government, 42 states, and the District of Columbia $325 million in exchange for a release of various actual and potential claims through September 16, 1996. Judge Donald W. VanArtsdalen of the Eastern District of Pennsylvania approved the settlement and retained jurisdiction to enforce its terms.

In order to determine the effect of the settlement agreement on plaintiff's claims, this Court transferred *LaCorte I* to the Eastern District of Pennsylvania. Judge VanArtsdalen determined that

---

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 2

2000 WL 17838 (E.D.La.)

**(Cite as: 2000 WL 17838 (E.D.La.))**

the settlement dismissed all of plaintiff's claims except for the allegations set forth in paragraphs 32-38 and 50e, pertaining to SBCL's alleged submission of false claims for unordered and medically unnecessary urinalysis tests. The urinalysis claims were then severed and transferred back to this Court on December 14, 1998. In the surviving paragraphs of *LaCorte I*, plaintiff alleged that SBCL performed unordered and medically unnecessary urine tests on his patients and patients at other nursing homes as part of an annual screening program. (*See* Civil Action No. 96-1380, Compl. ¶¶ 32-34). Plaintiff attached to his complaint copies of SBCL laboratory reports which allegedly revealed four occasions of fraudulent billing practices at St. Anthony's Nursing Home and Harahan Guest House. Those bills did not refer to urinalysis tests.

On March 31, 1997, plaintiff filed another FCA action against SBCL ("*LaCorte II* ") regarding its post-settlement conduct. The second amending complaint to *LaCorte II* restated plaintiff's urinalysis claims from *LaCorte I* and further alleged that SMBCL performed unauthorized urinalysis tests as part of its routine "audit" programs at nursing homes and "other healthcare facilities." (*See* Civil Action No. 97-942, 2nd Amend. Compl. ¶ 41C.) SBCL moved to dismiss the urinalysis claims in *LaCorte I* and *LaCorte II* for failure to plead fraud with particularity under Rule 9(b) of the Federal Rules of Civil Procedure. On August 19, 1999, this Court denied SBCL's motion to dismiss but ruled as follows:

**\*2** Although plaintiff's claims are weak on specifics, they do provide the basic framework, procedures, and nature of the fraudulent scheme. Plaintiff has identified four different dates upon which defendant allegedly committed the fraud, a nursing home where a fraudulent test allegedly occurred, and the nature of the fraudulent practice. However, as defendant notes it is unclear how the bills attached to plaintiff's complaint provide evidence of fraud. Moreover, plaintiff has failed to allege for which other nursing homes, let alone which non-nursing home, "other healthcare facilities," SBCL conducted fraudulent urinalysis tests, the dates of

such tests, and the patients upon which they were performed.

(*See* Order and Reasons, Aug. 19, 1999, at 24.) Because the Court found plaintiff's complaint lacked specificity, it granted plaintiff leave to amend. (*See id.* at 25.)

This Court consolidated *LaCorte I* and *II* on April 7, 1999. Plaintiff had filed six amending complaints to *LaCorte I*, the last of which he filed after this Court's August Order. On September 30, 1999, Magistrate Judge Lance Africk granted SBCL's Rule 12(e) Motion for More Definite Statement and ordered plaintiff to file a seventh amending complaint "which shall supersede the prior six complaints." SBCL now moves to dismiss plaintiff's urinalysis claims, as alleged in paragraphs 100-119 of the seventh complaint, for failure to plead fraud with particularity under Rule 9(b). SBCL asserts that the Court should not give plaintiff further leave to plead with particularity but should dismiss his urinalysis claims with prejudice. Furthermore, SBCL argues that the Court should dismiss paragraphs 110 and 111 of the complaint, which allege that SBCL performed unauthorized urinalysis tests as a result of its requisition form design, as barred by SBCL's 1996 settlement agreement and release with the government.

II. DISCUSSION

A. Failure to Plead Fraud with Particularity under Rule 9(b)

The Fifth Circuit treats a Rule 9(b) motion to dismiss for failure to plead fraud with particularity as the equivalent of a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See United States ex rel. Russell v. EPIC Healthcare Mgmt. Group*, 193 F.3d 304, 308 (5th Cir.1999) (*citing Shushany v. Allwaste, Inc.*, 992 F.2d 517, 520 (5th Cir.1993)); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir.1997). Accordingly, the Court may not dismiss any of plaintiff's claims unless it appears certain that he cannot prove any set of facts that would entitle him to relief. *See Home Capital Collateral, Inc. v. Federal Deposit Ins. Corp.*, 96

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2000 WL 17838 (E.D.La.)

**(Cite as: 2000 WL 17838 (E.D.La.))**

F.3d 760, 764 (5th Cir.1996). Moreover, the Court must accept as true all well-pleaded facts in the complaint and view them in the light most favorable to plaintiff. *See American Waste & Pollution Control Co. v. Browning-Ferris, Inc.,* 9494 F.2d 1384, 1386 (5th Cir.1991).

**\*3** Claims brought under the FCA must comply with Rule 9(b), which provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *See* FED. R. CIV. P. 9(b); *Russell,* 193 F.3d at 308; *Thompson,* 125 F.3d at 903. The Fifth Circuit has noted that "what constitutes 'particularity' will necessarily differ with the facts of each case." *See Shushany,* 992 F.2d at 521. At a minimum, however, Rule 9(b) requires the plaintiff to set forth the "who, what, when, where, and how" of the alleged fraud. *See Thompson,* 125 F.3d at 903 (*citing Williams v. WMX Tech., Inc.,* 112 F.3d 175, 179 (5th Cir.1997)). *See also Russell,* 193 F.3d at 308 ("to plead fraud with particularity a plaintiff must include the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby") (citations and internal quotations omitted). Courts have required less specificity to meet Rule 9(b)'s pleading requirements in cases involving complex and numerous allegations of fraud occurring over an extended period of time. *See Johnson,* 183 F.R.D. at 206-07 (collecting cases); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 20 F.Supp.2d 1017, 1039 (S.D.Tex.1998) (same); *Ford Motor Co. Bronco II Products Liability Litigation,* 1995 WL 714441, at * 3 (E.D.La. Dec. 4, 1995) (*citing* 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1296). However, the plaintiff may plead fraud "upon information and belief" only when the relevant facts are peculiarly within the opposing party's knowledge, and the plaintiff supports his allegations with an adequate factual basis. *See Thompson,* 20 F.Supp.2d at 1039. Moreover, the Fifth Circuit has warned that the information and belief exception "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Thompson,*

125 F.3d at 903 (*quoting Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068 (5th Cir.1994)).

In his seventh complaint, plaintiff realleges that SBCL committed fraudulent urinalysis testing as a result of screening and auditing programs. Plaintiff also adds a new urinalysis claim, which alleges that SBCL performed unauthorized urinalysis tests due to the use of intentionally or recklessly designed test requisition forms.

B. Screening and Auditing Programs

With regard to the "screening program" claims, the Court finds plaintiff has failed to plead with particularity how the scheme allegedly perpetrated by SBCL was fraudulent. Plaintiff maintains that SBCL defrauded Medicare and Medicaid by auditing patient medical charts, using the accumulated data to generate requisition forms and routine specimen collection "instructions," which were substituted for physicians' orders to justify the performance of unauthorized and medically unnecessary urinalysis tests. (*See* Seventh Compl. ¶ ¶ 106-07, 112-14.) The complaint does not say how SBCL's data accumulation led to the fraudulent performance of unordered urinalysis tests. It does not even state whether the data was false or who substituted the data for a physician's order. Accordingly, the Court finds that these vague allegations do not state with particularity how SBCL committed fraud in violation of the FCA as the result of an alleged screening program.

**\*4** Moreover, plaintiff has not alleged the who, when and where of the alleged fraud. Rather than amend his complaint to plead fraud with particularity against "other healthcare facilities," as instructed by this Court, plaintiff instead broadened his urinalysis claims in the seventh complaint to encompass the universe of healthcare facilities located throughout the United States. Plaintiff maintains that, upon information and belief, SBCL's fraudulent testing practices have been repeated "at other nursing homes located throughout the United States," as well as at hospitals, medical clinics and home health agencies, since January 1992. (*See id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 4

2000 WL 17838 (E.D.La.)

**(Cite as: 2000 WL 17838 (E.D.La.))**

¶¶ 114, 118.) To meet the pleading requirements under Rule 9(b), the Court does not require plaintiff to identify in his pleadings each of the potentially *thousands* of urinalysis tests performed by SBCL. However, plaintiff must provide a factual basis which adequately apprises defendant of the nature and scope of his allegations. Here, plaintiff has provided nothing to support his claims that SBCL performed unauthorized urinalysis testing on a national scale. Accordingly, plaintiff has failed to plead a nationwide scheme of fraudulent urinalysis testing against SBCL.

Plaintiff's claims also lack the requisite specificity even if they are limited to screening and audit programs in nursing homes and other home healthcare agencies in Louisiana. In the complaint, plaintiff states that he observed instances of SBCL's fraudulent testing and billing practices over a seven-year period while treating patients at several nursing homes, including Harahan Guest Home, Covenant, St. Anthony and Norman Care-East haven-Sunrise-Sunbridge. (*See* Seventh Compl. ¶ 109.) Plaintiff further alleges that the fraud occurred at home healthcare agencies in Louisiana, including Apple Homecare, and Allcare Health Link, as well as in his own office practice. (*See id.*) However, he has failed to identify a single specific occasion when SBCL performed an unauthorized urinalysis test.

This is not a case where the facts are peculiarly within the defendant's knowledge. Plaintiff alleges that SBCL performed urinalysis tests on *his* patients which *he* did not order. Nevertheless, he fails to identify a single fraudulent urinalysis test that was unordered or unauthorized, a single date on which such testing was performed, or a single patient on whom such a test was performed. *See Thompson,* 125 F.3d at 903 (dismissing claims for failure to plead fraud with specificity when plaintiff did not identify any specific physicians who made referrals or any specific claims for medically unnecessary services); *United States v. Crescent City, E.M.S., Inc.,* 151 F.R.D. 288, 290 (E.D.La.1993) (*qui tam* plaintiff's failure to allege exact dates representations were made or place where alleged fraud took place necessitated dismissal under Rule

9(b)). Plaintiff attached copies of SBCL laboratory and billing reports to his opposition memorandum, which he contends reveal unauthorized and medically unnecessary urinalysis tests performed by SBCL at two nursing homes and at Dr. LaCorte's office. (*See* Pl.'s Opp'n Mot. Dismiss Ex. 1.) However, requisition forms and physician progress reports proffered to the Court by SBCL at oral argument establish that those tests were either not for urinalysis or were ordered by Dr. LaCorte and Dr. R. Miles for patients covered by private insurance. The reports therefore do not provide specific incidents of unauthorized urinalysis testing or fraudulent billing practices against government healthcare organizations.

**\*5** Finally, plaintiff argues that his urinalysis claims should not be dismissed because they are no less specific than those made in the three original *qui tam* complaints filed against SBCL or by plaintiff in another *qui tam* action against Roche Biomedical Laboratories, Inc. (*See* Pl.'s Opp'n Mot. Dismiss, at 3-4.) The specificity, or lack thereof, of the factual allegations made in those complaints is irrelevant. Those cases were all settled, and the complaints were never challenged in court on Rule 9(b) grounds.

For the foregoing reasons, the Court finds that plaintiff has failed to plead with particularity his claims of fraudulent urinalysis testing as a result of screening and audit programs as required by Rule 9(b).

C. Test Requisition Forms

Plaintiff's seventh complaint also alleges that SBCL intentionally or recklessly designed test requisition forms to encourage physicians to order urinalysis tests which were not medically necessary. (*See* Seventh Compl. ¶ 110.) Specifically, plaintiff contends that SBCL offered only one option on its urinalysis requisition form during and prior to 1996. (*See id.*) As a result, SBCL allegedly performed urinalysis with both microscopy and macroscopy analysis in instances where only one, but not both, type of analysis was authorized by the physician and/or deemed medically necessary. (*See id.*) To the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 5

2000 WL 17838 (E.D.La.)

**(Cite as: 2000 WL 17838 (E.D.La.))**

extent the requisition form claims refer to conduct arising prior to and through September 16, 1996, they are dismissed as released by the 1996 settlement agreement between SBCL, the United States, and the three original relators. [FN2] Further, plaintiff has not identified a single instance during the seven-year period when SBCL used these test requisition forms to perform an unauthorized urinalysis test. In addition, there is absolutely no way for the Court, or defendant, to discern from the face of the complaint where or on whom SBCL might have used these requisition forms fraudulently. Accordingly, plaintiff has failed to plead these claims with particularity under Rule 9(b).

> FN2. The 1996 "Settlement Agreement and Release" released SBCL from actual and potential claims through September 16, 1996, for conduct described in Paragraphs H through Q of its Preamble. Paragraph I provides as follows:
> I. WHEREAS, the United States contends that SBCL violated federal statutes and/or common law doctrines in connection with its testing and billing for Urinalysis tests ... by routinely performing urinalysis with microscopy and/or routinely billing for Urinalysis with microscopy when a Urinalysis was ordered; these services were billed by and paid to SBCL; (Def.'s Mot. Dismiss, Ex. 1, at 4-5.) A comparison of the settlement agreement and the seventh complaint establishes that the settlement covers the conduct alleged by plaintiff against SBCL in paragraphs 110 and 111.

D. Dismissal or Leave to Amend

Plaintiff has had numerous opportunities to replead his urinalysis claims with specificity. Indeed, since this Court's August Order granting plaintiff leave to amend his urinalysis claims, plaintiff has filed a sixth and seventh amending complaint. Plaintiff has nevertheless failed to cure the identified deficiencies and has in fact broadened his conclusory allegations. The Court will therefore not

grant plaintiff further leave to amend his complaint but orders his urinalysis claims dismissed.

III. CONCLUSION

For the foregoing reasons, defendant's motion to dismiss plaintiff's urinalysis claims is GRANTED and paragraphs 100-11 of the complaint are hereby DISMISSED.

2000 WL 17838 (E.D.La.)

**Motions, Pleadings and Filings (Back to top)**

• 2:96CV01380  (Docket)

(Apr. 22, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT K

factiva

Page      1

Citation                    Found Document          Rank(R) 1 of 1          Database
4/15/96 MODHC 32                                                            MODHC

4/15/96 Mod. Healthcare 32
1996 WL 7526140

Modern Healthcare
Copyright 1996 Crain Communications Inc.

Monday, April 15, 1996

Special Report

SPECIAL REPORT; FBI WIDENS CHICAGO HOSPITAL PROBE

Bruce Japsen

The FBI is investigating whether a Chicago hospital illegally funneled senior citizens from federally subsidized housing projects to boost its profits, MODERN HEALTHCARE has learned.

While a review by the Illinois attorney general's office of Edgewater Medical Center's 1994 sale enters its seventh month, the FBI has widened the probe of the 172-bed facility on Chicago's north lakefront. The FBI would neither confirm nor deny the existence of its investigation, but knowledgeable sources say they have been contacted by FBI agents.

Edgewater, rated the most expensive hospital in the Chicago area for 1994 and 1995, has attracted a substantial number of low-income senior-citizen patients from Chicago Housing Authority projects some 10 miles away. As many as 30 community acute-care hospitals are closer to the housing projects than Edgewater (See map).

Some of those admissions are being looked at by federal agents as possibly fraudulent. For example, a CHA building president said residents were transported to Edgewater without a physician's knowledge. In another case, a physician says a patient was admitted under his name while he was visiting relatives in Mississippi.

A MODERN HEALTHCARE analysis of Edgewater's admissions in 1993 shows that more than 10% of Edgewater Medical Center's inpatients lived in low-income South Side neighborhoods where the Chicago Housing Authority operates 18 senior residential facilities. Those 1993 admissions were used to highlight Edgewater's financial performance in a document filed with the Illinois Health Facilities Authority in August 1994, when the hospital was sold for $35.1 million in a deal financed with tax-exempt bonds (Oct. 9, 1995, p. 50).

In 1993, Edgewater's inpatient admissions skyrocketed 24% to 6,600. Near bankruptcy in 1989, Edgewater attributed its financial turnaround to new patients from "senior programs."

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4/15/96 MODHC 32

"(Edgewater) has targeted the Medicare population as an area of growth," the hospital said in its IHFA filing. "In connection with this focus, (Edgewater) established various senior programs, which in the 1993 fiscal year resulted in $3.6 million of gross revenues, with $1.9 million of this revenue coming from patients who had not previously used Edgewater's services," the document said.

Hospital executives said in the filing that "three physicians are responsible for over 95% of the admissions in the 65-plus (age) category," which works out to 1,114 patients per physician.

Analysts say it is unusual for a community hospital that gains 50% of its admissions from Medicare patients in a market as large as Chicago to rely on so few physicians to provide that many referrals. When federal investigators look at possible abuse, analysts say it's common for authorities to examine why patients travel relatively long distances for care. In June 1993, Edgewater had 348 physicians on its medical staff, and 205 of those were considered "active admitters," the IHFA documents said.

"Federal regulators will look to see if a hospital has a particular specialty or a physician with a specific specialty that would draw patients from far away," said Scott Becker, an attorney with Chicago-based law firm Ross & Hardies, which specializes in healthcare fraud-and-abuse cases. "If an investigator can't find that initial rhyme or reason, there could be a problem."

Sources confirm the federal probe involves the hospital and its relationship with Chicago-based Universal Geriatric Services. Edgewater leases space from the Chicago Housing Authority for two clinics, one at a South Side location and another in the city's Near North area. The probe centers on admissions from the South Side clinic, the Artensa Randolph Healthcare Center. Universal, an investor-owned firm that incorporated in August 1992, assists with the management of both clinics, said Anthony Todd, Universal's president.

Edgewater leases space from the CHA for Artensa Randolph for just $1 a year. The two-year lease expires Oct. 31.

The CHA's relationship with clinics in their buildings is "strictly that of a landlord," said Dorothy Downer, the CHA's director of social services. "In order to make healthcare more convenient for our constituents, we lease out some space at a very reasonable rate."

Vendors that provide services in CHA buildings must make presentations to tenant boards.

Edgewater's ability to land a contract with the CHA was decided by a vote of all residents of the CHA building, its board and president, Downer said.

"Our centers have experienced more than 17,000 (patient) visits from 1992 to 1996," Edgewater CEO Peter Rogan said in response to questions submitted by MODERN HEALTHCARE.

But Marjorie Meade, president of the tenants' board of one of four South Side

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Westlaw

4/15/96 MODHC 32

CHA senior facilities called the Armour Square Apartments, said residents are unhappy with Universal's management, demanding that the firm and Edgewater be removed from the projects. Meade has urged city, state and federal agencies to investigate Edgewater and Universal.

"Patients who go to the clinic end up at Edgewater whether they need to go there or not," Meade said. Artensa Randolph Health Care Center is located at another Armour Square building.

Edgewater has contracted with Universal since late 1992 to "provide various personnel and administrative services," Rogan said.

In 1993, more than 700 of Edgewater's 6,600 patients came from the nine zip codes concentrated on the South Side in areas where the CHA's senior buildings are located, according to the Illinois Hospital & HealthSystems Association's healthcare information service, known as COMPdata.

These patients are coming from areas far removed from Edgewater's primary service area, which is at the farthest northeast point along Chicago's lakefront. All but a handful of the three dozen acute-care hospitals in the city of Chicago are closer to the CHA buildings than Edgewater. Seven other hospitals lease clinic space at CHA senior buildings, but those clinics are located in or near the hospitals' service areas.

The federal investigation is the latest controversy involving the scandal-plagued CHA.

Last June, the federal government, at the direction of the department of Housing and Urban Development, took control of the CHA amid charges of corruption and mismanagement.

Last year, the Illinois attorney general's office began investigating Edgewater's conversion from a for-profit hospital owned and operated by Rogan back to a not-for-profit hospital. From its founding in 1929, the hospital was not-for-profit until Rogan bought it in 1989 for $1 million.

Rogan, who remains Edgewater's chief executive officer as an employee of San Francisco-based Braddock Management, was paid handsomely when Edgewater was sold. Braddock manages Edgewater for Permian Health Care, a little-known not-for-profit holding company in Denver.

The purchase in August 1994 by Permian was financed by $41 million in bonds issued by the IHFA, including $31 million to buy out Edgewater's shareholders, who were Rogan and his three children. The remaining $10 million went to service the bond issue.

The $1 million Rogan used to buy the hospital in 1989 went to a new not-for-profit foundation, and the hospital's assets were moved to for-profit Edgewater Operating Co., which ran the hospital until it was sold to Permian.

The attorney general's investigation of Edgewater's conversion is in its

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Page    4

4/15/96 MODHC 32

seventh month. The state is looking into whether the price Permian paid was fair and the nature of the relationship between Permian and Rogan.

Documents filed by Edgewater with the IHFA said 1993 was the hospital's most significant growth year since Rogan purchased the facility. IHFA records said hospital admissions jumped 24.5% in 1993 from 1992. Inpatient admissions dropped an average of 1.3% during the same period at hospitals in the Chicago area, according to the Metropolitan Chicago Healthcare Council.

Edgewater had net income of $2.5 million on net revenues of $58.9 million in 1993, the latest year financial figures were available from HCIA, a Baltimore-based healthcare information company.

Meanwhile, Edgewater has ranked as the most expensive hospital in the Chicago area, according to 1994 and 1995 surveys of Illinois hospital charges by Milwaukee-based Meridian Resource Corp. The firm said charges at Edgewater are nearly 80% above the state median.

But Braddock Management has said charges are high because 90% of the hospital's business comes from fixed government healthcare payments. Braddock and Edgewater have said Medicare and Medicaid don't always cover costs, thus increasing overall charges for those who can pay.

Meade, the CHA tenant board president, said physicians who previously worked with patients from CHA buildings weren't happy with Universal. "We've had doctors work here who have been very upset that patients were referred to Edgewater by Universal without the doctor's written orders," she said.

Rogan said he was aware of Meade's allegations and that they are unfounded. "We have no knowledge of instances when patients have been admitted to Edgewater by anyone other than a physician who is a member of our medical staff," Rogan said.

Universal's Todd also denied any fraudulent admissions practices. "We administer the business aspects of the clinic," Todd said in a written statement. "The physicians at the clinic are solely responsible for the medical direction of the patients."

However, Will Gee, a physician who had worked at Artensa Randolph, said he was dismissed in January after seven months because Edgewater executives said he wasn't referring enough patients to their facility.

Gee joined Edgewater's medical staff in June 1995 after he learned the CHA clinic was in need of a physician. Gee said he became impressed with Edgewater's program because it provided transportation for low-income CHA residents to the clinic, to the hospital and back to their homes.

"I didn't think these (CHA) patients had a history of getting good care, and I thought I could give something back to the community," Gee said.

A few weeks into his work, Edgewater executives began encouraging Gee to send

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



4/15/96 MODHC 32

more patients. "I'm thinking, 'Am I doing my job too well that I'm keeping people out of the hospital?'*" Gee said.

   Last October, Gee's relationship with Universal and Edgewater began to sour. Gee described a case where a patient with difficulty breathing was referred to Edgewater from a CHA building under Gee's name, without his orders. Edgewater admissions records show that Gee was the "attending physician" for the patient admitted to Edgewater Oct. 27.

   But Gee said he was in Jackson, Miss., visiting relatives and didn't return to Edgewater for work until Nov. 2. Then, he was informed by a staff nurse that one of his patients was asking for him. After seeing the patient, who was stable, Gee had the patient released.

   Gee said he complained to Universal and Edgewater executives about the admission problem, to no avail. By Jan. 8 this year, Gee was fired from his contract work at the clinic and replaced that same day.
TABULAR OR GRAPHIC MATERIAL SET FORTH IN THIS DOCUMENT IS NOT DISPLAYABLE

 Caption:  A long way from home (MAP);Edgewater probe widens (CHART)

                    ---- INDEX REFERENCES ----

KEY WORDS:          CHICAGO, HOSPITALS, INVESTIGATIONS, FBI

Language:  EN
Word Count: 1733

4/15/96 MODHC 32

        (C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

