# EXHIBIT A

Westlaw.

--- F.3d ---
**(Cite as: 2005 WL 1567316 (7th Cir.(Ill.)))**

**H**

**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Seventh Circuit.
UNITED STATES ex rel. Sanford **GROSS**,
Plaintiff-Appellant,
v.
AIDS RESEARCH ALLIANCE-CHICAGO,
Roberta Luskin-Hawk, Thomas Klein, Ross
Slotten, Neel French, Patricia Dixon, and Catholic
Health Partners, Defendants-
Appellees.
**No. 04-2566.**

Argued Dec. 8, 2004.
Decided July 6, 2005.

**Background:** Subject in federally-funded acquired
immune deficiency syndrome (AIDS) research
study brought qui tam action under the False Claims
Act (FCA), alleging various acts of negligence and
mismanagement by researcher, several of its
participating medical professionals, and institutional
review board for the study. The United States
District Court for the Northern District of Illinois,
William J. Hibbler, J., 2004 WL 905952, dismissed
complaint, and relator appealed.

**Holdings:** The Court of Appeals, Sykes, Circuit
Judge, held that:
(1) relator failed to plead that fraudulent
statement's purpose was to coax a payment of
money from the government with requisite
particularity;
(2) relator failed to allege that any particular
certification of regulatory compliance was a
condition of payment of government money; and
(3) District Court lacked jurisdiction over relator's
claim to extent it was based on warning letter sent

by Federal Drug Administration (FDA) to
institutional review board.
Affirmed.

**[1] Federal Civil Procedure** ⇐636

170Ak636 Most Cited Cases
The False Claims Act (FCA) is an anti-fraud statute
and claims under it are subject to the heightened
pleading requirements of rule requiring that fraud
be pled with particularity. 31 U.S.C.A. § 3729 et
seq.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[2] United States** ⇐120.1
393k120.1 Most Cited Cases
A False Claims Act (FCA) claim premised upon an
alleged false certification of compliance with
statutory or regulatory requirements requires that
the certification of compliance be a condition of or
prerequisite to government payment. 31 U.S.C.A. §
3729(a)(2).

**[3] Federal Civil Procedure** ⇐636
170Ak636 Most Cited Cases
Subject in federally-funded acquired immune
deficiency syndrome (AIDS) research study failed
to plead with requisite particularity that fraudulent
statement's purpose was to coax a payment of
money from the government, as would support
False Claims Act (FCA) claim premised upon an
alleged false certification of compliance with
statutory or regulatory requirements, in qui tam
action alleging various acts of negligence and
mismanagement by researcher, several of its
participating medical professionals, and institutional
review board for the study, where alleged false
statements, identified only by a categorical and
essentially undecipherable listing of various "forms,
written reports and study results" the defendants
filed with the government at some point during
course of the study, shed no light on nature or
content of individual forms or why any particular
false statement would have caused government to
keep funding study, much less when any payments

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1567316                                                    Page 2

--- F.3d ---
**(Cite as: 2005 WL 1567316 (7th Cir.(Ill.)))**

occurred or how much money was involved. 31
U.S.C.A. § 3729(a)(2); Fed.Rules Civ.Proc.Rule
9(b), 28 U.S.C.A.

**[4] United States ☞122**
393k122 Most Cited Cases
Subject in federally-funded acquired immune
deficiency syndrome (AIDS) research study failed
to allege that any particular certification of
regulatory compliance was a condition of payment
of government money, and, thus, subject failed to
state a False Claims Act (FCA) claim premised
upon an alleged false certification of compliance
with statutory or regulatory requirements, in qui tam
action alleging various acts of negligence and
mismanagement by researcher, several of its
participating medical professionals, and institutional
review board for the study. 31 U.S.C.A. §
3729(a)(2).

**[5] United States ☞120.1**
393k120.1 Most Cited Cases
False claim allegations must relate to actual money
that was or might have been doled out by the
government      based      upon      actual      and
particularly-identified   false   representations.   31
U.S.C.A. § 3729 et seq.

**[6] United States ☞122**
393k122 Most Cited Cases
District Court lacked jurisdiction over qui tam
action brought under the False Claims Act (FCA)
by subject in federally-funded acquired immune
deficiency   syndrome   (AIDS)   research   study,
alleging    various    acts    of    negligence    and
mismanagement by researcher, several of its
participating medical professionals, and institutional
review board for the study, where relator did not
allege that he was an original source of information
in   warning   letter   sent   by   Federal   Drug
Administration (FDA) to institutional review board
suspending its participation in an unrelated study
for      "violating      regulations      governing      the
composition, operation, and responsibilities of an
IRB." 31 U.S.C.A. § 3730(e)(4)(A).
Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 01 C 8182--William J. Hibbler, Judge.

Christopher   N.   Mammel,   Childress   Duffy
Goldblatt, Chicago, IL, for Plaintiff-Appellant.

Jannis E. Goodnow, Lord Bissell & Brook,
Chicago, IL, Michael P. Bruyere, Lord Bissell &
Brook, Atlanta, GA, David B. Honig, Hall, Render,
Killian, Heath & Lyman, Indianapolis, IN, for
Defendants-Appellees.

Before FLAUM, Chief Judge, and POSNER and
SYKES, Circuit Judges.

SYKES, Circuit Judge.

*1 Sanford Gross was a subject in an AIDS
research study funded by the National Institutes of
Health   ("NIH")   and   conducted   by   the   AIDS
Research     Alliance-Chicago     ("the     Alliance").
Catholic Health Partners acted as the Institutional
Review Board for the study. Gross brought a claim
on behalf of the United States under the *qui tam*
provision of the False Claims Act ("FCA"), 31
U.S.C. § 3729(a), alleging various acts of
negligence and mismanagement by the Alliance,
several of its participating medical professionals,
and Catholic Health Partners. Gross alleged that
the defendants submitted various forms and reports to
the government during the course of the study and
these constituted "certifications" that the study was
being conducted in compliance with federal
regulations, grant study protocols, and "Good
Clinical Practices," when, in fact, it was not. These
are the alleged "false claims" that form the basis of
Gross's action under § 3729(a).

The district court dismissed the original and
amended complaints for failure to plead fraud with
particularity as required by Rule 9(b), and
dismissed the second amended complaint pursuant
to Rule 12(b)(6) for failure to state a claim. The
latter ruling was based largely on what the district
court saw as insufficiencies in the allegations
regarding the knowledge element of a § 3729(a)
claim. *See United States ex rel. Lamers v. City of
Green Bay,* 168 F.3d 1013, 1018-19 (7th Cir.1999).
The district court also invoked the jurisdictional bar
in 31 U.S.C. § 3730(e)(4)(A), which precludes *qui
tam* FCA claims premised upon publicly disclosed
information unless "the person bringing the claim is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ---
**(Cite as: 2005 WL 1567316 (7th Cir.(Ill.)))**

an original source of the information."

We affirm, although on somewhat different reasoning. The second amended complaint fails under Rule 9(b) because it does not allege to the required degree of particularity the false statement or statements made by the defendants, with knowledge of their falsity, for the purpose of obtaining payment from the government. In addition, the second amended complaint fails under Rule 12(b)(6) because it does not allege that payment by the government was conditioned upon certification of regulatory compliance, a necessary component of a *qui tam* FCA claim premised upon false certification of compliance with federal statutes and regulations.

### I. Facts
The second amended complaint is 42 pages long and contains 163 numbered paragraphs, some of which have numerous lettered subparts. We sketch only the pertinent allegations here. The NIH sponsored a research study on an "off-label investigational new drug" for the treatment of AIDS. The Alliance was one of 15 participating agencies, and Gross was a participant in the study from October 1998 to December 1999. Catholic Health Partners acted as the Institutional Review Board for Alliance's participation in the study, and the individual named defendants are participating physicians and a nurse. The Alliance was awarded approximately $3.7 million in NIH funding for its participation in the study.

**\*2** The second amended complaint contains numerous allegations of negligence, mismanagement, and poor oversight of the study, including, for example: prescription of medication known to reduce the effectiveness of the study drug; allowing Gross's viral load to spike dramatically; failure to maintain adequate study records; and failure to obtain proper informed consent. These lapses caused the defendants to be noncompliant with a laundry list of federal regulations (there is no need to recite them here), various study protocols, and "Good Clinical Practices." The second amended complaint also alleges that Catholic Health Partners participated in "other federal grants" and was out of compliance with certain

federal regulations in connection with these unspecified "other grants." The pleading alleges that on December 9, 2002, the Federal Drug Administration sent Catholic Health Partners a warning letter temporarily suspending its participation in an unrelated study for "violating regulations governing the composition, operation, and responsibilities of an IRB."

As to the alleged false claims in particular, the second amended complaint alleges that the defendants submitted various "forms, written reports and study results" to the government, including (but not limited to): Form PHS 398; Form PHS 2590; Form FDA 1572; CPCRA Form 704; "Financial Service Requests"; "Consent Forms"; "DAIDS Investigator of Record Agreement"; and "initial and continuing review records." Apart from these cryptic acronyms and generalized references to form titles, the forms are not described any further; their purpose or content is not identified, nor is there any indication when they were filed vis-á-vis any grant payments. The second amended complaint does not describe how the filing of any of these forms related to payment of grant money. Instead, it alleges that '[i]ndividually, and in cumulative effect, the forms, written reports, and study results submitted by the defendants constituted certifications of compliance with all requirements and conditions of the research grant." There is also a general allegation that "[d]efendants, individually and in conspiracy, have knowingly made false or fraudulent claims and certifications to justify retention of federal funds already received and to induce payment of additional federal funds."

### II. Discussion
[1][2] The FCA is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir.2003) (Rule 9(b) applies "because the False Claims Act condemns fraud but not negligent errors or omissions.") As is pertinent here, the FCA imposes liability against any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ---
**(Cite as: 2005 WL 1567316 (7th Cir.(Ill.)))**

Government." 31 U.S.C. § 3729(a)(2). An FCA claim under § 3729(a)(2) has three essential elements: (1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false. 31 U.S.C. § 3729(a)(2); *Lamers,* 168 F.3d at 1018. An FCA claim premised upon an alleged false certification of compliance with statutory or regulatory requirements also requires that the certification of compliance be a condition of or prerequisite to government payment. *United States ex rel. Mikes v. Strauss,* 274 F.3d 687, 697 (2d Cir.2001); *United States ex rel. Siewick v. Jamieson Science & Engineering, Inc.,* 214 F.3d 1372, 1376 (D.C.Cir.2000); *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 786-87 (4th Cir.1999); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 902 (5th Cir.1997); *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266-67 (9th Cir.1996).

**\*3** In *Lamers,* this court affirmed summary judgment against the FCA relator on the second and third elements of the claim, concluding that minor technical regulatory violations do not make a claim "false" for purposes of the FCA; the existence of mere technical regulatory violations tends to undercut any notion that a prior representation of regulatory compliance was knowingly and falsely made in order to deceive the government. *Lamers,* 168 F.3d at 1019; *see also United States ex rel. Luckey v. Baxter Healthcare Corp.,* 183 F.3d 730, 733 (7th Cir.1999). The district court relied on *Lamers* to conclude that the second amended complaint failed to state a claim. *Lamers* was a summary judgment case, however; here we are at the pleading stage, and the violations Gross has alleged appear on their face to go beyond the "minor technical violations" at issue in *Lamers.*

[3] In our view, the insufficiencies in Gross's second amended complaint relate instead to the first element of the claim, which, in a nutshell, requires that the fraudulent statement's purpose must be to coax a payment of money from the government. As the statute itself puts it, liability attaches only when a false statement is used "to get a false or fraudulent claim paid or approved by the Government." 31

U.S.C. § 3729(a)(2). Gross has failed to plead this element with the specificity required by Rule 9(b).

The false statements on which his claim is grounded are identified only by a categorical and essentially undecipherable listing of various "forms, written reports and study results" the defendants are alleged to have filed with the government at some point--the pleading does not say when--during the course of the study. As we have noted, the purpose or content of these forms is not described, nor does the second amended complaint describe how any of the forms relate to the payment of study funds. There are no specifics about how the $3.7 million in study funds were paid--whether in a lump sum when the study commenced or periodically while the study was ongoing. All we have are generalized allegations that the forms, considered "individually and in cumulative effect," constitute "certification" of regulatory compliance; and that the defendants, "individually and in conspiracy," made false certifications "to justify retention of federal funds already received" and "to induce" additional payment. These conclusory allegations shed no light on the nature or content of the individual forms or why any particular false statement would have caused the government to keep the funding spigot open, much less when any payments occurred or how much money was involved. This does not satisfy "the who, what, when, where, and how" requirement for pleading fraud under Rule 9(b). *Garst,* 328 F.3d at 376 (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990)).

Our conclusion here is bolstered by the analysis in *Garst.* There, the FCA relator faced similar pleading troubles, having suffered the district court's dismissal of his first three complaints. *Garst,* 328 F.3d at 375. The district court finally ordered the relator to file a more definite statement, but even that was "loaded with so many acronyms and cross-references to the third amended complaint (plus its attachments) that no one could understand it without juggling multiple documents." *Id.* at 376. Ultimately we concluded that although the relator had "come closer to specific allegations of deceit," he nevertheless "fail[ed] to link them to any claim for payment." *Id.* at 378. Thus, we held that the complaint in *Garst* failed Rule 8's "short and plain

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ---
**(Cite as: 2005 WL 1567316 (7th Cir.(Ill.)))**

statement" requirement as well as Rule 9(b)'s particularity mandate. We do not mean to suggest that Gross's second amended complaint flunks Rule 8, but we reach the same conclusion here as in *Garst* on the failure to plead fraud with particularity. *Id.* at 376-77.

*4 [4] In addition, Gross has failed to allege that any particular certification of regulatory compliance was a *condition* of payment of government money. In this respect the second amended complaint failed to state a claim and dismissal under Rule 12(b)(6) was justified. As we have noted, where an FCA claim is based upon an alleged false certification of regulatory compliance, the certification must be a condition of the government payment in order to be actionable. The second amended complaint makes no such allegation.

[5] At oral argument, counsel suggested that the second amended complaint's incorporation by reference of the "regulatory framework" was enough to clarify the causal connection between false certifications and government payouts. But counsel admitted that this would be true only if the district judge had "gone out and read all those regulations quite carefully." It was not incumbent upon the district judge to become an expert in all of the regulations governing NIH grant compliance so that he could piece together a theory on why any particular form listed in the second amended complaint might have fraudulently caused the government to cut a check. False claim allegations must relate to actual money that was or might have been doled out by the government based upon actual and particularly-identified false representations. On this, the complaint is silent.

[6] Finally, as we have noted, to the extent that Gross's claim was based upon the 2002 warning letter to Catholic Health Partners, the district court invoked the jurisdictional bar contained in § 3730(e)(4)(A). That section reads:
> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or

investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A). The district court was entirely correct. Gross did not allege that he was an original source of the information in the warning letter. The judgment of the district court is AFFIRMED.

2005 WL 1567316 (7th Cir.(Ill.))

**Briefs and Other Related Documents (Back to top)**

- 04-2566 (Docket)

(Jun. 22, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

| | |
|---|---|
| Your Search: | TI(GROSS) |
| Date/Time of Request: | Wednesday, July 13, 2005 16:39:00 Central |
| Client Identifier: | 29862-10020-27052 |
| Database: | CTA7-ALL |
| Citation Text: | 2005 WL 1567316 |
| Lines: | 309 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

# EXHIBIT B

APPEAL, SCHENKIER, TERMED

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 2.4 (Chicago)
### CIVIL DOCKET FOR CASE #: 1:01-cv-08182

Sanford M. Gross, et al v. AIDS Research, et al
Assigned to: Honorable William J. Hibbler
Demand: $0
Cause: 31:3729 False Claims Act

Date Filed: 10/24/2001
Jury Demand: None
Nature of Suit: 690 Forfeit/Penalty:
Other
Jurisdiction: U.S. Government Plaintiff

#### Plaintiff

**Sanford M Gross**
*Relator*

represented by **Christopher N. Mammel**
Childress Duffy Goldblatt, Ltd
515 North State Street
Suite 2200
Chicago, IL 60610-8190
(312) 494-0200
Email: cmammel@childresslaw.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**George K Lang**
Childress Duffy Goldblatt, Ltd
515 North State Street
Suite 2200
Chicago, IL 60610-8190
(312) 494-0200

#### Plaintiff

**John Ashcroft**
*Attorney General of the United States*

#### Plaintiff

**Scott Lassar**
*United States Attorney for the Northern
Distrist of Illinois*

#### Plaintiff

**United States of America**

represented by **AUSA**
United States Attorney's Office, NDIL
219 South Dearborn Street
Suite 500
Chicago, IL 60604
(312) 353-5300
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**AIDS Research Alliance - Chicago**      represented by **Jannis E. Goodnow**
Lord, Bissell & Brook LLP
115 South LaSalle Street
Chicago, IL 60603
(312) 443-0700
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael P Bruyere**
Lord, Bissell & Brook LLP
1170 Peachtree Street
Suite 1900
Atlanta, GA 30309
(404)870-4600
*ATTORNEY TO BE NOTICED*

**Defendant**

**Roberta Luskin-Hawk**      represented by **Jannis E. Goodnow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael P Bruyere**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Thomas Klein**      represented by **Jannis E. Goodnow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael P Bruyere**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ross Slotten**      represented by **Jannis E. Goodnow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael P Bruyere**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**
**Neel French**                                  represented by  **Jannis E. Goodnow**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Michael P Bruyere**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

**Defendant**
**Patricia Dixon**                               represented by  **Jannis E. Goodnow**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Michael P Bruyere**
                                                 (See above for address)

**Defendant**
**Catholic Health Partners**                     represented by  **N. Kent Smith**
                                                 Hall, Render, Killian, Heath & Lyman,
                                                 P.S.C.
                                                 One American Square
                                                 Box 82064, Suite 2000
                                                 Indianapolis, IN 46282
                                                 (317) 633-4884
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **David B. Honig**
                                                 Hall, Render, Killian, Heath & Lyman,
                                                 P.S.C.
                                                 One American Square
                                                 Box 82064, Suite 2000
                                                 Indianapolis, IN 46282
                                                 (317) 633-4884

                                                 **Tami J. Reding-Brubaker**
                                                 Cassiday, Schade & Gloor
                                                 415 Washington Street
                                                 Suite 214
                                                 Waukegan, IL 60085-5564
                                                 (847) 249-0700

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 10/24/2001 | 1 | COMPLAINT - Civil cover sheet - Appearance(s) of George Lang, Christopher N. Mammel as attorney(s) for plaintiff ( no summons(es) |

| | | issued.) ( Documents: 1-1 through 1-3) (cdy) (Entered: 11/13/2002) |
|---|---|---|
| 10/24/2001 | | RECEIPT regarding payment of filing fee paid; on 10/24/01 in the amount of $150.00, receipt #1049424. (cdy) (Entered: 11/13/2002) |
| 10/24/2001 | 2 | Document Sealed (pursuant to Court Order) (cdy) (Entered: 11/13/2002) |
| 01/07/2002 | 3 | Document Sealed (pursuant to Court Order) (cdy) (Entered: 11/13/2002) |
| 01/14/2002 | 4 | Document Sealed (pursuant to Court Order) document sealed [3-1] (cdy) (Entered: 11/13/2002) |
| 11/08/2002 | 5 | MINUTE ORDER of 11/8/02 by Hon. Charles P. Kocoras: The complaint is hereby unsealed. All other current contents of the Court's file in this case shall remain under seal and not be made public or served upon the defendants. The seal is hereby lifted as to all matters occurring in this action after the date of this order. All orders of the court shall be sent to the United States (Attorney's Office.) (Entered Order.) Telephoned notice (cdy) Modified on 12/05/2002 (Entered: 12/05/2002) |
| 11/08/2002 | 6 | NOTICE of election by the government to decline intervention (cdy) (Entered: 12/05/2002) |
| 11/12/2002 | 7 | REASSIGNMENT ORDER of 11/12/02 This case is reassigned to the Hon. William J. Hibbler from the Hon. Charles P. Kocoras. (For further detail see order.) Mailed notice (cdy) (Entered: 11/15/2002) |
| 12/05/2002 | | SUMMONS issued, five originals and five copies, as to defendants Catholic Health Partners, AIDS Research Alliance, Roberta Laskin-Hawk, Thomas Klein, Neal French on 12/05/02 (Attachment) (cdy) (Entered: 12/05/2002) |
| 12/06/2002 | | SUMMONS issued, original and one copy as to defendant Ross Slotten. (fce) (Entered: 12/11/2002) |
| 12/17/2002 | | SUMMONS issued, one original and one copy, as to defendant Patricia Dixon on 12/17/02 (cdy) (Entered: 12/18/2002) |
| 01/10/2003 | 7 | MOTION by defendants AIDS Research Alliance-Chicago, Thomas Klein, Ross Slotten, and Neel French for enlargement of time to respond to complaint (cdy) (Entered: 01/15/2003) |
| 01/10/2003 | 8 | ATTORNEY APPEARANCE for defendants AIDS Reseach Alliance - Chicago, Robert Luskin-Hawk, Thomas Klein, Ross Slotten, Neel French by Jannis E. Goodnow (cdy) (Entered: 01/15/2003) |
| 01/10/2003 | 9 | MINUTE ORDER of 1/10/03 by Hon. Joan B. Gottschall: Defendants' agreed motion for enlargement of time to respond to complaint [7-1], is granted [7-1]. Defendants' are to answer or otherwise plead to the complaint by close of business 02/13/03. Mailed notice (cdy) (Entered: 01/15/2003) |
| 01/15/2003 | | SCHEDULE set on 1/15/03 by Hon. John W. Darrah: Status hearing set to 9:15 2/27/03 before Judge Darrah in courtroom 1203 to set scheduling order. Plaintiff directed to advise the defendants of the status date. Mailed |

# EXHIBIT C

LAW OFFICES

# POWER ROGERS & SMITH, P.C.

Three First National Plaza
70 West Madison Street
55th Floor, Chicago
Illinois 60602-4212
TEL: 312 236-9381
FAX: 312 236-0920
www.prslaw.com

Joseph A. Power, Jr.
Larry R. Rogers
Todd A. Smith
Thomas G. Siracusa
Thomas M. Power
Larry R. Rogers, Jr.
Devon C. Bruce
Joseph W. Balesteri
Kenneth J. Merlino
Sean M. Houlihan
Brian LaCien

February 17, 2005

VIA FACSIMILE
Attorney Eric Pruitt
Sidley, Austin, Brown & Wood
10 South Dearborn Street
Chicago, IL 60603

Re:    Bannon v. Edgewater Hospital et. al.

Dear Mr. Pruitt:

I first want to say I think we certainly were able to resolve many of our disagreements which we had in our face-to-face meeting in Judge Lindberg's courtroom yesterday. I would like to memorialize some of our agreements and understandings based upon that meeting.

First, as I indicated to you, we do not have an objection to producing Anne Bannon for her deposition. Our hesitancy to do so to date had to do with either the availability of Ms. Bannon or the availability of her counsel. After consulting with Ms. Bannon's calendar, Mr. Berger's calendar and myself, we are able to produce her on March 4, 2005 at 2:00 p.m. here in the law offices of Power, Rogers & Smith. Please contact me immediately if you are unavailable on that date and I will provide you with alternative dates to depose Anne Bannon.

I would also like to confirm that you have agreed to produce the Edgewater Board of Director's meeting minutes as requested by Mr. Berger in a supplemental request to produce documents. Please provide that information to us as soon as possible. Secondly, you have agreed to produce any and all documents that you or your client have concerning the computation of the dollar amount of claims submitted by Edgewater Hospital and the doctors at issue to Medicare and Medicaid during the relevant time period at issue. As I indicated to you, I spoke to the United States Attorney's office on Wednesday afternoon at which time I was first told by Linda Wawzenski that Edgewater Hospital has already computed these amounts. She was very clear that Edgewater has these documents because they were produced by Edgewater to her in a related action. I would kindly ask you to produce any and all such documents at your earliest convenience.

Three First National Plaza
70 West Madison Street
55th Floor, Chicago
Illinois 60602-4212
TEL: 312 236-9381
FAX: 312 236-0920
www.prslaw.com

LAW OFFICES

# POWER ROGERS & SMITH, P.C.

Joseph A. Power, Jr.
Larry R. Rogers
Todd A. Smith
Thomas G. Siracusa
Thomas M. Power
Larry R. Rogers, Jr.
Devon C. Bruce
Joseph W. Balesteri
Kenneth J. Merlino
Sean M. Houlihan
Brian LaCien

As I indicated to you in our meeting, we are having some difficulty in obtaining these and other documents which we believe are non-privileged from the United States Attorney's office. This is due to some related litigation with respect to the proceedings against Mr. Rogan. I will of course attempt to obtain the documents I need from the United States Attorney's office, but in the meantime if you could produce those documents which are relevant to this litigation, I would certainly appreciate it. Also, this may obviate the necessity of my office staff inspecting at least a portion of the documents which you have made available to us at Edgewater Hospital.

I would also ask that you produce any and all deposition transcripts or statements of any of the board of director's officers or doctors involved in this litigation. As I understand it, there have been several related actions concerning the fraud that was occurring at Edgewater Hospital. In addition to the United States government statements in the Santiago proffer, I understand that there are depositions that have been given by Mr. Rogan as well as some of the other Edgewater employees and physicians in the case. I would ask that you kindly produce any of those statements and deposition transcripts in order to possibly obviate the necessity of calling these witnesses live at this trial.

As I have also indicated to you, we fully intend on disclosing at least one retained expert in this matter on the issue of the computation of damages. We will not be able to do so, however, until we obtain the information of the total amount of submissions made by Edgewater Hospital and the defrauding doctors to the United States government for treatment rendered by the various physicians at issue in this case. As you know, we just received the first portion of that information on January 31, 2005. As soon as we have the necessary information, I will promptly deliver that to our consultants and we will promptly disclose our opinion witnesses.

In regards to the disclosure statement to the United States government, the motion to compel interrogatory answers and the deposition of Sid Berger, as I understand it, these discovery disputes all involve the same issue. Namely, you are searching for proof that the relator was the original source of the information set forth in the complaint. As indicated by Mr. Berger, we are taking the position that this information which you are seeking is protected under the attorney-client work product privilege.

LAW OFFICES

# POWER ROGERS & SMITH, P.C.

Three First National Plaza
70 West Madison Street
55th Floor, Chicago
Illinois 60602-4212
TEL: 312 236-9381
FAX: 312 236-0920
www.prslaw.com

Joseph A. Power, Jr.
Larry R. Rogers
Todd A. Smith
Thomas G. Siracusa
Thomas M. Power
Larry R. Rogers, Jr.
Devon C. Bruce
Joseph W. Balesteri
Kenneth J. Merlino
Sean M. Houlihan
Brian LaCien

We are further taking the position that the information that you seek is irrelevant to the issues in this case. It is defendant's burden to prove that our Complaint which cites specific instances of fraud occurring in 1998 and 1999 was actually derived from two magazine articles published in 1996. Of course, this is an impossibility as our complaint was not based upon the public disclosures, per <u>Farmington</u>, "original source" is a non-issue. In any event, we will review the disclosure statement to the United States government and may very well present the court with a copy of the disclosure statement *in camera*. We will then also supply a brief to the court as to why we believe the document is privileged. I can expect that we can address this issue next Thursday morning before Judge Lindberg.

Very truly yours,

POWER, ROGERS & SMITH, P.C.

Devon C. Bruce
Attorney at Law

DCB/sld

# EXHIBIT D

**TRANSCRIBED FROM DIGITAL RECORDING**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANNE BANNON, individually and ex rel., | ) | No 00 C 7036 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| EDGEWATER HOSPITAL , et al., | ) | Chicago, Illinois |
| | ) | March 21, 2005 |
| Defendants. | ) | 9:02 A.M. |

TRANSCRIPT OF PROCEEDINGS - Status
BEFORE THE HONORABLE ARLANDER KEYS, Magistrate Judge

APPEARANCES:

For the Plaintiff:        POWERS, ROGERS & SMITH
                          70 West Madison Street
                          Suite 5500
                          Chicago, Illinois  60602
                          BY:  MR. DEVON C. BRUCE

                          MR. SIDNEY R. BERGER
                          Three First National Plaza
                          Suite 3700,
                          Chicago, Illinois  60602

For Defendant Edgewater:  SIDLEY, AUSTIN, BROWN & WOOD, LLP
                          10 South Dearborn Street
                          Bank One Plaza
                          Chicago, Illinois  60603
                          BY:  MR. SCOTT T. MENDELOFF
                               MR. ERIC S. PRUITT

                 PAMELA S. WARREN, CSR, RPR
                    Official Court Reporter
                   219 South Dearborn Street
                         Room 1928
                   Chicago, Illinois   60604
                       (312) 294-8907

**NOTE:  Please notify of correct speaker identification.**

1        MR. MENDELOFF:  Yes, your Honor.

2        THE COURT:  -- against several defendants, including

3 Edgewater.

4        MR. BRUCE:  That's correct, your Honor.

5        THE COURT:  And individual doctors and a Universal

6 Geriatric Services.

7        MR. MENDELOFF:  That's correct.

8        THE COURT:  Who represents Universal?

9        MR. MENDELOFF:  They aren't here.  Mr. Bruce might

10 know, he's the plaintiff.

11        THE COURT:  Okay.  And, Mr. Bruce, you represent the

12 relators, right?

13        MR. BRUCE:  That's correct, your Honor.

14        THE COURT:  And who represents the government?

15        MR. MENDELOFF:  The government is not here.  They have

16 declined to take part.

17        THE COURT:  Oh, so -- so this is simply the relators

18 against the defendants.

19        MR. MENDELOFF:  Yes.

20        MR. BRUCE:  That's correct, your Honor.

21        THE COURT:  All right.

22        MR. MENDELOFF:  And just so that your Honor is clear

23 on the situation, there is a separate litigation completely

24 involving Edgewater Hospital that involves litigation between

25 Edgewater Hospital and Mr. Rogan, who was the director of

1   Edgewater Hospital, et cetera.  We represent Edgewater Hospital

2   in connection with that case.

3          In connection with that case, which is both in

4   bankruptcy court and federal district court in front of Judge

5   Filip, we -- Edgewater Hospital entered into a settlement

6   agreement with the relator in which the relator agreed to not

7   press its claims against Edgewater but to continue to press its

8   claims against Edgewater's insurance company.

9          THE COURT:  Okay.

10         MR. MENDELOFF:  Edgewater's insurance company then

11  approached us and asked us if we would represent Edgewater for

12  purposes of the insurance claim, which is what we are talking

13  about here.

14         THE COURT:  Okay.

15         MR. MENDELOFF:  So even though we are also

16  representing the hospital separately regarding its prosecution

17  of claims against Mr. Rogan, here the case really involves the

18  relators's claim against the insurance -- Edgewater's

19  insurance.  We represent the -- Edgewater for that purpose too.

20         THE COURT:  All right.  Now you, from my reading of

21  the complaint and the answers and the other documents, you were

22  brought -- Edgewater was brought into this because of the one

23  patient authority.

24         MR. MENDELOFF:  That's where it appears, your Honor.

25  Although Mr. --

# EXHIBIT E

### SIDNEY R. BERGER
ATTORNEY AT LAW
THREE FIRST NATIONAL PLAZA, SUITE 3700
CHICAGO, ILLINOIS 60602

(312) 558-6730
FAX (312) 558-7773

November 13, 2000

## VIA FEDERAL EXPRESS

Ms. Janet Reno
United States Attorney General
Department of Justice
10th and Constitution Avenue N.W.
Washington, D.C. 20530

> Re:  **Anne Bannon v. Edgewater Hospital, et al. -**
> **Case No. 00 C 7036 -    UNDER SEAL**

Dear Ms. Reno:

Enclosed please find a copy of the above-reference qui tam Complaint which was filed in the Northern District of Illinois. In accordance with 31 U.S.C. §3730(b)(2), the purpose of this letter is to disclose substantially all material evidence and information upon which my client's Complaint is based.

This action involves a conspiracy between hospitals, doctors, a pharmacy, and a durable medical equipment company to defraud Medicare and Medicaid. Although more individuals and companies are more likely than not involved, the following are the facts as we understand them to be.

My client is Anne Bannon who has worked as a volunteer on behalf of Little Brothers of the Elderly for over twenty years. In said capacity, Ms. Bannon has taken an active role in the betterment of the welfare of a great number of senior citizens throughout the Chicago area.

One such senior citizen with whom Ms. Bannon has had an ongoing relationship with is Florence Hammothe who is 78 years old and resides at an assisted living center located at 1039 West Hollywood, Chicago, Illinois. Ms. Hammothe's personal physician is Dr. Kris Sriram. As such, Anne has spoken to Dr. Sriram on numerous occasions.

In approximately April, 1999, a "free clinic" (i.e. where "doctors" and "nurses" came to the building and gave the residents a physical exam at no charge) was held at Florence's building. As the residents were told that if they participated in the clinic they would receive a free lunch, Florence went down to the clinic where she saw an Indian "doctor". Since Florence's own doctor is Indian, Florence assumed that the doctor at the clinic was associated with her doctor.

## SIDNEY R. BERGER

Ms. Janet Reno
November 13, 2000
Page 2

After having taken her blood pressure and temperature, the "doctor" told her it would be best to be seen by another doctor and that a van would come by the next day to pick her up to take her to that doctor.

The next day the van did in fact come and pick up Florence and approximately six other residents from the building and transported them to Doctors Hospital located on the south side of Chicago which is approximately 20 miles from where Florence lives. Florence was encouraged to allow her admission into the Hospital but she refused telling them that she would only agree to be admitted if her friend, Anne Bannon (the Relator herein), agreed that it was the right thing to do. Doctors Hospital attempted to contact Ms. Bannon, but was unsuccessful. With Florence refusing to be admitted without Anne's consent, Doctors Hospital found itself having no choice other than to drive Florence back to her apartment.

Since, April, 1999, Universal has sponsored a number of free clinics at Florence's building. On at least three occasions, Ms. Bannon has been contacted by representatives of the Wellness Institute requesting her agreement to have Florence hospitalized. In each of these telephone conversations, Ms. Bannon advised the caller that she would not consent to any hospital admission, that there was no reason for Florence to be admitted into the hospital, and they should never again "examine" her at any future free clinic and that they should never again attempt to have her hospitalized. Despite these admonitions from Ms. Bannon in each conversation with representatives of Wellness, on at least two subsequent occasions, they still sought to have Florence admitted into the Hospital.

In January, 2000, Dr. Sriram was talking to Anne and complaining about how Doctors Barnabas (Ravi and Satish) were defrauding Medicare. He said he used to work with Doctors Barnabas at Methodist Hospital and when he saw that they were committing Medicare fraud he left the practice. He further said that it was the Doctors Barnabas who were behind the "free clinic" at Florence's building the time they took her to Doctors Hospital. He said that the testing was just a ruse to try to get new patients who they would then ship to Doctors Hospital so that they could be admitted there. He said that the "testing" at the seniors' buildings were performed by a resident who has not passed state boards. He gave the resident's name as being P. J. Brovack whose job it was to get the seniors sent over to Doctors Hospital where they would be examined by Dr. Barnabas who would try to find anything wrong with them so that they would be admitted into the hospital. Dr. Sriram encouraged Anne to notify the authorities about the fraud which Doctors Barnabas were committing because if they were ever questioned about Medicare fraud, they would "pee in their pants."

## SIDNEY R. BERGER

ها

Ms. Janet Reno
November 13, 2000
Page 3

         In approximately February, 2000, Florence received a call from an individual who sought to provide her with Ensure[1] at no cost to her. Once again, Florence directed the caller to contact Anne. Anne did in fact receive a telephone call from an individual who identified herself as Lockie Sain who was from the Look & Supply Medical Equipment Company ("L&S"). Lockie explained to Anne that at one of the clinics it was noted that Florence was rather frail, she was calling to offer to provide Ensure at no cost. All that she needed was a note from Florence's doctor and then she could begin sending the Ensure. Anne told Lockie that she would speak to Florence's doctor. Before doing so, we discovered that L&S was listed in the Chicago phone book at 6915 South Ada, Chicago 60636, with a telephone number of 773-483-2317. Anne found it strange that a company located at 6900 South would seeking to provide products to someone who lived 5600 North.

         Anne spoke to Dr. Sriram about her conversation with Lockie and Lockie's need for a prescription from Florence's doctor, and Sriram responded that "he'll see."

         Thereafter, Lockie called Anne two more times asking if Florence's doctor got the prescription and Anne responded both times that "he's getting to it." Dr. Sriram left a message with Florence that if she wanted to get Ensure, he would give her the prescription and that she should call the number he was giving her and ask for Jeff Veal. Not having heard back from Florence, Dr. Sriram left a message with Shirley (a manager at the building) telling her that she should see that Florence calls Jeff Veal at 773-374-4550 so that she could get the Ensure. In the message left to both Florence and Marge, Dr. Sriram specifically requested that when Veal is called, Florence should give him her Medicaid number.

         Shirley told Anne about the message that was left. Anne called the above telephone number and the phone was picked up by a gentleman identifying himself as "Veal". It was the phone number of a business known as 200 Pharmacy located at 9004 South Stony Island. Anne asked if the pharmacy is affiliated with a hospital and was told that it was not but that it was affiliated with a clinic. Being puzzled as to why a pharmacy on the South side of the City would be supplying items to a resident on the North side of the City, Anne asked that question of Veal in a manner such as, "Does it pay for a pharmacy on the South side to supply an item on the North side?" Veal asked who the doctor was and Anne told him it was Dr. Sriram. Veal responded that they deliver stuff all over the City and, in fact, to a number of Dr. Sriram's patients.

---

     [1]Ensure is a dietary supplement properly reimbursable by Medicare **only** if the patient cannot swallow and therefore has enteral feeding. Florence has no difficulty swallowing and is not tube fed.

## SIDNEY R. BERGER

Ms. Janet Reno
November 13, 2000
Page 4

        We have since discovered that 200 Pharmacy is an Illinois corporation and Jeff Veal is its Registered Agent and President. The address for Jeff Veal according to the Secretary of State's records is 3151 South Indiana Avenue, Chicago, Illinois.

        In March, 2000, Anne was visiting Florence and one of the "free clinics" was being held at her building. There was a big sign "Universal Geriatric Services". There was also a smaller sign on the bottom which mentioned the "Wellness Institute". There was an 800 number given (1-800-587-4027) which we have discovered is an 800 number for Doctors Hospital. The Wellness Institute is located at 2100 South Indiana, Chicago. At least as of 1997, Universal Geriatric was located at 2100 South Indiana Avenue. It is now located at 2100 North Southport, Chicago, Illinois. According to the records of the Secretary of State, the Wellness Institute was incorporated in 1993 and is located in DuPage County. Its President is Vijay Prashagear. Its Secretary is Rochelle Prashagear. Its Registered Agent is Gauran G. Patel, whose address is 220 West 444 Lake Street, Addision, Illinois 60101.

        Universal Geriatric Services is an Illinois corporation incorporated in 1992. Its Registered Agent, President, and Secretary, is Anthony Todd, whose address is 655 West Irving Park Road. Chicago, Illinois 60613.

        In April, 2000, Anne called Universal Geriatric Services whose phone was answered by a person whose voice Anne recognized as being that of Lockie Sain. Upon recognizing her voice, Anne acted as if she had dialed the wrong number and hung up the telephone. Later that month, Lockie made her third (and last) telephone call to Anne inquiring whether Florence's doctor has given the prescription which she needed. Anne attempted to engage Lockie in "small talk" and Lockie told her that she used to work for Universal Geriatric Services which did screenings at seniors' housing (such as Florence's) on behalf of Edgewater and Grant Hospitals.

        In approximately in May, 2000, Anne called both Edgewater and Doctors Hospitals so as to inquire if Doctors Barnabas and Sriram were on staff at either hospital. She was informed that Doctors Barnabas are on staff at both Edgewater and Doctors Hospitals but that Dr. Sriram was on staff at Edgewater, but not at Doctors. Shortly thereafter, Anne contacted the Wellness Institute and inquired if Dr. Cubria was affiliated with the Institute. She was told that, "He comes by to pick up his mail."

        We have obtained the hospital records of Dorothy Cifax who was admitted to Edgewater Hospital on October 14, 1998. Her attending, admitting and referring doctor were all referred to as being Dr. Andrew Cubria. Her financial class was originally designated as being Medicare but thereafter corrected to reflect Managed Care HMO. Her admit type was "Urgent".

### SIDNEY R. BERGER

Ms. Janet Reno
November 13, 2000
Page 5

Her admitting diagnosis was cardiac arrythmia. (All of these facts are contained in Dorothy's hospital record, pages of which are being attached hereto as Exhibit 1.)

Dorothy's history was taken on October 14, 1998, by Vivak Blatl who set forth her chief complaint as being swelling of right leg. Dorothy's detailed history was set forth as follows:
Plaintiff states that she was part of senior group that gave free tests to senior citizens. Patient went to Dr. Cubria's office where they found EKG abnormalities or w/u. Patient states that she had no C.P. (chest pain), no N/V (nauseau, vomiting), and no diaphoresis. Patient states that at Dr. Cubria's office she told them that she had leg pain. Patient states that leg pain lasted one year. Patient states that her leg swelling is not associated with pain. Patient states that with rest swelling reduces." (All of these facts may be found on Exhibit 2 attached hereto.)

Dorothy was discharged on December 16, 1998, and was given her patient discharge instruction summary which set forth nitroglycerin medication as needed for chest pain while at the same time setting forth that no medications were prescribed. (Exhibit 3, hereto.)

Dorothy's discharge planning as contained in her patient progress notes states that she: "...needs to call Dr. Cubria's office for a return appointment and Orsini Home Health to follow up patient at home; venous doppler done...hospital transportation arranged". (See Exhibit 4.)

Attached hereto as Exhibit 5 is a copy of the Physician Attestation Report prepared two weeks after Dorothy's admission which sets forth the diagnosis and procedures performed. Despite the fact the principal diagnosis is presented as being "chest pain" nowhere in the record did Dorothy ever complain of chest pains and, to the contrary, in the initial history taken when she was admitted, she specifically stated she had no chest pain.

We have had Dorothy's hospital records reviewed and our expert has concluded that there was no medical need for her to be admitted into the Hospital and there was no medical need for any of the Procedures performed. The only possibly legitimate reason to have considered admitting Dorothy into the Hospital would have been a concern that the swelling of her leg was due to a blood clot. However, if that were the fact, the first test which should have been performed upon her would have been the venous doppler. A cardiologist concerned about the possibility of his patient having a blood clot, would not perform heart catherizations without first having ruled out the possibility of a blood clot. In Dorothy's case, Dr. Cubria performed catherizations prior to doing the venous doppler test.

In approximately April, 2000, Anne called Altgeld Gardens so as to inquire which company conducts the "free clinics" there. She was informed that the clinics are run by Universal

**SIDNEY R. BERGER**

Ms. Janet Reno
November 13, 2000
Page 6

Geriatric whose President is Anthony Todd. She was further informed that Todd is a nurse who performed the screenings.



Sincerely,

Sidney R. Berger

SRB:jh

cc:    Mr. Scott Lassar, via hand delivery
       Mr. Michael Hertz, via Federal Express

# HISTORY 1

NOTE: WHEN WRITING PATIENT'S HISTORY:
USE THE FOLLOWING SEQUENCE:
1. CHIEF COMPLAINT     2. HISTORY OF PRESENT ILLNESS
3. HISTORY OF PAST ILLNESS    4. FAMILY HISTORY
5. SOCIAL HISTORY AND HABITS    6. SYSTEMIC REVIEW

DATE: 10/14/98    NAME OF EXAMINER: Vivek Bhatt

PATIENT IDENTIFICATION (AGE, SEX, RACE): 75 y.o. AA ♀

CHIEF COMPLAINT: ® (_) S.I.T.J

DETAILED HISTORY OF PRESENT ILLNESS: _____



**EDGEWATER MEDICAL CENTER**
5700 NORTH ASHLAND AVENUE · CHICAGO ILLINOIS 60660-4096
(773) 878-6000

022438 M 9/25/23 437 2
CIFAX, DOROTHY
10/14/93  F  075Y MED PR
CUBRIA, ANDREW H SP
551608

## ~ATIENT DISCHARGE INSTRUCTION SUMMARY

te: 10/16/9 ___ Time of Discharge: ___ AM / PM

SCHARGE DIAGNOSIS: R/O ISCHEMIA, R/O MI, S/P CARDIAC CATHETERIZATION

| MEDICATION | DOSAGE | TIME(S) TO BE TAKEN | WHAT FOR | COMMENTS |
|---|---|---|---|---|
| NITROGLYCERIN | 0.4mg | as needed | for chest pain | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

MEDICATIONS: ☑ No medications prescribed · Prescriptions given: ☐ Yes ☐ No  Returned preadmission drugs ☐ Yes ☐ None
Medication instructions given to: ☐ Patient ☐ Significant Other  Relationship: ___
Patient or significant other verbalizes understanding of medication instructions: ☐ Yes ☐ No
Comments: ___

2grams, low cholesterol diet

TRITION: ☐ Regular  Other (specify): ___  ☐ No instructions needed  ☑ Food & drug interaction handout given
instructions given to: ☐ Patient  ☐ Significant Other  Relationship: ___  Instructed By: ___

TREATMENT/WOUND CARE: ☐ No treatment prescribed  ☑ Heplock discontinued
Treatments prescribed (list): ___

Patient or S/O verbalizes understanding of instructions: ☑ Yes ☐ No  ___  Patient or S/O demonstrates treatment ☐ Yes ☐ No
instructions given to: ☐ Patient ☐ Significant Other  Relationship: ___
Comments: ___

ACTIVITY LEVEL: ☑ Independent ☐ Crutches ☐ Walker ☐ Cane ☐ Wheelchair ☐ Other  (explain): ___
Restrictions: ___

Instructions given to: ☐ Patient ☐ Significant Other  Relationship: ___
Patient or S/O demonstrates activity and/or verbalizes understanding of instructions:  ☐ Yes  ☐ No

DISCHARGE STATUS: ☑ M.D. Order  ☐ AMA
To: ☑ Home  ☐ Other: ___
Mode: ☑ Wheelchair  ☐ Ambulatory  ☐ Medicar  ☐ Ambulance
Home care follow-up:  ☐ Yes  ☐ No
Health Status: ___

Vital Signs: T  98.7    P  54    R  18    B/P  120/70

Comments: ___

FOLLOW-UP APPOINTMENT WITH: Physician: ___  Date: ___  Time: ___ AM
☐ General Medicine Clinic Resident: ___  Dr. Cubria
☐ I will arrange for my appointment after discharge with: ___
Physician: ___  Other ___
If there are any questions regarding these instructions, please contact your physician.

I HAVE RECEIVED A COPY OF THE ABOVE INSTRUCTIONS AND UNDERSTAND THEM. I HAVE RECEIVED MY PERSON
BELONGINGS AND/OR VALUABLES SLIP TO PICK UP THE ITEMS I DEPOSITED IN THE HOSPITAL SAFE.

___  ___  Registered Nurse

JUE DATE: 10/28/98        EDGEWATER MEDICAL CENTER     PROGRAM-ID: 3
ISSUE TIME: 11.14.50        PHYSICIAN ATTESTATION REPORT

PATIENT NAME:   CIFAX, DOROTHY        AGE:   75 Y     SEX: F
ACCOUNT NUMBER:        822488        ROOM: 4W/0437 2
MEDICAL RECORD NUMBER:     551608        FIN. CLASS: 5 - MANAGED CARE/ HM
ADMISSION DATE:        10/14/98
DISCHARGE DATE/STATUS:     10/15/98    1 - HOME

MDC/DRG ASSIGNMENT
  05 - DISEASES & DISORDERS OF THE CIRCULATORY SYSTEM
  125 - CIRCULATORY DISORDERS EXCEPT AMI, W CARD CATH W/O COMPLEX DIAG

PRINCIPAL DIAGNOSIS: 786.59     CHEST PAIN NEC

SECONDARY DIAGNOSES
  2. 729.81 SWELLING OF LIMB        3. 794.31 ABNORM ELECTROCARDIOGRAM
  4.                              5.
  6.                              7.
  8.                              9.
  10.                           11.
  12.                           13.
  14.                           15.

PRINCIPAL SURGEON: 47404 CUBRIA, ANDREW H (SP)

PROCEDURES                         DATE     PHYSICIAN
  37.23    RT/LEFT HEART CARD CATH     10/15/98   47404 CUBRIA, ANDREW H (SP
  88.53    LEFT VENTRICULOGRAM        10/15/98   47404 CUBRIA, ANDREW H (SP
  88.55    CORONARY ANGIOGRAM (JUDKINS)   10/15/98   47404 CUBRIA, ANDREW H (SP

I CERTIFY THAT THE NARRATIVE DESCRIPTIONS OF THE PRINCIPAL AND SECONDARY DIAGN(
AND THE MAJOR PROCEDURES PERFORMED ARE ACCURATE AND COMPLETE TO THE BEST OF MY
KNOWLEDGE.

PHYSICIAN ATTESTMENT:       _____       _____

                           (SIGNATURE)                     (DATE)

ATTENDING PHYSICIAN:    47404   CUBRIA, ANDREW H (SP)

RATE-RATES FROM THE FEDERAL REGISTER DATED AUGUST 31. 1994

Printed: 10/14/98
Medical Record Number:      551608          Account Number:  822488    By: PAHO
Patient Type:   INPATIENT                    Admit Date:  10/14/98  Time: 11:21
                                             Disch Date:  10.16.98 Time:

Patient Name:   CIFAX, DOROTHY          Attending Dr:  47404 CUBRIA, ANDREW H (SP)
Room Number: 4W      437-2              Admitting Dr:  47404 CUBRIA, ANDREW H (SP)
Accomodation:  SEMI                     Referring Dr:  47404 CUBRIA, ANDREW H (SP)

Address:        13058 S EVANS  APT 93-1
City/State:  CHICAGO        IL    60627     Financial Class: MEDICARE  managed Care #440
Telephone:   773  468-3889                  Medical Service: MEDICINE  Cardiology
SSN:         352180443      Age: 075Y       Medical Resident:  YES
DOB:         9/25/23
Sex/Race:    F /BLACK                        Admit Type:     URGENT
Mar Status:  WIDOW(OR)                       Treatment Authorization:
Religion:    PROTESTANT
Place of Birth: CHICAGO
Admitting Diagnosis:          414.9
    CAD, CARDIAC ARRYTHMIA
Comments:
  PT IS A DIRECT ADMIT..FROM DR OFFICE..ALL FORMS AND SIGNATURES ATTACHED...

----------------------------------------------------------------------------

Nearest Relative:          Employer Name:            Emergency Contact:
  DELLA ADAMS

                                                                   Pt Rel:
  773 821-0068  Pt Rel: SS
                             Occupat.:              2CS
----------------------------------------------------------------------------
  Guarantor#:  179232                 Guarantor Employer:
  CIFAX, DOROTHY
  13058 S EVANS  APT 93-1
  CHICAGO           IL    60627
  773 468-3889   Pt Rel PT
  SSN:   352180443                      Occupation:
----------------------------------------------------------------------------
Insurance Information:
INS # 1: CO:    1   MEDICARE           INS # 3: CO:        78659
Plan:         1   PART A/B             Plan:
Address:                               Address:            72581
City/St:                               City/St:
  Zip Code:                              Zip Code:         7#431
Subscriber:  CIFAX, DOROTHY            Subscriber:
Group:                                 Group:
ID#:   WA941535                        ID#:

INS # 2: CO:                           INS # 4: CO:
Plan:                                  Plan:           10/15 3733      47454
Address:                               Address:              8853
City/St:                               City/St:
  Zip Code:                              Zip Code:           3856
Subscriber:                            Subscriber:
Group:                                 Group:
ID#:                                   ID#:
----------------------------------------------------------------------------
  EDGEWATER MEDICAL CENTER            ADMISSION FACE SHEET
  5700 N ASHLAND  CHICAGO IL  60660

822488 A 9/25/23 437 2
CIFAX, DOROTHY
0/14/98 F 075Y MED
CUBRIA, ANDREW H S P
551608

## PATIENT PROGRESS NOTES

| Date/Time | Physicians Start Here | Nursing and other Patient Care Personnel Start Here |
|---|---|---|

CIFAX,DOROTHY 822488 437-2 16 OCT 98 6:48 HR 63 VPB 8 SINUS BRADY 25 mm/sec (BAMIA1B)(G#201)

CR .15
QRS .08
QT .5

II HR 66

4372  Sinus rhythm

| | | |
|---|---|---|
| 10/16/98 | 1000 | P: Discharge Planning |

seen and examined by Dr. Cubrici ē discharge order

I > Notified pt of OK order - discharge instructions Pt diet and need to call Dr. Cubria's office for r/c appointment and onsite home health to follow-up pt at home. Venous doppler done.

P Check VS - Hospital transportation arranged.

E > [illegible] sinus removed on scheduled meds. VSS denies C/P or dis comfort in sinus rhythm. Verbalized understanding of entire Given. Discharged [illegible] [illegible] via utilizing hospital [illegible].

# EXHIBIT F

DEXIA CREDIT LOCAL (both )
individually and on behalf of LaSalle Bank )
National Association, as Master Trustee), )
                                           )   Case No. 01 C 9452
          Plaintiff,                       )
                                           )   Hon. Wayne R. Andersen
     v.                                    )
                                           )
EDGEWATER MEDICAL CENTER, f/k/a            )
Northside Operating Co., an Illinois not for )
profit corporation;                        )
AMERICAN STANDARD, INC., a                 )        **DOCKETEN**
Wisconsin corporation;                     )
LEOPARDO COMPANIES, INC., an               )        **JAN 2 5 2002**
Illinois corporation;                      )
COLUMBIA PIPE & SUPPLY CO., an             )
Illinois corporation;                      )
PALATINE BUILDERS SUPPLY CO., an           )
Illinois corporation                       )
CIRCUIT ENTERPRISES, INC., an              )
Illinois corporation;                      )
PINTO CONSTRUCTION GROUP, INC.,            )
an Illinois corporation;                   )
JOHNSON CONTROLS, INC., a                  )
Wisconsin corporation;                     )
THE FIELD HOUSE, INC., an Illinois         )
corporation;                               )
PARKSIDE INSULATION, INC., an              )
Illinois corporation;                      )
DESIGN ORGANIZATION, INC., an              )
Indiana corporation;                       )
JUST RITE ACOUSTICS, INC., an Illinois     )
corporation; UNKNOWN OWNERS; and           )
NONRECORD CLAIMANTS                        )
                                           )
          Defendants.                      )
                                           )

## AMENDED ORDER APPOINTING RECEIVER

THIS CAUSE COMING ON TO BE HEARD upon Plaintiff Dexia Credit Local's ("Dexia") Motion for Appointment of Receiver (the "Receiver Motion"), and upon the proofs heard and exhibits allowed herein, proper notice having been given, and the oral motion of the Receiver, Eugene Crane, to amend the Order Appointing Receiver (the "Oral Motion"), to which Oral Motion no objection has been interposed, and this Court being fully advised in the premises.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.      The Receiver Motion and the Oral Motion are granted as set forth herein.

2.      Eugene Crane, who is not a party or entity interested in this action, is hereby appointed receiver (the "Receiver"). The Receiver shall have the powers and duties set forth in this Order and in 735 ILCS 5/15-1704. The Receiver shall manage the real property generally referred to as Edgewater Medical Center, located at 5700 N. Ashland Avenue, Chicago, Illinois and legally described in Exhibit A to the Verified Complaint, and the improvements, fixtures and personal property located thereon, as well as accounts receivable and the proceeds thereof of the Defendant, Edgewater Medical Center (which real property, personal property, leases and rents, improvements and fixtures, as well as accounts receivable and the proceeds thereof of the Defendant, Edgewater Medical Center, are collectively referred to herein as the "Property").

3.      The Receiver is hereby ordered, authorized and directed to immediately take possession of the Property, and all persons named herein and all persons holding under them, are ordered and directed to deliver forthwith to the Receiver possession of the Property, and all rents, revenues, issues, proceeds, profits, cash, bank accounts and security deposits from the Property in the possession or control of any of the defendants named herein, together with all books, records, accounts, ledgers, and other documentation necessary to the continuing management of the Property. It is further ordered that the Receiver be and hereby is authorized to use any personal property of the defendants named herein on the premises of the Property.

K5069-1

4.     The Receiver is authorized to receive and collect all rents, revenues, issues, proceeds, profits and security deposits from the Property accruing with respect thereto whether the same are now due and unpaid or shall hereafter become due. Without prior leave of this Court, the Receiver may commence appropriate litigation to collect such sums if circumstances warrant.

5.     The Receiver is authorized to enter into such agreements in connection with the protection, possession, preservation, control, management and operation of the Property as he may deem advisable, and to incur such expenses and liabilities and make such disbursements out of the proceeds of the Property as may in his judgment be advisable, useful or necessary in connection with the foregoing, including, but not limited to, payment of real estate taxes and utility bills and assessments, payment of general expenses for maintenance and repair to the Property and procurement of proper insurance coverage.

6.     The Receiver is authorized to employ such agents and employees as may in his judgment be advisable, useful or necessary in the protection, possession, preservation, control, management and operation of the Property and to make such payments and disbursements out of the proceeds of the Property as may be necessary and proper for the protection, possession, preservation, control, management and operation of the Property.

7.     The Receiver is authorized to protect, possess, preserve, control, manage and operate the Property. Such authority shall include, but is not limited to, the authority of the Receiver to take all actions necessary to enforce or terminate any and all leases pursuant to their terms or otherwise pursuant to applicable law.

8.     The Receiver shall be compensated for the fair and reasonable value of his services out of the proceeds from the Property at his customary hourly rate, but not in the aggregate to exceed $35,000 from the date of this Order to and including January 8, 2002. The compensation of the Receiver for the period commencing after January 8, 2002, shall be subject of a further order of this Court. The balance of such revenues shall be available to the Receiver for payment of expenses necessary and appropriate to the management of the Property. Any

amounts remaining after the payment of said expenses and the payment of the Receiver's compensation shall be held in escrow pending further order of Court.

9. The Receiver shall file monthly reports of his activities. Such reports shall include, without limitation, statements of operating income, expenses and occupancy. The original of such reports shall be filed with this Court and a copy of such reports shall be sent to counsel of record for the parties.

10. The Receiver may be removed, and this Order and all rights of the Receiver and any of his agents and employees hereunder may be canceled and terminated, by further Order of this Court.

11. The Receiver and his agents and employees shall have no right to assign any rights, title or interest or any obligations pursuant to this Order, without further Order of this Court.

12. The Receiver shall maintain the computer services to Grant Hospital subject to further Order of Court.

ENTERED this 16th day of January, 2002.

Hon. Wayne R. Andersen

Stephen E. Garcia, Esq.
Kaye Scholer LLP
311 S. Wacker Drive
Suite 6200
Chicago, IL 60602
(312) 583-2300
Attorneys for Dexia Credit Local

Eugene Crane, Esq.
Arthur G. Simon, Esq.
Dannen, Crane, Heyman & Simon
135 S. LaSalle Street
Suite 1540
Chicago, IL 60603
(312) 641-6777
Attorneys for Eugene Crane, Receiver

P.09    31264169S3                    CRANE-HEYMEN        16:15    NOU-04-2004

# EXHIBIT G

ANNE BANNON, Individually, and )
ex rel. UNITED STATES OF AMERICA )
and THE STATE OF ILLINOIS, )
                         )
         Relator, )
                         )
      v. )   No. 00 C 7036
                         )
EDGEWATER MEDICAL CENTER; DR. )
ANDREW CUBRIA; DR. RAVI BARNABAS; )
UNIVERSAL GERIATRIC SERVICES, INC.; )   Judge George W. Lindberg
ANTHONY TODD; THE WELLNESS )
INSTITUTE, INC.; DR. KRISHNASWAMI )   Mag. Judge Jeffrey Cole
SRIRAM; TWO HUNDRED PHARMACY, INC.; )
JEFF W. VEAL; DOCTORS HOSPITAL OF )
HYDE PARK, INC., )
                         )
         Defendants. )

## DEFENDANT EDGEWATER MEDICAL CENTER'S AMENDED OBJECTIONS AND RESPONSES TO RELATOR ANNE BANNON'S FIRST SET OF REQUESTS FOR ADMISSIONS

        Defendant Edgewater Medical Center ("Edgewater") objects and responds to

Relator Anne Relator's ("Relator") First Set of Requests for Admissions (the "Requests") as

follows:

### GENERAL OBJECTIONS

        Edgewater objects to these Requests to the extent that the statements for which

Relator seeks admissions are: (a) derived from publicly disclosed information; and (b) Relator

is not the original source of that information.

## RESPONSES

1.    **Beginning before 1995 and continuing until in or after May, 2001, individuals at Edgewater devised a scheme to defraud by which they falsely and fraudulently generated revenue for Edgewater.**

RESPONSE:  Edgewater objects to Request No. 1 because the term "a scheme to defraud" as clarified by Relator is substantially irrelevant. When Edgewater pointed out during the meet and confer process that Relator's use of the non-specific term "*a* scheme to defraud" (emphasis supplied) is impermissibly vague because it does not indicate to which scheme it is referring, Relator clarified that the "scheme to defraud" referenced throughout the instant Requests to Admit referred not to the scheme set out in the complaint in this case, but rather the schemes set out in Dexia Crédit Local's ("Dexia") v. Peter G. Rogan, Braddock Management LP, Bainbridge Management LP, and Bainbridge Management Inc. ("Dexia Complaint") and in Edgewater Medical Center v. Peter Rogan, Braddock Management LP, Bainbridge Management LP, and Bainbridge Management Inc. ("Edgewater Complaint"). Relator's referencing to complaints in other cases has the effect of rendering Request No. 1 irrelevant because vast portions of the schemes in those other cases differ substantially from the scheme alleged in this case. First and foremost, while the core of the complaint in this case is that Edgewater violated the False Claims Act by perpetrating a scheme to defraud, neither the Dexia nor the Edgewater Complaint implicates Edgewater in the fraud schemes alleged there. In fact, the Edgewater Complaint alleges that Edgewater was the victim of the fraud scheme Rogan, Braddock Management LP ("Braddock"), Bainbridge Management LP ("Bainbridge") and Bainbridge Management, Inc. ("Bainbridge Inc.") perpetrated in that case. Second, the Dexia and Edgewater Complaints consist of numerous allegations of misconduct in no way involving the knowing and intentional conduct of Edgewater that is included in Relator's complaint. Thus, in

referencing a vast array of allegations from <u>two</u> <u>other</u> <u>cases</u> which find no counterparts in Relator's complaint in <u>this</u> case, Request No. 1 is irrelevant.

Edgewater also objects to Request No. 1 because the term "individuals at Edgewater" is vague and subject to varying interpretations. To the extent the scheme to defraud by "individuals at Edgewater" is intended to reference a scheme to defraud <u>by Edgewater</u> (as alleged in the complaint in this case), Edgewater denies Request No. 1. We note that while the Edgewater and Dexia Complaints both allege that Rogan, Braddock, Bainbridge and Bainbridge Inc. perpetrated a "scheme to defraud" <u>through Edgewater,</u> neither complaint alleges a scheme to defraud <u>by Edgewater.</u> Indeed, the Edgewater complaint alleges that Edgewater was <u>the victim</u> of the scheme to defraud alleged in that case. Further, in the Dexia Complaint, Dexia: (i) alleges that it was the victim of a scheme to defraud by Rogan, Braddock, Bainbridge and Bainbridge Inc. and (ii) does not implicate Edgewater. Conversely, if Request No. 1 is intended to request Edgewater to admit that Rogan, Braddock, Bainbridge and Bainbridge Inc. committed a scheme to defraud while working at Edgewater (in which Edgewater itself did not knowingly or intentionally participate), Edgewater would admit Request No. 1.

2. **At least as of April, 1996, Northside Operating Company was doing business as Edgewater Medical Center (Northside Operating Company and/or Edgewater Medical Center will hereafter be referenced to as "Edgewater").**

RESPONSE: Admitted.

3. **Part of the aforesaid scheme to fraudulently generate revenue for Edgewater was the giving of kickbacks and bribes in the form or money and other remuneration and incentives to certain doctors, patient recruiters, and other individuals, in exchange for patient referrals.**

RESPONSE: In as much as Request No. 3 pertains to "the aforesaid scheme,"

Edgewater incorporates by reference the objections and other statements set out in its response to

Request No. 1. Edgewater also objects to the term "scheme to fraudulently generate revenue for

3

Edgewater" as vague. If the phrase is intended to ask Edgewater to admit that the Dexia and Edgewater Complaints allege schemes whose purpose was "to fraudulently generate revenue for Edgewater," Edgewater denies Request No. 3. Both the Dexia and Edgewater Complaints make quite clear that the purpose of the schemes alleged was for Rogan, Braddock, Bainbridge and Bainbridge Inc. to enrich themselves by fraud. (See, e.g., Dexia Cplt. at ¶¶ 8, 9, 135; Edgewater Cplt. at ¶¶ 121, 123, 134-35) If the phrase is intended to ask Edgewater to admit that the scheme set out in the Dexia and Edgewater Complaints alleges, as a step in the scheme, that Rogan, Braddock, Bainbridge and Bainbridge Inc. fraudulently caused money to be sent to Edgewater (before Rogan, Braddock, Bainbridge and Bainbridge Inc. then siphoned the money out of Edgewater), then Edgewater would admit Request No. 3. Furthermore, as to the term "kickbacks and bribes in the form or money and other remuneration and incentives to . . . patient recruiters . . .", Edgewater denies that the scheme alleged in the Dexia and Edgewater Complaints pertained to "incentives" other than payments.

4.     **Part of the aforesaid scheme was fraudulently disguising the payment of kickbacks so that those payments appeared to be legitimate payments for services so as to avoid discovery of the scheme.**

RESPONSE: In as much as Request No. 4 pertains to "the aforesaid scheme," Edgewater objects to Request No. 4 for the reasons articulated in Edgewater's response to Requests No. 1 and 3. If Request No. 4 is intended to request Edgewater to admit that Rogan, Braddock, Bainbridge and Bainbridge Inc. committed a scheme to defraud while working at Edgewater (in which Edgewater itself did not knowingly or intentionally participate) that included the concealment of payments and kickbacks by creating contracts and other instrumentalities that created the false impression that the payments and kickbacks were for legitimate services, Edgewater would admit Request No. 4.

4

5. **Part of the aforesaid scheme was hospitalizing patients knowing that those patients did not require hospital treatment and did not meet the Medicare or Medicaid criteria for hospitalization.**

RESPONSE: In as much as Request No. 5 pertains to "the aforesaid scheme,"

Edgewater objects to Request No. 5 for the reasons articulated in Edgewater's response to

Requests No. 1 and 3. If Request No. 5 is intended to request Edgewater to admit that Rogan,

Braddock, Bainbridge and Bainbridge Inc. committed a scheme to defraud while working at

Edgewater (in which Edgewater itself did not knowingly or intentionally participate) that

included admitting and causing others to admit individuals to Edgewater who did not need meet

the Medicare and Medicaid criteria for hospital admission, Edgewater would admit Request No.

5.

6. **Part of the aforesaid scheme was performing medically unnecessary procedures and testing on patients including, but not limited to heart catheterizations, angioplasties, other angiographic and cardiac related tests and procedures, ultrasounds, cat scans, blood tests, and x-rays.**

RESPONSE: In as much as Request No. 6 pertains to "the aforesaid scheme,"

Edgewater objects to Request No. 6 for the reasons articulated in Edgewater's response to

Requests No. 1 and 3. If Request No. 6 is intended to request Edgewater to admit that Rogan,

Braddock, Bainbridge and Bainbridge Inc. committed a scheme to defraud while working at

Edgewater (in which Edgewater itself did not knowingly or intentionally participate) that

included performing and causing others to perform medically unnecessary procedures and testing

on certain patients, Edgewater would admit Request No. 6.

7. **Part of the aforesaid scheme was the admitting of patients to Edgewater for reasons other than illness including: giving patients cash or other benefits, coaching patients to lie about their physical condition, promising that hospital services would cost the patients nothing, and falsely representing to certain patients that they needed to be hospitalized, knowing that these patients did not need hospitalization.**

RESPONSE: In as much as Request No. 7 pertains to "the aforesaid scheme,"

Edgewater objects to Request No. 7 for the reasons articulated in Edgewater's response to

Requests No. 1 and 3. If Request No. 7 is intended to request Edgewater to admit that Rogan,

Braddock, Bainbridge and Bainbridge Inc. committed a scheme to defraud while working at

Edgewater (in which Edgewater itself did not knowingly or intentionally participate) that

included: admitting and causing others to admit patients to Edgewater who did not need to be

admitted to Edgewater for any medically necessary reason; recruiting patients by giving patients

cash and/or other benefits; promising these patients that hospital services would cost the patients

nothing; coaching and causing others to coach patients to lie about their physical condition; and

lying and causing others to lie to patients about their need for hospitalization, Edgewater would

admit Request No. 7.

      8.    **Part of the aforesaid scheme was the concealing from certain patients material information concerning the payment of kickbacks in exchange for admissions, including the fact that those kickbacks were intended to and did improperly influence the medical decisions of doctors.**

      RESPONSE: In as much as Request No. 8 pertains to "the aforesaid scheme,"

Edgewater objects to Request No. 8 for the reasons articulated in Edgewater's response to

Requests No. 1 and 3. If Request No. 8 is intended to request Edgewater to admit that Rogan,

Braddock, Bainbridge and Bainbridge Inc. committed a scheme to defraud while working at

Edgewater (in which Edgewater itself did not knowingly or intentionally participate) then

Edgewater would admit that, in a plea agreement entered in connection with *United States v.*

*Andrew Cubria* (01 CR 469) (N.D. Ill.), Andrew Cubria admitted that "Person A" (on

information and belief, Rogan), Braddock, Bainbridge and Bainbridge Inc. "concealed and

caused others to conceal, from certain patients, material information concerning the payment of

kickbacks in exchange for admissions, including the fact that those kickbacks were intended to,

and did, influences the decisions of certain doctors, thereby depriving those patients of their doctors' honest services." While Edgewater believes Request No. 8 to be true, based upon the information currently known or readily obtainable to Edgewater and based upon reasonable inquiry, Edgewater lacks sufficient information to enable it to definitively admit or deny Request No. 8 at this time.

9. **Part of the aforesaid scheme was the submitting of false and fraudulent claims for payment to Medicare, and Medicaid which included claims relating to medically unnecessary admissions, services, procedures, and testing, and for services rendered to patients who were referred to Edgewater in exchange for kickbacks.**

RESPONSE: In as much as Request No. 9 pertains to "the aforesaid scheme," Edgewater objects to Request No. 9 for the reasons articulated in Edgewater's response to Requests No. 1 and 3. If Request No. 9 is intended to request Edgewater to admit that Rogan, Braddock, Bainbridge and Bainbridge Inc. committed a scheme to defraud while working at Edgewater (in which Edgewater itself did not knowingly or intentionally participate) that included submitting and causing others to submit false and fraudulent claims to Medicare and Medicaid fraudulently seeking compensation for medically unnecessary admissions, services, procedures and testing, and for services rendered to patients who were referred to Edgewater in exchange for kickbacks, Edgewater would admit Request No. 9.

10. **On April 23, 2004 Edgewater filed an adversary complaint in its bankruptcy proceedings against Peter Rogan and entities he allegedly controlled, seeking, in part, damages incurred by Edgewater due to the fraudulent schemes used to defraud Medicare and Medicaid.**

RESPONSE: In as much as Request No. 10 pertains to "the fraudulent schemes," Edgewater objects to Request No. 10 for the reasons articulated in Edgewater's response to Requests No. 1. Edgewater also objects to Request No. 10 because the phrase "fraudulent schemes" (emphasis supplied) because the Edgewater Complaint alleges <u>a</u> scheme perpetrated

7

by Rogan, Braddock, Bainbridge and Bainbridge Inc. and does not allege multiple schemes.

Subject to the foregoing objections, Edgewater admits Request No. 10.

11. **As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report.**

RESPONSE: Admitted.

12. **Cost reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.**

RESPONSE: Admitted.

13. **Every hospital cost report contains a "certification" that the provider's chief administrator or responsible designee must sign.**

RESPONSE: Admitted.

14. **In executing a certification for a cost report, the provider has to certify that the filed cost report is truthful, (i.e., that the cost information contained in the report is true and accurate), correct, (i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions) complete, (i.e., that the hospital cost report is based upon all information known to the provider), and compliant with the Stark Statute and not affected by kickbacks in relation to the services referenced in the cost report.**

RESPONSE: Admitted.

15. **A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary.**

RESPONSE: Admitted.

16. **Edgewater submitted cost reports at all times material to this complaint.**

RESPONSE: Relator's counsel has informed Edgewater's counsel that "material to this complaint" is intended to refer to the time period 1994 to 2000. Edgewater admits that it submitted cost reports for 1995, 1996, 1997, 1998, and 1999.

17. **At all times relevant to this complaint, the hospital cost report certification page included the following notice: misrepresentation or falsification of any information**

contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative actions, fines and/or imprisonment may result.

RESPONSE: Relator's counsel has informed Edgewater's counsel that "at all times relevant to this complaint" is intended to refer to the time period 1994 to 2000. Edgewater admits Request No. 17 as to the hospital cost report certification for the period 1994-2000.

18. **At all times material to this complaint, the cost reports submitted by Edgewater to Medicare were false and fraudulent.**

RESPONSE: Relator's counsel has informed Edgewater's counsel that "at all times material to this complaint" is intended to refer to the time period 1994 to 2000. Edgewater objects to Request No. 18 as unduly vague because, as written, it appears to ask Edgewater to admit that the entire cost report for each of the referenced years was "false and fraudulent." To the extent Relator intends this reading, Edgewater denies Request No. 18. Conversely, if Request No. 18 is intended to ask Edgewater to admit that parts of Edgewater's cost reports for 1994-1999 were false, then Edgewater would admit Request No. 18.

19. **The cost reports filed on behalf of Edgewater for 1995, 1996, 1997, 1998 and 1999 each included a certification falsely representing that the hospital provided services in compliance with pertinent laws and regulations when in fact, they had violated various laws and regulations including those pertaining to kickbacks, and providing medically unnecessary services.**

RESPONSE: Edgewater objects to Request No. 19 because the phrase "they" is vague and subject to varying interpretations. To the extent the use of the term "they" is intended to reference a scheme to defraud <u>by Edgewater</u> (as alleged in the complaint in this case), Edgewater denies Request No. 19. Conversely, if Request No. 19 is intended to request Edgewater to admit that the cost reports Rogan, Braddock, Bainbridge and Bainbridge Inc. filed on behalf of Edgewater for 1995, 1996, 1997, 1998 and 1999 each included a certification falsely

representing that the hospital provided services in compliance with pertinent laws and

regulations when in fact, Rogan, Braddock, Bainbridge and Bainbridge Inc. had committed a

scheme to defraud that included violation of various laws and regulations including those

pertaining to kickbacks, and providing medically unnecessary services (in which Edgewater

itself did not knowingly or intentionally participate), Edgewater would admit Request No. 19.

20.    **In filing its cost reports, Edgewater concealed the fact that certain
admissions and procedures were medically unnecessary, that certain costs were not
properly incurred, and that various co payments had been waived, knowing that the
disclosure of any of the foregoing would have resulted in the denial of those claims.**

RESPONSE:  To the extent Request No. 20 is intended to reference a scheme to defraud

by Edgewater  (as alleged in the complaint in this case), Edgewater denies Request No. 20.

Conversely, if Request No. 20 is intended to request Edgewater to admit that Rogan, Braddock,

Bainbridge and Bainbridge Inc. concealed the fact that certain admissions and procedures were

medically unnecessary, that certain costs were not properly incurred, and that various co

payments had been waived, knowing that the disclosure of any of the foregoing would have

resulted in the denial of those claims (in which Edgewater itself did not knowingly or

intentionally participate), Edgewater would admit Request No. 20.

21.    **A sate (sic) and federal investigation of possible fraud and other
improprieties at Edgewater was first publicly disclosed in magazine articles appearing in
Modern Healthcare Magazine ("Articles") on April 15, 1996 and April 22, 1996
respectively.**

RESPONSE:  Regarding the referenced state investigation, Edgewater admits that the

April 15, 1996 issue of Modern Healthcare magazine contained an article that discussed "a

review by the Illinois attorney general's office of Edgewater Medical Center's 1994 sale." To

Edgewater's knowledge, this Illinois attorney general review involved only the propriety of

10

Rogan's sale of Edgewater and not any health care issues at Edgewater. Edgewater admits that articles appearing in Modern Healthcare magazine on April 15, 1996 and April 22, 1996 publicly disclosed a federal investigation involving: (i) Anthony Todd and Universal Geriatric Services transporting senior citizens from federally subsidized housing projects on Chicago's Southside to Edgewater Medical Center and (ii) the performance at Edgewater of medically unnecessary procedures on such senior citizens. Edgewater denies the remainder of Request No. 21.

22. **Edgewater knew and had reason to know of these investigations because it was a subject or target of the investigations and its Board of Direction (sic) discussed matters relating to these investigations in 1996 and 1997.**

RESPONSE: Admitted.

23. **On April 19, 1996, a special meeting of the Board of Directors of Edgewater was called in order to discuss the Modern Healthcare magazine article.**

RESPONSE: Edgewater objects to Request No. 23 because the phrase "the Modern Healthcare magazine article" is vague, ambiguous and subject to varying interpretations, but Edgewater assumes that this is a reference to the articles referenced in Request No. 21. Subject to the foregoing objection, Edgewater admits that the Board of Directors of Edgewater held a special meeting on April 19, 1996 at which a Modern Healthcare magazine article was discussed.

24. **No member of Edgewater's Board of Directors was indicted by either the State of Illinois or the federal government, in regards to the fraud at Edgewater.**

RESPONSE: In as much as Request No. 24 pertains to "the fraud at Edgewater," Edgewater incorporates by reference the objections and other statements set out in its response to Request No. 1. Subject to the foregoing objection, Edgewater admits that to date and to the best of its knowledge, neither the State of Illinois nor the federal government has indicted a member of Edgewater's Board of Directors for participation in any fraud perpetrated at Edgewater.

25. **The accounting firm of Ernst and Young (EY) had audited Edgewater's financial statements for its 1992, 1993, and 1994 fiscal years.**

RESPONSE: Edgewater objects to Request No. 25 as not reasonably calculated to lead

to the discovery of admissible evidence because it seeks discovery relating to 1992 and 1993

because: (i) Relator's Third Amended Complaint does not contain any allegations relating to the

years 1992 and 1993 and (ii) Edgewater Medical Center did not begin operations until in or

about August 1994. Prior to 1994, Edgewater operated under a different name and legal owner.

Edgewater also objects to Request No. 25 because the subject of Ernst & Young's audits of

Edgewater's financial statements generally is not reasonably calculated to lead to the discovery

of admissible evidence. Subject to the foregoing objections, Edgewater admits that Ernst &

Young audited Edgewater's financial statements for its 1994 fiscal year.

26. **Edgewater had hired the accounting firm of EY to audit its 1995 financial statements.**

RESPONSE: Edgewater objects to Request No. 26 because the subject of Ernst &

Young audits of Edgewater's financial statements is not reasonably calculated to lead to the

discovery of admissible evidence. Subject to the foregoing objection, Edgewater states that,

upon the information currently known or readily obtainable to Edgewater and upon reasonable

inquiry, Edgewater cannot definitively admit or deny Request No. 26 at this time.

27. **At Edgewater's Board of Directors meeting held on June 25, 1996, it was reported to the Board that based upon the allegations contained in the Articles, EY had requested additional information before it would release its audit report on the 1995 financial statements.**

RESPONSE: Edgewater admits that, at an Edgewater Board of Directors meeting held

on June 25, 1996, it was reported to the Board that "Ernst & Young, auditor, has requested

additional information based upon the allegations contained in the Modern Healthcare articles."

Edgewater denies the remainder of Request No. 27.

28. **In exhibit E-2 of Edgewater's management report-operations for the fiscal quarter ending June 30, 1996, it was reported that: "the audit of the hospital's books and records has also been impacted, as the outside certified public accountants have delayed**

issuing the report awaiting a final report on internal investigations of the allegations ....
The audit is expected to be released by August 31, 1996.

RESPONSE: Denied.

29.    **EY never performed the audit of Edgewater's 1995 financial statements.**

RESPONSE: Edgewater objects to Request No. 29 because the subject of Ernst &

Young audits of Edgewater's financial statements is not reasonably calculated to lead to the

discovery of admissible evidence. Edgewater also objects to the phrase "never performed"

insofar as it suggests that Ernst & Young was hired to do work related to an audit of Edgewater's

1995 financial statements. Upon the information currently known or readily obtainable to

Edgewater and upon reasonable inquiry, Edgewater does not know whether Ernst & Young ever

was retained to do such an audit. Subject to the foregoing objections, Edgewater admits that

Ernst & Young never performed an audit of Edgewater's 1995 financial statements.

30.    **At a special meeting of the Board of Directors of Edgewater held on August
29, 1996, the Board voted to retain the accounting firm of Coopers and Lybrand to do the
audit of Edgewater's 1995 financial statements.**

RESPONSE: Edgewater objects to Request No. 30 because the subject of Coopers and

Lybrand audits of Edgewater's financial statements is not reasonably calculated to lead to the

discovery of admissible evidence. Subject to the foregoing objection, Edgewater admits Request

No. 30.

**Dated: July 9, 2005**          SIDLEY AUSTIN BROWN & WOOD LLP

Scott Mendeloff
Gabriel Aizenberg
Eric S. Pruitt
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

*Attorneys for Defendant Edgewater Medical Center*

13

## CERTIFICATE OF SERVICE

I, Eric S Pruitt, an attorney, do hereby certify that I caused to be served the attached **Defendant Edgewater Medical Center's Amended Objections and Responses to Relator Anne Relator's First Set of Requests for Admissions** on the parties listed below by electronic mail this 9th day of July, 2005.

## SERVICE LIST

Joseph A. Power, Jr.
Devon C. Bruce
POWER ROGERS & SMITH, P.C.
70 W. Madison St., Suite 5500
Chicago, Illinois 60602
Tel: 312-236-9381
Fax: 312-236-0920

*Counsel for Relator Anne Bannon*

John A. Culver
Terry A. Fox
McKenna Storer
33 North LaSalle Street, Suite 1400
Chicago, Illinois 60602
Tel: 312-558-3900
Fax: 312-558-8348

*Counsel for Defendant Ravi Barnabas*

Sidney R. Berger
Suite 3700
Three First National Plaza
Chicago, Illinois 60602
Tel: 312-558-6730
Fax: 312-558-7773

*Counsel For Relator Anne Bannon*

Willis Everette Brown
Willis E. Brown, Ltd.
120 West Madison Street, Suite 825
Chicago, Illinois 60602
Tel: 312-372-3026
Fax: 312-372-3026

*Counsel for Defendants Two Hundred Pharmacy, Inc. and Jeff W. Veal*

AUSA Linda Wawzenski
Deputy Chief, Civil Division
Office of the United States Attorney for the
Northern District of Illinois
219 South Dearborn Street, Suite 5000
Chicago, Illinois 60604
Tel: 312-353-1994
Fax: 312-886-4073

CH1 3281479v.1