

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANNE BANNON, Individually and<br>ex rel. UNITED STATES OF AMERICA and<br>THE STATE OF ILLINOIS | )<br>)<br>)<br>) | |
| Relator, | )<br>) | |
| vs. | )<br>)<br>) | No. 00 C 7036<br><br>Magistrate Judge<br>Jeffrey Cole |
| EDGEWATER MEDICAL CENTER; DR.<br>ANDREW CUBRIA; DR. RAVI BARNABAS;<br>UNIVERSAL GERIATRIC SERVICES, INC.;<br>ANTHONY TODD; THE WELLNESS INSTITUTE,<br>INC.; DR. KRISHNASWAMI SRIRAM; TWO<br>HUNDRED PHARMACY, INC.; JEFF W. VEAL;<br>DOCTORS HOSPITAL OF HYDE PARK, INC. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

On April 29, 2004, Anne Bannon filed the fourth version of her *qui tam* False Claims Act

complaint. It came just two weeks after Judge Lindberg granted the motion of Edgewater Medical Center

("EMC"), to dismiss the second amended complaint for failure to plead fraud with the particularity required

by Rule 9(b), Federal Rules of Civil Procedure. Like its predecessors, the third amended complaint alleged

that the defendants knowingly submitted false claims to Medicare and Medicaid in violation of the False

Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1), and the Illinois Whistleblower Reward and Protection Act

("IWRPA"), 740 ILCS 175/3. Unlike its predecessors, however, the third amended complaint explicitly

referred to and extensively relied upon information that had been publicly disclosed in cases involving the

events and *dramatis personae* in this case. EMC has moved to dismiss this iteration of the complaint, pursuant to §3730(e)(4)(A)-(B) of the FCA – the so-called public disclosure bar – which provides that "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions" unless the action is brought by the Attorney General or the person bringing the action is "an original source" of the information.

Ms. Bannon's argument that the public disclosure bar has no application unless the public disclosure antedates the filing of the complaint is contrary to the encompassing and unambiguous language Congress used in §3730(e)(4)(A). The question is whether the "*action*" – not the complaint – is "based upon" the public disclosures. Acceptance of her argument would not only be faithless to Congresses' command, but would frustrate one of the central goals Congress sought to achieve in 1986 when it amended the FCA by adding §3730(e)(4), namely "prevent[ing] 'parasitic' *qui tam* actions in which relators, rather than bringing to light independently discovered information of fraud, simply feed off of previous disclosures." *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 342 F.3d 634, 646 (6th Cir. 2003). There is no principled difference between a *complaint* based upon information in public disclosures (of which the relator is not the source) and an *amended complaint* that is based upon and can only be sustained by resort to that information. The goal of prohibiting parasitic suits requires application of the public disclosure bar in the latter case no less than in the former.

## FACTUAL BACKGROUND

### A.
### The Initial Public Disclosure Of The Federal Investigation of EMC

The April 15, 1996 edition of Modern Healthcare Magazine, a weekly Crain's Business magazine

servicing healthcare management, contained an extensive and disquieting report on an FBI investigation into an overarching fraud by Edgewater, its doctors, and Universal Geriatric Services. The article said that the investigation had its genesis in complaints that Edgewater had "illegally funneled senior citizens from federally subsidized housing projects to boost its profits. ..." Edgewater, which the article branded as the most expensive hospital in the Chicago area from 1994 to 1995, had attracted a substantial number of low income senior citizen patients from Chicago Housing Authority projects on Chicago's South Side, even though as many as 30 community acute-care hospitals were closer to the housing projects than Edgewater. (*EMC's Memorandum in Support of Motion to Dismiss Third Amended Complaint*, Ex. K)("the Memorandum").

The article noted that more than 10% of Edgewater's inpatients lived in low income South Side neighborhoods, where the CHA operated 18 senior residential facilities. Edgewater leased space in one of the CHA's South Side locations, the Artensa Randolph Healthcare Center, for a dollar a year. In 1993 Edgewater's inpatient admissions skyrocketed 24% to 6,600 patients. Near bankruptcy in 1989, Edgewater, itself, attributed its resurrection to new patients from "senior programs." Incredibly, three physicians were responsible, the article reported, for over 95% of the admissions in the 65-plus age category. In the overwhelming majority of cases, the seniors had been bused long distances from their homes to Edgewater Hospital. (Ex. K).

The Modern Healthcare article quoted a Dr. G, a physician who worked at Artensa Randolph, who complained that he had been dismissed earlier in the year "because Edgewater executives said he wasn't referring enough patients to their facility." The article also explained that the probe was focusing on Edgewater's relationship with Universal Geriatric Services, which assisted Edgewater in the management

3

of the Artensa Randolph Healthcare Center. The federal probe centered on admissions from this particular clinic. The article reported that residents had complained that patients who visited EMC's onsite clinic ended up at the hospital whether they needed to or not. At the same time, the Illinois attorney general was investigating the sale of EMC to Permian from Peter Rogan, another defendant in the instant case, as well as its conversion from a not-for profit to a for-profit facility. The Modern Healthcare article contained quotations from Mr. Rogan, who was Edgewater's CEO, and who the article noted was a focus of the State's investigation regarding the price Permian paid for Edgewater and the nature of the relationship between Permian and Rogan. (Ex. K, at 2-3).

## B.
### Ms. Bannon's Complaint And Judge Lindberg's Ruling On EMC's Motion For Judgment On The Pleadings

In early November, 2000, more than four years after the Modern Healthcare article appeared, Ms. Bannon filed her complaint as relator. She filed an amended complaint (under seal) on February 20, 2001, in which she added some defendants, and a second amended complaint on February 24, 2004, which terminated some, and added other defendants. After the government declined to intervene, and the complaint was made public in November of 2002, EMC answered the second amended complaint in November of 2004. It raised three separate affirmative defenses based on the claim that Ms. Bannon's suit was predicated on publicly disclosed information, and that she was not an original source of that information. Hence, the answer contended, the court lacked "subject matter jurisdiction" of the case. 31 U.S.C. § 3730(e)(4)(A). That same day, it filed a motion for judgment on the pleadings under Rule 12(c), Federal Rules of Civil Procedure, and a motion to dismiss under Rule 9(b).

On April 14, 2005, Judge Lindberg granted the motion in part and denied it in part. *United States*

4

*ex rel. Bannon v. Edgewater Hosp., Inc.*, No. 00 C 7036, 2005 WL 991757 (N.D.Ill. April 14, 2005).

Judge Lindberg rejected EMC's argument that a *qui tam* plaintiff was required as a jurisdictional matter

to plead that there had not been prior public disclosure of the underlying facts of the complaint or, if there

had been, that the plaintiff was the original source:

> In order for there to be a specificity requirement in pleading, it is necessary to be able to
> trace the requirement to a statute or the Federal Rules of Civil Procedure. *See Leather-
> man et al. v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S.
> 163, 164 (1993). Rule 8(a)(2) only requires that a complaint include "a short and plain
> statement of the claim that the pleader is entitled to relief." Fed .R.Civ.P. 8(a)(2).
> Contrary to EMC's contention, Rule 8(a)(2) does not require a plaintiff to set out in detail
> the facts upon which she bases her claim. *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct.
> 99, 2 L.Ed.2d 80 (1957).

2005 WL 991757, *2.

The court was receptive to EMC's contentions that the claimed fraud was not pled with the

requisite particularity in that there were not the necessary allegations of when the misrepresentations were

made and who was responsible for submitting the fraudulent claims to Medicare and Medicaid. It further

found that the relator only alleged that EMC acted with deliberate ignorance, was negligent in managing the

operations and billing practices, and in submitting bills to Medicare. The court went on to find that, although

the complaint generally alleged that EMC made false claims under the FCA, it did not "associate specific

sets of statements with particular agents of EMC, specify the content of these statements, or articulate a

time or place that the fraudulent claims were made." 2005 WL 991757, *2-3. The relator was thus given

leave to file the third amended complaint that is now under consideration.

### C.
### The Allegations of the Third Amended Complaint

In response to Judge Lindberg's ruling, the third amended complaint has added 28 new paragraphs.

5

(¶¶ 32, 35, 48-68, 83-87). It also refers to: the April 1996 Modern Healthcare article that publicly disclosed the FBI's investigation (¶¶ 32, 86-87); the publicly disclosed, extensive and highly-detailed discovery materials from the government's pending, related case, *United States v. Rogan*, No. 02 C 3310 (N.D.Ill.)(¶¶ 60-61; Exhibit A); and the publicly disclosed plea agreements of three of the individual defendants in this case. (¶ 93; Exhibits B and C).[1] Other than this extensive reliance on these publicly disclosed materials, the third amended complaint tells much the same story as those that came before it and were rich in generalized conclusions. Without the publically disclosed information on which it explicitly relies, there is no more meaningful particularization in the third amended complaint than there was in the second.

According to the third amended complaint, the relator is a resident of northwest suburban Park Ridge, who has acted as a volunteer on behalf of elderly people in and around the Chicago area for more than twenty-five years. There is no allegation these volunteer efforts were the basis for the allegations regarding EMC's claimed fraudulent applications for reimbursement for treatment of Medicare and Medicaid beneficiaries. In addition to the extensive, admitted reliance on publicly disclosed information, the third amended complaint differs from the second in that it contains allegations about two individuals, one of whom, Dorothy C., was treated at Edgewater, the other of whom is irrelevant to the present motion.

Dorothy C. was a seventy-five-year-old woman who lived on the far south side of Chicago and who attended a free clinic sponsored by Universal Geriatric Services on October 13, 1998. Following testing, she was referred to a physician. The day after the free clinic, Dorothy was taken by van, along with

---

[1] Exhibit A is a seven-page, detailed breakdown of payments between 1995 and 2000 by attending physician, while Exhibits B and C are comprised of 22 pages which explain in detail the fraud involved in this case.

6

five or six others, to Dr. Cubria, a cardiologist, at his office at Edgewater Hospital. Dr. Cubria admitted Dorothy as an in-patient on an "urgent" basis, although she had no cardiac symptoms. Nevertheless, Dorothy was subjected to an angiogram. She was discharged on October 16, 1998, with instructions to follow up with Dr. Cubria. (¶¶ 28-29).

Shortly thereafter, Edgewater submitted a claim for reimbursement for the costs of her hospitalization. According to the third amended complaint, defendants Peter Rogan – Edgewater's CEO – Roger Ehman, and Dr. Cubria were responsible for the claim, which was allegedly false and fraudulent in that Edgewater Hospital did not provide any properly reimbursable services on behalf of Dorothy C. that were reimbursable by Medicare. (¶ 35).[2]

It is alleged that at least as early as April of 1996 – the date of the Modern Healthcare article – Edgewater Hospital knew or should have know that Dr. Cubria was performing unnecessary procedures on healthy patients, and that Peter Rogan and Roger Ehman – both principals of the hospital – had actual knowledge of those procedures and of the 1996 Modern Healthcare article. (¶ 32).

From 1994 through 2000, Roger Ehman was the senior vice president of Marketing for Edgewater Hospital and was responsible for maintaining and increasing the number of patients admitted to the hospital, and for signing documents on its behalf and handling complaints from doctors and staff. (¶¶ 49-50). Peter

---

[2] The relator's second specific claim of fraud involves 78-year-old Florence H., who, in April of 1999, attended a "free clinic" sponsored by defendant, Wellness, at 1039 West Hollywood, Chicago, where Florence resided. A van came transported her and several other residents to a doctor's office at defendant, Doctors' Hospital of Hyde Park, miles away from Florence's north side home. Upon arriving at the hospital, Florence and her neighbors were told that they needed to be admitted before Dr. Barnabas could see them. While Frence's neighbors agreed to be admitted, Florence refused. The hospital transported Florence back to her apartment. According to the third amended complaint, upon information and belief, there was no legitimate medical basis for admitting Florence or her neighbors to Doctors' Hospital. It is not alleged that EMC was involved in this occurrence.

Rogan was the president and chief executive officer of Edgewater Hospital, and his responsibilities included the administration and supervision of Medicare cost reports made to the United States government for Medicare and Medicaid reimbursements. The relator also alleges, however, that Joanne Skvarek was the chief executive officer of Edgewater Hospital beginning from 1999 to 2000. Henry Zeisel was the chief financial officer of Edgewater Hospital, and oversaw all financial matters including claims made to the United States Government. (¶¶ 51-53). Each of these individuals participated and was *ultimately* responsible for the submission of Medicare and Medicaid claims. Yet, it is also alleged that *ultimate* responsibility rested with Dr. Cubria. (¶¶ 54, 59 (Emphasis supplied)). And, the relator claims that when Dr. Cubria submitted fraudulent claims to the United States government, he "*allowed and directed* the Edgewater Hospital administrators to submit claims for medically unnecessary hospitalizations." (¶58)(Emphasis supplied). The third amended complaint then lists the total dollar amounts in fraudulent claims for each of the years 1995 through 2000. (¶ 60). The information came from a document compiled and produced by EMC, and filed in connection with the government's pending, related FCA case, *United States v. Rogan*, No. 02 C 3310 (N.D.Ill.)(¶ 61; Ex. A).

It is also alleged that Rogan and Ehman both "gave and/or received money and other benefits in exchange for patient admissions; caused numerous patients to be admitted who did not need to be admitted in order to increase admissions; caused or knew that false entries were made to certain medical records which included exaggerating the patient's symptoms; caused medically unnecessary tests to be performed such as x-rays and blood tests; and allowed Dr. Cubria . . . to perform numerous medically unnecessary

8

procedures." (¶¶ 66-67).[3] Joanne Skvarek allegedly prevented any audit of cardiac catheterizations and failed to follow up on allegations of unnecessary procedures. (¶ 68).

In conclusion, the third amended complaint alleges that the claims Dr. Cubria and Dr. Barnabas submitted for patient services were false and fraudulent in that the services provided were medically unnecessary. (¶ 89). There are, in addition, allegations that: EMC acted with "deliberate ignorance" in failing to properly manage the day-to-day operations of Edgewater Hospital and its billing practices (¶¶ 81-82); the Hospital's board of directors acted with "reckless disregard and deliberate ignorance" of the certification of unnecessary medical procedures. ((¶¶ 83-85). Indeed, the board allegedly was made aware of the fraudulent activity occurring at the Hospital through "a publication which raised questions of fraud at Edgewater Hospital," and the board even discussed the publication at a few of its meetings. (¶ 86-87). Read in context, the publication is the 1996 Modern Healthcare article.

## II.
## ANALYSIS

### A.
### History Of The False Claims Act And Its Public Disclosure Bar

#### 1.

The False Claims Act, which establishes civil penalties for any person who presents "a false or fraudulent claim for payment or approval" by the United States government, 31 U.S.C. § 3729(a)(1), was initially adopted during the Civil War in response to widespread fraud in defense contracts. *United States*

---

[3] The Complaint also alleges that Messrs. Rogan and Ehmann allowed Dr. Barnabas and Dr. Sriram to do the same, (*Id.* at ¶ 60) but the third amended complaint does not implicate them in the Dorothy C. episode. Rather, it notes the public knowledge that all three physicians have pled guilty to the criminal charge of defrauding Medicare. (*Id.*, at ¶ 93)(*Third Amended Complaint*, Exs. B, C).

v. *Neifert-White Co.*, 390 U.S. 228, 230 (1968); *United States v. Bornstein*, 423 U.S. 303, 309 (1976). Its *qui tam* provisions authorized private individuals to sue on behalf of the federal government and were intended to aid the government in discovering fraud and abuse. The term comes from the Latin expression, *qui tam pro domino rege quam pro se ipso in hac parte sequitur*. ("Who brings the action for the King as well as for himself"). *United States ex rel. Mathews v. Bank of Farmington*, 166 F.3d 853, 857 (7th Cir.1999). If the claim is proven, the relator receives a statutorily prescribed percentage of the recovery, with the balance going to the government. (*Id.* at 857-58, *citing* 31 U.S.C. § 3730(d)). *See Vermont Agency of National Resources v. United States ex. rel. Stevens*, 529 U.S. 765 (2000).[4]

Since its enactment in 1863, the Act has contained several different *qui tam* provisions. Originally, there were no "significant jurisdictional limitations," *Fleet Bank of Maine*, 24 F.3d at 324, and plaintiffs were not precluded from bringing suit even when the case was based exclusively on information already in the government's possession, as occurred in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943). Proving the insight of Justice Cardozo's observation that "[a]ll history demonstrates that legislation intervenes only when a definite abuse has disclosed itself through the excess of which public feeling has finally been aroused," Nature of the Judicial Process, 144 (1921), Congress reacted to the *Hess* decision, and in 1943 amended the Act to preclude all *qui tam* actions based on information in the government's possession at the time the action was initiated. The purpose of the 1943 amendments was to prevent the abuses by parasitic and opportunistic relators. *United States ex rel. Mathews v. Bank of Farmington*,

---

[4] This historical background of the False Claims Act and its subsequent amendments has been described in detail by numerous courts and need not be repeated. *See, e.g., United States ex rel. S. Prawer & Co. v. Fleet Bank of Maine*, 24 F.3d 320, 324 (1st Cir. 1994); *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 646, 649-51 (D.C.Cir. 1994); *United States ex. rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1496-98 (11th Cir. 1991)

166 F.3d at 858.

Over the next four decades, courts strictly construed "the jurisdictional bar," established in the 1943 amendments, *Fleet Bank of Maine*, 24 F.3d at 325, which proved as unworkable as the original *qui tam* provisions and precluded suits even where the relator was the original source of the information. *See United States ex rel. State of Wisconsin v. Dean*, 729 F.2d 1100 (7th Cir. 1984). By 1986 – and in response to *Dean* – Congress perceived the need to recalibrate the Act's *qui tam* provisions. Thus, in 1986, the False Claims Amendments Act of 1986 was passed. The amendments were designed to encourage the filing of private *qui tam* actions while at the same time, to prevent so-called suits in which relators, rather than bringing to light independently discovered information regarding wrongdoing directed against the government, simply fed off of previous disclosures of fraud. *Fleet Bank of Maine*, 24 F.3d at 325-26.

The 1986 Amendments abolished the "'jurisdictional defense'" that required dismissal of a *qui tam* action where the government was aware of the information prior to the suit, even if the relator had provided the information. *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 948 (1997). The 1986 amendments permitted *qui tam* suits where the information was in the government's possession, except where the suit was based on information that had been publically disclosed and was not brought by an original source of that information. *Hughes Aircraft Co.*, 520 U.S. at 946 (1997); §3730(e)(4)(A).[5] The amendments represent the latest chapter in a long line of repeated congressional efforts to encourage whistle-blowing while simultaneously discouraging "opportunistic behavior," *Quinn*, 14 F.3d at 651 – that

---

[5] Other provisions of the amendments provided "whistleblower" protection by adding subsection (h), independently of a *qui tam* action. 31 U.S.C. §3730(h).

is, to prevent suits based upon public information that the relator played no part in uncovering. *See United States ex rel. Feingold v. AdminaStar Federal, Inc.*, 324 F.3d 492, 494 (7th Cir. 2003); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1016 (7th Cir.1999); *Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562, 565 (11th Cir.1994). The 1986 amendments "'must be analyzed in the context of these twin goals of rejecting suits which the government is capable of pursuing itself while promoting those which the government is not equipped to bring on its own.'" *Fleet Bank of Maine*, 24 F.3d at 326 (*quoting Quinn*, 14 F.3d at 651).[6]

## 2.

Congress's solution to the tension between encouraging people to come forward with information of fraud and preventing parasitic lawsuits was § 3730(e)(4)(A):

> No court shall have jurisdiction over an action under this section[[7]] based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.[8]

"Original source," "means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. 3730(e)(4)(B); *United States*

---

[6] The pendulum having first swung toward the allowance of claims by those having no responsibility for bringing the fraud to light, and then toward rejection of claims by those who did, it has come to rest in the middle. But even this middle ground has proven to be a fertile one for dispute.

[7] Section 3730 authorizes a private party to bring an action for violations of §3729.

[8] The IWRPA's nearly identical public disclosure bar is set out at 740 ILCS 175/4(e)(4). The discussion of the FCA's public disclosure bar applies with equal force to that found in the Illinois statute.

*ex rel. Mathews* 166 F.3d at 864.

The parties contest the application of § 3730(e)(4)(A)'s public disclosure bar, although the landscape of the field of battle differs from that overseen by Judge Lindberg. EMC's current motion is based on Rule 12(b)(6), not 12(b)(1), and the argument is not that the third amended complaint fails affirmatively to plead compliance with the public disclosure bar, but rather that it affirmatively reveals that it is based on the 1996 Modern Healthcare article and the voluminous and highly detailed information that *admittedly* was in the public record prior to the filing of the third amended complaint. It is this information on which the relator predicates her claim of compliance with Rule 9(b) and without which the third amended complaint fails. Thus, the question presented here is whether the public disclosure bar of §3730(e)(4)(A) precludes a relator from curing an insufficiently particularized pleading by basing an amended pleading upon information that was publically disclosed after the complaint but before the amended pleading.

## B.
## Nature Of The Public Disclosure Bar

Section 3730(e)(4)(A) provides that no court shall have "jurisdiction" over "an action" that is "based upon the public disclosure of allegations or transactions" unless the person bringing the action is "an original source" of the information. Initially, the Seventh Circuit appeared to read the word "jurisdiction" as meaning subject matter jurisdiction. *See Houck on Behalf of U.S. v. Folding Carton Admin. Committee*, 881 F.2d 494, 505 (7th Cir. 1989)(affirming the dismissal of a complaint for lack of subject matter jurisdiction where information upon which claim was based was publicly disclosed and relator was not original source of information). *See also United States ex rel. Bledsoe v. Community Health*

*Systems, Inc.*, 342 F.3d 634, 641, 646 (6th Cir. 2003)(referring to absence of "subject matter jurisdiction" over provisions in complaint based on public disclosures); *United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co.*, 255 F.Supp.2d 351, 367-68 (E.D.Pa. 2002)(where relator is not an original source, the court "will lack subject matter jurisdiction over that count").

Judge Easterbrook's *dubitante* opinion for the panel in *United States ex rel. Fallon v. Accudyne Corp.*, 97 F.3d 937 (7th Cir. 1996), however, came to this conclusion:

> For what it is worth, we doubt that § 3730(e)(4)(A) uses the word "jurisdiction" in the sense of adjudicatory power, which is conferred by §§ 1331, 1345, and 3732(a) [9] rather than "this section" (sec. 3730). In context, the word appears to mean that once information becomes public, only the Attorney General and a relator who is an "original source" of the information may represent the United States. This does not curtail the categories of disputes that may be resolved (a real "jurisdictional" limit), but instead determines who may speak for the United States on a subject, and who if anyone gets a financial reward. "Jurisdiction" is a notoriously plastic term. It is therefore not surprising that the Supreme Court had held that a similar reference to jurisdiction in the Norris-LaGuardia Act, 29 U.S.C. §§ 101, 104, limits remedies rather than subject-matter jurisdiction . . . .

*Id.* at 941 (Parenthesis in original).[10] *Cf. Steel Co. v. Citizens for Better* Environment, 523 U.S. 83 (1998)("'Jurisdiction is a word of many, too many, meanings.'"). *Accord United Phosphorus Ltd. v. Angus Chemical Co.*, 323 F.3d 942, 948 (7th Cir. 2002)(*en banc*) and *id.* at 953 (Wood, J., dissenting), *cert. denied* 540 U.S. 1003 (2003).

Two years later, in *Hughes Aircraft Co.*, the Supreme Court held that §3730(e)(4)(A) not only

---

[9] The third amended complaint predicates subject matter jurisdiction on § 3732(a) and 28 U.S.C. §1345.

[10] While *Houck on Behalf of U.S. v. Folding Carton Admin. Committee*, used the phrase,"subject matter jurisdiction, " it also viewed § 3730(e)(4)(A) as a limitation on who may speak for the United States where an action is based on publicly disclosed transactions. 881 F.2d at 504.

speaks to the power of the court, but to the substantive rights of the parties as well. In *Hughes Aircraft Co.*, the Court was called upon to determine whether the 1986 amendments to the FCA should be applied retroactively. The Court noted that by eliminating the previously viable "defense" that the information in the *qui tam* complaint was already known to the government, the 1986 amendment thereby changed "the *substance* of the existing cause of action...." 520 U.S. at 948. This extension of an FCA action to private parties in circumstances where the action was previously foreclosed, "essentially create[d] a new cause of action...." *Id.* at 949-50. The 1986 amendments, the Court concluded, does not merely allocate jurisdiction among forums, rather it *creates* jurisdiction where none previously existed; it thus speaks not just to the power of a particular court but to the substantive rights of the parties as well." *Id.* at 951. Thus, the Court held that the jurisdictional exception to the presumption against retroactivity did not apply to the 1986 amendments.

In 1999, in *United States ex rel. Mathews v. Bank of Farmington*, the Seventh Circuit, although referring to § 3730(e)(4)(A) as a "jurisdictional bar" and stating that "it is plain that in fact satisfaction of § 3730(e)(4) is ... an issue of subject matter jurisdiction," 166 F.3d at 856, 859, went on to say that a plaintiff who failed to satisfy the statute's requirements "may be barred from maintaining the action on the grounds which Congress labeled as jurisdictional, whether or not they are in fact jurisdictional." *Id.* In *United States ex rel. Feingold v. AdminaStar Federal, Inc.*, 324 F.3d 492, 494 (7th Cir. 2003), the Seventh Circuit recognized that while in *Matthews* it had discussed §3730(e)(4) as "turning on a 'jurisdictional bar,'" it adverted to the "h[o]d[ing]" in *Hughes Aircraft* that "what we are actually dealing with is an issue of substantive law." 324 F3d at 494. That this analysis is one of substantive law mattered in *Hughes Aircraft*, but not, the Court of Appeals said, in the case before it. *Id.* at 494, n.1. *See also*

15

*Yannacopolous v. General Dynamics*, 315 F.Supp.2d 939, 946-47 (N.D.Ill. 2004)(Gettleman, J.)(public disclosure provision substantive not jurisdictional).[11]

The Seventh Circuit's most recent exegesis of the public disclosure bar is *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601 (7th Cir. 2005), which sustained the district court's dismissal of an amended complaint, where the complaint on its face revealed that it was based upon a publicly disclosed document that was attached as an exhibit to the complaint. The facts are these: in 1998, Dr. Gross participated as a patient in an FDA sponsored study to investigate the effectiveness of various drugs on HIV patients. Thereafter, Gross alleged that the defendants failed to comply with various federal regulations and that these failures were reckless and/or intentional. *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 2004 WL 905952 (N.D.Ill. 2004). The district court dismissed the complaint for failure to plead fraud with particularity.

To overcome the Rule 9(b) hurdle, Dr. Gross attached to the second amended complaint a 2002 warning letter issued by the FDA to defendant, Catholic Health Partners ("CHP"), citing various regulatory violations found by the FDA. There were no additional facts pled to support the conspiracy claim. 2004 WL 905952 at *4. The district court held that its "jurisdiction to hear FCA claims is limited by" §3730(e)(4)(A). 2004 WL 905952 at *6. The district court "beg[a]n[] its jurisdictional inquiry" by first determining whether Gross's allegations against CHP have been publicly disclosed. *Id.* at *7. The court found that the FDA's letter to CHP was a public disclosure because it established the agency's awareness of the information that substantiates Gross's allegations of fraud against CHP. Gross did not allege that the

---

[11] *Compare United Phosphorus Ltd. v. Angus Chemical Co.*, 323 F.3d at 950 ("On the other hand, it is also true that sometimes a reference to 'jurisdiction' in statutes is merely. . . a shorthand way of referring to an element of the claim.").

information in his complaint was based upon another source or that he was an original source of the information supporting the claims – which would "avoid the FCA's jurisdictional bar...." *Id.* at 7. Since the claims appeared to have been based upon the findings in the FDA warning letter, the case was dismissed with prejudice. [12] In affirming, the Court of Appeals held, "to the extent that Gross's claim was based on the 2002 warning letter to Catholic Health Partners, the district court invoked the jurisdictional bar contained in §3730(e)(4)(A) ... *The district court was entirely correct.* Gross did not allege that he was an original source of the information in the warning letter." *Id.* at 606 (Emphasis supplied). [13]

In sum, it is not entirely clear whether the Seventh Circuit views §3730(e)(4) as a question of subject matter jurisdiction or a question of substantive law. If the public disclosure bar is viewed as a question of "real" jurisdiction, there is the obvious advantage of having the question settled early in the litigation. *Compare United Phosphorus Ltd.*, 322 F.3d at 952. [14] Ultimately, the question is one of congressional intent. That is, did the Congress intend to restrict the reach of the FCA – which is a matter

---

[12] The dismissal was also based on Rule 12(b)(6) for failure to state a claim based largely on perceived insufficiencies in the allegations regarding the knowledge element of a §3729(a) claim. The Court of Appeals affirmed although on slightly different reasoning. It concluded that the amended complaint did not satisfy Rule 9(b), and that it failed under Rule 12(b)(6) because it did not allege that payment by the government was conditioned upon certification of regulatory compliance, a necessary component of a *qui tam* FCA claim. 415 F.3d at 603.

[13] Here, as in *Gross*, the amended pleading attached exhibits that show it is based upon public disclosures in violation of §3730(e)(4)(A), and Ms. Bannon "did not allege that [s]he was an original source of the information in the [exhibits]."

[14] Allowing prompt disposition of actions that can be shown to be parasitic would serve substantial institutional ends, while imposing no burden on the relator. Unnecessary complaints sap the time of judges, forcing parties with substantial disputes to wait in a longer queue and condemn them to receive less judicial attention than they would otherwise get. *Cf. Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073, 1077 (7th Cir. 1987). But, of course, questions of jurisdiction are determined by Congressional intent, not considerations of judicial efficiency.

to be considered under Rule 12(b)(6) – or did it intend to limit the reach of the adjudicatory power of the courts – which is a matter to be considered under Rule 12(b)(1). As in *Feingold*, the answer is not critical to disposition of this case.[15]  Under either view, Ms. Bannon's case must be dismissed.

## C.
### Evaluation Of The Third Amended Complaint Under § 3730(e)(4)(A)

Determining whether to dismiss an action under §3730(e)(4)(A) involves three considerations: (1) whether the relator's allegations have been publicly disclosed; (2) whether the action is "based upon" those public disclosures; and (3) if they are, whether the relator is an "original source" of the information. *Feingold*, 324 F.3d at 495; *Gross*, 2004 WL 905952 (N.D.Ill. 2004), *aff'd*, 415 F.3d 601 (7th Cir. 2005).

The third amended complaint refers to, and extensively relies upon, four documents that EMC argues constitute public disclosures: 1) the April 1996 Modern Healthcare article; 2) the *United States v. Rogan* discovery materials (Exh. A to the third amended complaint); and 3-4) the 22 pages that comprise the plea agreements of Dr. Barnabas and Dr. Cubria, copies of which are attached as Exhibits B and C to the third amended complaint. (*See also id.*, ¶¶ 60-61, 93). That pleading refers to the Modern Healthcare article three times. (¶¶ 32, 86-87). Indeed, it is that article that relator contends was ignored by the individual defendants and which demonstrate (at least in large measure) their knowledge of the wholesale fraud going on under their very noses. Since the detailed *United States v. Rogan* discovery materials and the plea agreements are attached to her pleading, they are part of it for all purposes and may be considered under Rule 12(b)(6). *See* Rule 10(c), Federal Rules of Civil Procedure; *Albany Bank & Trust Co. v.*

---

[15] EMC has expressed uncertainty about the issue and has sought to hedge its bet by asking that the dismissal be considered both under Rule 12(b)(1) and 12(b)(6).

*Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002).[16]

If the public disclosure bar were considered to present a question of subject matter jurisdiction –
as the district court did in *Gross* – rather than a matter of substantive law – as some pre-*Gross* cases have
at least implied – and EMC's motion were to be considered under Rule 12(b)(1), instead of Rule 12(b)(6),
these documents would, nevertheless, be proper subjects for consideration. Generally, when considering
a motion to dismiss for lack of subject matter jurisdiction, all well-pled allegations in the complaint are
deemed true, and all reasonable inferences are drawn in favor of the plaintiff. *Martin v. Shalala*, 63 F.3d
497, 501 (7th Cir.1995). "However, as here, if the complaint is formally sufficient but the contention is that
there is *in fact* no subject matter jurisdiction, the movant may use affidavits and other materials to support
the motion. The burden of proof on a 12(b)(1) issue is on the party asserting jurisdiction. . . and the court
is free to weigh the evidence to determine whether jurisdiction has been established." *United Phosphorus
Ltd.,* 323 F.3d at 946. (Emphasis in original). *Accord Remer v. Burlington Area School Dist.*, 205 F.3d
990, 996 (7th Cir. 2000) (When "evidence pertinent to subject matter jurisdiction has been submitted, ...
the [ ] court may properly look beyond the jurisdictional allegations of the complaint ... to determine
whether in fact subject matter jurisdiction exists."); *Wilkerson v. Butler*, 229 F.R.D. 166, 169 (E.D.Cal.
2005); *United States ex rel. Phipps v. Comprehensive Community Development Corp.*, 152

---

[16] In resolving a motion to dismiss, a district court is entitled to take judicial notice of matters in
the public record without converting the Rule 12(b)(6) motion into a motion for summary judgment.
*Anderson v. Simon*, 217 F.3d 472, 475 (7th Cir. 2000). *See also Henson v. CSC Credit Services*, 29
F.3d 280, 284 (7th Cir. 1994)(judicial notice of publicly filed court documents); *Isuzu Motors Ltd. v.
Consumers Union of U.S., Inc.*, 12 F.Supp.2d 1035, 1042 (C.D.Cal. 1998)(judicial notice of the
publication of various television programs and newspapers); *Steiner v. Shawmut Nat. Corp.*, 766 F.Supp.
1236, 1241 (D.Conn. 1991)(listing newspaper and magazine articles among the wide range of material
that may be introduced in conjunction with a Rule 12(b) motion); 5C C.Wright and A.Miller, Federal
Practice and Procedure: Civil § 1364, at 133-140 (2004)(same).

F.Supp.2d 443, 448-9 (S.D.N.Y. 2001). In sum, whether the public disclosure bar be viewed as a matter of subject matter jurisdiction or as a matter of substantive law, it is perfectly proper to consider Exhibits A, B and C and the 1996 Modern Healthcare article in deciding EMC's motion to dismiss.

### 1.
### The Allegations Of Fraud Against Edgewater Hospital Have Been Publicly Disclosed

The purpose of the FCA is to encourage individuals with knowledge of wrongdoing to bring it to the attention of the government. Where a public disclosure has occurred, the government is in a position to vindicate society's interests, and a *qui tam* action is unnecessary. *Feingold*, 324 F.3d at 495; *Mathews*, 166 F.3d at 861. Where, on the other hand, information about a false claim has not been publicly disclosed, society benefits by creating a monetary incentive for a knowledgeable person to identify the problem, present the information to the government, and, where the government declines to prosecute, proceed with a *qui tam* action under the FCA. *Feingold*, 324 F.3d at 495; *Mathews*, 166 F.3d at 857-58. A "public disclosure" exists within the meaning of the FCA "when the critical elements exposing the transaction as fraudulent are placed in the public domain." *Feingold*, 324 F.3d at 495.

It is beyond debate that the critical elements of the third amended complaint are based on information that was publicly disclosed at various times beginning in April 1996, when the Modern Healthcare article revealed the FBI's investigation into Edgewater's funneling of elderly patients from their homes on the south side to Edgewater's facility on the north side where they were subjected to needless medical treatment. Indeed, the relator has conceded that "it is evident that the statutorily defined 'public disclosures' of the allegations of fraud against Edgewater were made in April, 1996." (*Relator's Memorandum in Support of Response to EMC's Motion for Judgment on the Pleadings*, at 4).

The discovery materials in *Rogan* that elaborately detailed the fraud were filed in the United States

District Court for the Northern District of Illinois as early as February 10, 2005, (*Third Amended*

*Complaint*, Ex. A; EMC's Memorandum in Support of Motion to Dismiss Relator's Third *Amended*

*Complaint*, Ex. E), more than two months before the relator employed them to add critical allegations to

her third amended complaint. These materials are "publicly disclosed" for the purposes of the FCA.

*Feingold*, 324 F.3d at 495-96; *Mathews*, 166 F.3d at 860.[17] Similarly, the factually rich plea agreements

were filed in the district court and became publicly disclosed on February 8, 2005, (*Third Amended*

*Complaint*, Ex. C), also two months before the relator was able to formulate the allegations added in her

third amended complaint. In short, it is idle to suggest that they do not constitute public disclosures under

§3730(e)(4)(A).

## 2.
## The Third Amended Complaint Is "Based On" Publicly Disclosed Information

An action is "based upon" public disclosures within the meaning of §3730(e)(4)(A) when it "both

depends essentially upon publicly disclosed information and is actually derived from such information."

*Feingold*, 324 F.3d at 497(*quoting Mathews*, 166 F.3d at 864). In *Mathews*, the Seventh Circuit

explained the rationale behind this interpretation:

One is textual: "based upon" is not synonymous with "identical to" or "similar to," but can

---

[17] *United States ex rel. Wang v. FMC Corporation*, 975 F.2d 1412 (9th Cir. 1992) is not to the contrary. In *Wang*, the information made its way to the public because of the discovery permitted in that very case. *Id.* at 1416. Thus, the court held that if evidence publicly disclosed for the first time during the discovery phase of a *qui tam* suit were barred from use in that same suit by§ 3730(e)(4)(A), "*qui tam* plaintiffs would have little choice but to waive their right to discovery for fear of disclosing information that would bar the claims for which they might wish discovery in the first place." *Id.* The discovery materials at issue here come from a different, albeit related case. Consequently, the Hobson's choice that concerned the Ninth Circuit does not confront Ms. Bannon.

21

be substituted for "derived from" wherever it occurs. The other rationale is policy: a lawsuit based upon information which happens to be similar or identical to publicly disclosed allegations or transactions, but which derives from some other source than the public disclosure, is not parasitic, and should not be barred by a provision meant to bar parasitic lawsuits.

166 F.3d at 1348.[18]

In the instant case, the third amended complaint relies extensively and explicitly on three Exhibits containing publicly disclosed documents and on the 1996 Modern Health magazine article, which gave an extensive account of the FBI's investigation and the contours of Edgewater's claimed fraud. That article related how elderly patients were taken far from their homes to Edgewater Hospital for needless procedures and how as a result the Hospital had dramatically prospered. The article appears to have been a template for the complaint and its subsequent iterations. Phrased differently, the suit was derived from the article. Although there is the *ipse dixit* in the relator's responsive brief that she discovered the fraud independently of the article (*id.* at 7), there is no explanation of how that occurred, and more importantly, no such allegation – even in a conclusory form – appears in any pleading. Unamplified, tendentious statements in briefs do not count. *Feingold*, 324 F.3d at 497; *Car Carriers Inc. v. Ford Motor Co.*, 745 F.2d 1101,

---

[18] *Mathews'* reading of the phrase "based upon" differs from that given it by a majority of the circuits. For example, the Second Circuit holds that a *qui tam* action is "based upon" a public disclosure when the supporting allegations are "the same as those that have been publicly disclosed . . . regardless of where the relator obtained his information." *United States ex rel. John Doe v. John Doe Corp.*, 960 F.2d 318, 324 (2nd Cir. 1992). *See also United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 652-655 (D.C.Cir. 1994); *United States ex rel. McKenzie v. Bellsouth Telecom., Inc.*, 123 F.3d 935, 940 (6th Cir. 1997); *Wang*, 975 F.2d at 1417 (9th Cir.); *United States ex rel. Precision Co. v. Koch Industries, Inc.*, 971 F.2d 548, 552 (10th Cir. 1992); *Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562, (11th Cir. 1994). The majority's reasoning for refusing to employ the analysis employed by the Seventh Circuit runs this way: if an action is "based upon" publicly disclosed information only when it is actually derived from the public disclosure, there would be no need for the "original source" provision. *See, e.g., United States ex rel. Mistick PBT v. Housing Authority of City of Pittsburgh,* 186 F.3d 376, 386 (3rd Cir. 1999).

1107 (7th Cir. 1984).

The allegations charging EMC's directors and principals with knowledge of the purportedly fraudulent claims for reimbursement depend essentially upon the 1996 Modern Healthcare article. (¶¶ 32, 86-87). These allegations were added in response to Judge Lindberg's concern that the relator had merely charged EMC with deliberate ignorance and negligence in managing its billing practices, and are essential to the third amended complaint. While the allegations regarding Dorothy C. are not based on the article, having occurred in 1998, the Dorothy C. incident is but a single (and in the context of this case an analytically insignificant) incident in the overarching fraud that the publicly disclosed documents attached to the complaint reveal.[19]

While there are allegations made on information and belief that the fraud began in 1994, two years before the April, 1996 Modern Healthcare article, (*Third Amended Complaint*, ¶¶ 48-50, 53-61, 66-67, 84-87), there is no elaboration of the basis for the claim, and there is no specific allegation of any wrongdoing in 1994. Even the selection of 1994 as the starting date of the fraud appears to be an inference derived from the disclosures in the article, which branded Edgewater as the most expensive hospital in the Chicago area *from 1994* to 1995, and that beginning at that time it had attracted a substantial number of low income senior citizen patients from Chicago Housing Authority projects on Chicago's South Side, even though as many as 30 community acute-care hospitals were closer to the housing projects than Edgewater.

---

[19] Although there is an allegation that Edgewater submitted a request for reimbursement from the government for Dorothy C., Edgewater contends that the disclosure statement that 31 U.S.C. §3730(b)(2) requires as a predicate to the filing of all *qui tam* actions demonstrated that no such request was ever made. (*See* EMC Reply Memorandum at 11, 15). Thus, while the incident is probative of the existence of the alleged fraud, standing alone, it is not a self-sufficient basis upon which the third amended complaint could be sustained if the publicly disclosed information were not considered.

The article charged that needless procedures were the source of the enhanced revenues. The allegations relating to events in 1995 are admittedly based on public disclosures. (See ¶61; Exs. A, B and C).

### 3.
### The Relator Was Not "An Original Source" Of The Information Contained In The Public Disclosures On Which The Third Amended Complaint Depends

To be an original source of information under the FCA, two criteria must be satisfied. First, the relator must have "direct and independent knowledge" of the information on which the allegations are based or be someone who would have learned of the information independently of the public disclosure. *Feingold*, 324 F.3d at 497; *Mathews*, 166 F.3d at 865; 31 U.S.C. §3730(e)(4)(B). *See also* 740 ILCS 175 4/4(e)(4)(B). Second, the relator must be a "source": she must have voluntarily provided the information to the government before filing suit. *Feingold*, 324 F.3d at 497; *Mathews*, 166 F.3d at 865.

Ms. Bannon has made no allegation that she is an original source of anything, and there is no allegation from which it could be concluded that she had direct and independent knowledge of the fraud she alleges, absent the public disclosures upon which the third amended complaint are manifestly dependent. *See Mathews*, 166 F.3d at 864 ("'There is no evidence to indicate that [the relator] would have learned of the claims to the funds absent public disclosure.'"); *Feingold*, 324 F.3d at 497 ("Because Feingold points to no evidence upon which this suit depends that is not publically disclosed, we hold that Feingold has based his action on publically disclosed documents....").

The nebulous allegation that Ms. Bannon was a resident of Park Ridge – a suburb 15 miles north of Chicago – who worked for 25 years as a volunteer on behalf of the elderly in and around the Chicago area (¶3), cannot sustain an inference of personal knowledge divorced from the public disclosures. The events in the third amended complaint occurred on Chicago's far south side and at Edgewater's facility on

Chicago's north side. The complaint is careful not to say that these events were within the temporal or geographic sphere of Ms. Bannon's efforts. But even if her volunteer status might have provided her with some information about the funneling of patients to Edgewater Hospital, it would not be reasonable to infer that she was thereby informed of the needless medical procedures and treatments and the ensuing false claims to the government. And being a volunteer on behalf of the elderly in and around the Chicago area could not possibly have been the basis for the highly detailed financial information of the year-by-year, doctor-by-doctor payments set forth in Exhibit A to the third amended complaint or the basis for the details of the fraud admitted by Dr. Barnabas and Dr. Cubria in the 22 pages that comprise their plea agreements with the government, copies of which are attached as Exhibits B and C to the third amended complaint.

There is no question that the allegations the relator added in the wake of Judge Lindberg's dismissal of the second amended complaint are based on the publicly disclosed *United States v. Rogan* discovery materials and the plea agreements. In paragraphs 60 and 61, for example, which particularize when misrepresentations were made and who made them – as Judge Lindberg's ruling directed – Ms. Bannon simply referred to the *United States v. Rogan* discovery materials and attached them to her pleading. In paragraphs 66 and 67, wherein she attempted to provide the required specificity to her allegations of fraud by detailing the activities of particular EMC agents, her allegations are obviously drawn from the extensive plea agreements. (*EMC's Memorandum in Support of Motion to Dismiss Relator's Third Amended Complaint*, Ex. F; *Third Amended Complaint*, Ex. C). Without these materials, there could not have been compliance with Rule 9(b) and Judge Lindberg's order dismissing the second amended complaint.

Her responsive brief virtually concedes that she had no knowledge of the detailed information in Exhibits A, B and C. There is no allegation that she has direct and independent knowledge even of the

25

Dorothy C. incident. Dorothy C. lived on the "far south side of Chicago at or around 130th Street." (*Third Amended Complaint* ¶ 25). Ms. Bannon is a resident of Park Ridge, a suburb north of Chicago. (*Id.* ¶ 3). Personal knowledge cannot be reasonably inferred.

**D.**

**Section 3730(e)(4)(A) Applies To Amended Pleadings That Rely On Publically Disclosed Information Coming After The Complaint But Before The Amended Pleading That Is Based Upon Them**

At bottom, Ms. Bannon's argument is that "jurisdictional analysis need only take place when public disclosures exist prior to the time the lawsuit is filed." (*Relator's Memorandum* at 5-6). But the contention that all that counts is the chronological relationship between the public disclosure and the date of the filing of the case is incompatible with the FCA's "plain" language, *United States ex rel. Bledsoe*, 342 F.3d at 641, 647, and the goals of §3730(e)(4).[20] Sections 3730(e)(4)(A) and (B) provide that no court shall have jurisdiction "over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing...or from the news media, unless... the person bringing the action is an original source of the information." It is the dependence of the action, not the dependence of the *complaint,* on publicly disclosed information with which the statute is concerned. Here the present action is manifestly based upon the public disclosures in Exhibits A, B, and C and the 1996 Crain's article, which are "essential to the claim." *Mathews*, 166 F.3d at 864.

While the 1986 amendment to the FCA sought to encourage lawsuits based on information that

---

[20] In a statutory construction case when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished. *Carter v. United States,* 530 U.S. 255, 257 (2000); *Adminastar Federal Inc.,* 324 F.3d at 495; *First National Bank of Chicago v. Standard Bank and Trust* , 172 F 3d. 472, 476 (7th Cir. 1999). *See also,* Frankfurter, *Some Reflections on The Reading of Statutes,* 47 Col. L. Rev. 527, 543 (1947)("violence must not be done to the words chosen by the legislature.").

has not been publicly disclosed, *Feingold*, 324 F.3d at 495, Congress also intended that the courts not be flooded by suits brought by those wishing to capitalize on others' discovery of frauds, which they themselves had in no manner contributed to exposing. *Mathews*, 166 F.3d at 858. To allow Ms. Bannon to rely on publically disclosed information to make her case simply because disclosure came after her (unsustainable) complaint was filed is to make application of the public disclosure bar a function of a fortuity having no necessary relationship to the goals of the 1986 amendment. There is no principled difference between a *complaint* based upon information contained in public disclosures (of which Ms. Bannon was not a source) and an *amended complaint* that is based upon and can only be sustained by resort to that information. The goal of prohibiting parasitic suits requires application of the public disclosure bar in the latter case no less than in the former.

The cases that have considered the question in this case are contrary to Ms. Bannon's position. In *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 342 F.3d 634 (6th Cir. 2003), the amended complaint added more detailed allegations about fraudulent billing practices that had been the subject of a lawsuit filed after the relator had initiated his action. The court of appeals held that the public disclosure bar prevented the relator from proceeding with the eight new paragraphs of the amended complaint. As the Sixth Circuit phrased it, no "subject matter jurisdiction" lies for paragraphs 17-24. *Id.* at 645-46. *United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co.* explicitly rejected the kind of argument advanced here. It stressed that if the critical event were the date of the filing of the suit, the "jurisdictional limitation" in §3730(e)(4) could be "readily circumvented." 255 F.Supp.2d at 368. The focus must be on the temporal relationship between the disclosure of a given allegation and its appearance in a questioned pleading, "*not* with whether the public disclosure antedated the inception of [the] action." *Id.*

at 367, n.15. (Emphasis in original).

The Seventh Circuit's recent decision in *Gross* compels the rejection of Ms. Bannon's argument. There, the district court dismissed the amended complaint under Rule 9(b). The second amended complaint cured the problem by relying on a publicly disclosed letter from the FDA, even though the disclosure came after suit was filed, but before the filing of the second amended complaint. The district court dismissed the second amended complaint with prejudice, because of §3730(e)(4)'s "jurisdictional" bar –a decision the Seventh Circuit held was "entirely correct." 415 F.3d at 606.

The relator's attempt to distinguish *Gross* on the theory that it involved a technical violation of governmental regulations, while this case presumably deals with a more serious and sinister offense, is a non-starter. Ms. Bannon's second amended complaint, like Dr. Gross' third amended complaint did not involve mere technical non-compliance with administrative regulations, which in any event is not to be policed under the FCA, *Lamers,* 168 F.3d at 1020, and which, by hypothesis, is not false and thus does not violate the FCA. *Gross,* 415 F.3d at 604. In *Gross,* as here, the violations alleged went beyond technical violations of regulations. *Id.* at 604.

The attempted distinction suffers from a more fundamental flaw, for it would exempt from the operation of the public disclosure bar a whole class of violations – "technical violations" – whatever that means. The FCA is an anti-fraud statute. *Gross,* 415 F.3d at 604; *Lamers,* 168 F.3d at 1020. Section 3729 provides for monetary penalties for any person who "knowingly" presents to the government for payment or approval a "false or fraudulent" claim or conspires to "defraud" the government by getting such a claim paid or approved. A claim is either knowingly false or fraudulent under §3729(a) and (b) or it is not. If it is not, there is no violation of the FCA, even if there were violations of administrative regulations. If it

28

is, calling the violation "technical," adds nothing to the analysis, and affixing the label to the violation is not a basis for it to be exempted from the all-enveloping sweep of §3730(e)(4). That section does not distinguish among subspecies of false claims cases, allowing some to proceed, while disallowing others, and judges are not at liberty to improvise and create exceptions for which Congress did not provide. *Compare Cassidy v. Indiana Dept. Of Corrections*, 199 F.3d 374, 376 (7th Cir. 2000). So long as the action is based on public disclosures of which the relator is not the original source, "no court shall have jurisdiction" to entertain the case. §3730(e)(4)(A)-(B).

Finally, the pleadings in both cases suffered from the same defect: both failed to satisfy Rule 9(b), and in both cases the relators tried to cure the problem by relying on information that had been publically disclosed after the filing of the complaint but before the amended pleading.[21] In so doing, both Dr. Gross and Ms. Bannon not only triggered §3730(e)(4),but ran afoul of a core purpose of Rule 9(b). The Rule, which the plaintiff concedes applies to FCA cases,[22] serves three main purposes: (1) to protect a defendant's reputation from harm; (2) to provide notice of the claim to the adverse party; and (3) to minimize "strike suits" and "fishing expeditions," *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1327 (7th Cir. 1994); *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 777 (7th Cir. 1994), and to prevent a claimant from searching for a valid claim after a civil action has been commenced. 2 James Wm. Moore

---

[21] In *Gross*, the *qui tam* action commenced on November 13, 2002; the second amended complaint was filed on April 14, 2003. The document in the second amended complaint was publicly disclosed in the interim, on December 9, 2002. 2004 WL 905952, at *1, *4.

[22] The Circuits are uniform in applying Rule 9(b) to FCA cases, *Gross*; *United States ex rel. Bledsoe*, 342 F.3d at 642 n.7, and do not relax Rule 9(b)standards on a theory that the defendant has more knowledge of the fraud than does the relator. *See, e.g., United States ex rel. Clausen v. Laboratory Corp. of America*, 290 F.3d 1301, 1308 (11th Cir. 2002); *United States ex rel. Karvelas v. Melrose-Wakefield Hospital*, 360 F.3d 220, 227 (1st Cir. 2004).

et al., Moore's Federal Practice § 9.03[1][a] (3d ed.2003). Acceptance of Ms. Bannon's argument would frustrate the latter aims, which are consonant with the design of the 1986 amendment to the FCA to "prevent 'parasitic' *qui tam* actions in which relators, rather than bringing to light independently discovered information of fraud, simply feed off of previous disclosures." *United States ex rel. Bledsoe*, 342 F.3d at 646.[23]

Dismissing the third amended complaint is not tantamount to saying that a relator must affirmatively plead compliance with the public disclosure bar – a requirement that Judge Lindberg has rejected.[24] Rather, this is a case in which the relator has "pled h[er]self out of court." *Lekas v. Briley*, 405 F.3d 602, 613 (7th Cir. 2005). *See also Atkinson*, 255 F.Supp.2d at 351. ("While . . . I am free to look beyond the four corners of relator's [FCA] complaint to resolve the question of what the government knew when, I find such to be unnecessary in the present context" in light of the "plaintiff's own account").

The third amended complaint makes it plain (and the relator's responsive brief concedes) that the allegations added to overcome the previous dismissal are based upon publicly disclosed information. A

---

[23] Ms. Bannon's argument that Rule 9(b) need not be complied with in this case because EMC already knows what it did – a point vigorously disputed by EMC – impermissibly assumes liability and puts out of view Rule 9's other goals. A variation of this argument was rejected by Judge Lindberg. (*Bannon Memorandum* Ex. 4 at 8; *Edgewater Reply Memorandum* at 6). If the current argument were accepted, Rule 9(b) motions would often entail a kind of mini-trial on the extent of the defendant's knowledge. Nothing in the text or history of the Rule envisions so collateral and time consuming an endeavor.

[24] Whether calling the public disclosure bar a matter of "substantive law" imposes some pleading requirement on the plaintiff or makes it a defense to be raised by the defendant – *Hughes Aircraft* used the word "defense" more than once – is uncertain. No case of which I am aware has considered the issue from either side. Requiring a relator to affirmatively plead compliance with the public disclosure bar would impose no burden on the relator and would be consistent with the ordinary rule, based on considerations of fairness, that a litigant does not have the burden of establishing facts peculiarly within the knowledge of his adversary. *Campbell v. United States*, 365 U.S. 85, 96 (1961).

30

court is not required to ignore facts alleged in the complaint that undermine a plaintiff's claim, *Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir. 1992), and "a plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts." *Jackson v. Marion County*, 66 F.3d 151, 153 (7th Cir. 1995). *Accord Roger Whitmore's Auto. Services, Inc. v. Lake County, Illinois*, 2005 WL 2297307, *13 (7th Cir. Sept. 22, 2005)(plaintiff pleaded himself out of making an evidentiary showing inconsistent with his allegations). *Cf.*, Rule 12(c), Federal Rules of Civil Procedure (judgment of the pleadings).

The cases on which Ms. Bannon relies did not consider whether "jurisdictional analysis need only take place when public disclosures exist prior to the time the lawsuit is filed," (*Relator's Memorandum* at 5-6), or the more specific issue of whether a relator may rely upon public disclosures coming after a complaint was filed, but prior to an amended pleading that is based on those disclosures and that was necessitated by the dismissal of the complaint under Rule 9(b). Thus they are not helpful here, for prior cases have precedential value only when there has been a deliberative consideration of the issue at hand. *Sub-silentio* or assumptive resolution is not enough. *See e.g.*, *City of Kenosha v. Bruno*, 412 U.S. 507, 512-13 (1973); *United States v. More*, 7 U.S. 159 (1805); *Erie County Retirees Assn. v. The County of Erie, Pennsylvania*, 220 F.3d 193, 219 (3rd Cir. 2000)(Shadur, J., dissenting)(collecting cases); *Kramer v. Scientific Control Corp.*, 534 F.2d 1085, 1090 (3d Cir. 1976).

In *United States ex rel. Dunleavy v. County of Delaware*, 123 F.3d 734, 740 (3rd Cir. 1997), the court merely held that certain documents did not constitute public disclosures. The issue of whether "jurisdictional analysis need only take place when public disclosures exist prior to the time the lawsuit is filed" (*Relator's Memorandum* at 5-6) simply was not presented, for the claimed public disclosures in fact

occurred prior to the filing of the *qui tam* action, thereby making unnecessary any inquiry regarding post-filing disclosures. Similarly, in *United States ex rel. McKenzie v. Bell South Telecom., Inc.*, 123 F.3d 935 (6th Cir. 1997), there was no doubt that the disclosures were made public prior to the initiation of the *qui tam* action. *Id.* at 940. *United States ex rel. Precision Co. v. Koch Industries, Inc.*, 971 F.2d 548 (10th Cir. 1992) undercuts Ms. Bannon's position. The issue there was whether the public disclosure bar applied "only to actions based 'solely' upon publicly disclosed information." *Id.* at 552. Rejecting the relator's contention, the court held that "Congress never intended a *qui tam* plaintiff to benefit in whole or in part upon publicly disclosed allegations or transactions unless that plaintiff can demonstrate he was an original source as defined by statute." *Id.* at 553. Finally, in *United States ex rel. Williams v. NEC*, 931 F.2d 1493 (11th Cir. 1991), the relator was a government employee who gained the information at issue through his employment. The court rejected a "dual status theory," whereby, when the government employee uses official information as a private citizen, he has disclosed the information to himself, such that a "public disclosure" had occurred. *Id.* at 1499. Still, the employee in that case "disclosed" the information when he filed suit; not after. *Id.* at 1500 n.11.

The only remaining question is whether dismissal of the third amended complaint should be with prejudice. EMC insists it must, and I agree. This is the relator's fourth go at it. Judge Lindberg dismissed the second amended complaint under Rule 9(b), and the relator has been unable to cure the deficiencies without violating the public disclosure bar. *Gross* and *Mathews* affirmed dismissals with prejudice. Nothing in this case calls for a different result, and the relator's responsive brief does not even hint at the possibility of a cure. Where the plaintiff cannot cure the defects in a complaint, dismissal with prejudice is appropriate.

*Strong v. David*, 297 F.3d 646, 648 (7th Cir. 2002).

## CONCLUSION

The defendant's motion to dismiss [# 100] the third amended complaint with prejudice is GRANTED pursuant to 31 U.S.C. §§3730(e)(4)(A)-(B). In light of this disposition, it is unnecessary to reach EMC's argument that the third amended complaint does not satisfy the requirements of Rule 9(b). Also, in light of this disposition, EMC's motions to compel the deposition of plaintiff [55], to respond to document requests, requests to admit and interrogatories [60], and to compel deposition of Sidney Berger [65] and are denied as moot. EMC's motion for sanctions [69] is denied.

ENTERED:

_____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 11/30/05